David A. Bahr (OSB No. 90199)
Bahr Law Offices, P.C.
1035 ½ Monroe Street
Eugene, OR  97402
(541) 556-6439 Voice
davebahr@mindspring.com
*Pro Hac Vice*

Lisa T. Belenky (CSB No. 203225)
Center for Biological Diversity
351 California St., Suite 600
San Francisco, CA 94104
(415) 436-9682 x307 Voice
lbelenky@biologicaldiversity.org

Erik Schlenker-Goodrich (New Mexico Bar No. 7875)
Western Environmental Law Center
P.O. Box 1507
Taos, New Mexico 87571
(575) 613-4197 Voice
eriksg@westernlaw.org
*Pro Hac Vice*

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT FOR THE

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CENTER FOR SIERRA NEVADA CONSERVATION, CENTER FOR BIOLOGICAL DIVERSITY, and FOREST ISSUES GROUP, non-profit corporations, | CASE NO.:  2:09-cv-2523-LKK-JFM |
| | **PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |
| Plaintiffs, | |
| v. | Oral Argument Requested<br>Note on Motion Calendar: March 28, 2011 |
| RAMIRO VILLALVAZO, in his official capacity as Forest Supervisor for the Eldorado National Forest, UNITED STATES FOREST SERVICE, | Courtroom 4 |
| | Hon. Lawrence K. Karlton |
| Defendants. | |

**TABLE OF CONTENTS**

Table of Contents ...............................................................................................................i

Table of Authorities .........................................................................................................iv

I.     Introduction ....................................................................................................1

II.    Legal Framework ..............................................................................................2

       A.    The National Forest Management Act, the Sierra Nevada Forest Planning
             Amendment and the Eldorado National Forest Plan..................................... 2

       B.    The Travel Management Rule and ORV Executive Orders .............................. 2

       C.    The National Environmental Policy Act .......................................................5

       D.    The Endangered Species Act ...................................................................... 6

III.   Factual and Procedural Background .....................................................................6

IV.    Standard of Review .........................................................................................9

V.     Plaintiffs Have Standing to Bring this Action ..................................................... 10

VI.    Argument ....................................................................................................10

       A.    The Forest Service Failed to Identify the Minimum Road System Before
             Designating ORV Travel Routes on the Eldorado National Forest.....................10

             1.    Subpart A of the Travel Management Rule Obligates the Forest Service
                   to Identify the Eldorado's Minimum Road System .............................10

             2.    The Forest Service Failed to Provide a Legally Adequate Minimum
                   Road System Designation ...........................................................12

       B.    The Forest Service's Decision Lacks the Site-Specific Analysis Required by Law ...............15

             1.    NEPA and the Travel Planning Rule Require Site-Specific Analysis
                   Prior to the Designation of Specific Motorize Roads and Trails ..............15

             2.    The FEIS Fails to Provide the Site-Specific Analysis Required by Law..............17

                   a.    The FEIS relies upon incomplete and inappropriate data ..........................17

                   b.    The FEIS fails to account for site-specific impacts of erosion
                         and sedimentation related to hillslope stability and soils ...........................17

                   c.    The FEIS Fails to Look at Site-Specific Impacts on Aquatic Habitat .........20

       C.    Defendants' Failure to Explain and Ensure Consistency with Forest Plan
             Requirements Violates NFMA and NEPA ...................................................... 21

       D.    The Forest Service Failed to Consider an Adequate Range of Alternatives ....................... 22

1        1.   An EIS Must Include a Reasonable Range of Alternatives…………….………..22

2        2.   The Forest Service Should have Considered an Alternative that Did Not
3          Authorize Any User-Create Routes………………………………………….......24

4   E.   The Forest Service Failed to Consult on Effects to Threatened Red-Legged Frogs in
     Violation of the ESA ……………………………………………………………..…24

5        1.   The Forest Service's "May Affect" Determination Triggered ESA Consultation
6          Requirements ...………………………………………...………………….....25

7        2.   The Forest Service Cannot Rely on the 2007 Concurrence to Avoid
       Consultation …………………………………………………………….....27

8   VII.   Conclusion ...………..………………………………………………………29

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## TABLE OF AUTHORITIES

2

## CASES

3

*California v. Bergland,*
483 F. Supp. 465 (E.D. Cal. 1980) .......................................................................................... 15

4

*California v. Block,*
690 F.2d 753 (9th Cir. 1982) ...................................................................... 15, 16, 23, 24

5

6

*Cal. ex rel. Lockyer v. United States Department of Agriculture,*
575 F.3d 999 (9th Cir. 2009) ............................................................................................ 25, 28

7

*Center for Biological Diversity v. National Highway Traffic Safety Administration,*
538 F.3d 1172 (9th Cir. 2008) .......................................................................................... 23

8

9

*Center for Biological Diversity v. United States Forest Service,*
349 F.3d 1157 (9th Cir. 2003) ............................................................................................ 5

10

*Center for Biological Diversity v. Bureau of Land Management,*
2009 U.S. Dist. LEXIS 90016 (N.D. Cal. Sept. 28, 2009) .................................................. 5, 23

11

12

*Churchill County v. Norton,*
276 F.3d 1060 (9th Cir. 2001) ............................................................................................ 15

13

*Citizens for a Better Henderson v. Hodel,*
768 F.2d 1051 (9th Cir. 1985) ............................................................................................ 24

14

15

*City of Tenakee Springs v. Clough,*
915 F.2d 1308 (9th Cir. 1990) ............................................................................................ 24

16

*Conner v. Burford,*
848 F. 2d 1441 (9th Cir. 1988) ............................................................................................ 18

17

18

*Environmental Protection Information Center v. United States Forest Service,*
451 F.3d 1005 (9th Cir. 2006) ............................................................................................ 9

19

*Idaho Conservation League v Mumma,*
956 F.2d 1508 (9th Cir. 1992) ............................................................................................ 10

20

21

*Kern v. Bureau of Land Management,*
284 F.3d 1062 (9th Cir. 2002) ............................................................................................ 15

22

*Montana Wilderness Association v. McAllister,*
658 F. Supp. 2d 1249 (D. Mont. 2009) ............................................................................ 16

23

24

*Motor Vehicle Manufacturers Ass'n of the United States, Inc. v. State Farm Mutual Automobile Insurance Co.,*
463 U.S. 29 (1983) ............................................................................................................ 9, 14

25

26

*Muckleshoot Indian Tribe v. United States Forest Service,*
177 F.3d 800 (9th Cir. 1999) ............................................................................................ 22

27

28

*Neighbors of Cuddy Mountain v. United States Forest Service*,
137 F.3d 1372 (9th Cir. 1998) ................................................................................ 16

*New Mexico ex rel. Richardson v. Bureau of Land Management*,
565 F.3d 683 (10th Cir. 2009) ................................................................................ 24

*Oregon Natural Desert Association v. Bureau of Land Management*,
531 F.3d 1114 (9th Cir. 2008) ........................................................................ 23, 24

*Pacific Rivers Council v. Thomas*,
30 F.3d 1050 (9th Cir. 1994) ................................................................................ 27

*Robertson v. Methow Valley Citizens Council*,
490 U.S. 332, 349 (1989) ...................................................................................... 13

*Salmon River Concerned Citizens v. Robertson*,
32 F.3d 1346 (9th Cir. 1994) ................................................................................ 16

*Sierra Club v. Thomas*,
105 F.3d 248 (6th Cir. 1997) .................................................................................. 5

*Tennessee Valley Authority v. Hill*,
437 U.S. 153, 185 (1978) ........................................................................................ 6

*Western Watersheds Project v. Kraayenbrink*,
2010 U.S. App. LEXIS 18250 (9th Cir. Sept. 1, 2010) ............................... 5, 27, 28

**STATUTES**

5 U.S.C. § 706(2) .................................................................................................... 9

16 U.S.C. § 1531(b) ................................................................................................ 6

16 U.S.C. § 1536(a) .................................................................................. 6, 24, 27, 29

16 U.S.C. § 1540(g) .............................................................................................. 10

16 U.S.C. § 1604(i) ............................................................................................ 2, 21

42 U.S.C. § 4332(2) ...................................................................................... 5, 15, 22

**ADMINISTRATIVE MATERIALS**

43 C.F.R. § 8342.1 ................................................................................................... 5

36 C.F.R. § 212.5 ......................................................................................... 3, 10, 14

36 C.F.R. § 212.55 .................................................................................... 4, 5, 11, 24

36 C.F.R. § 220.4 ................................................................................................... 15

40 C.F.R. § 1500.1 ............................................................................................. 5, 15

40 C.F.R. § 1502.1 .................................................................................................... 15

40 C.F.R. § 1502.15 ............................................................................................. 15, 21

40 C.F.R. § 1502.16 .................................................................................................. 15

40 C.F.R. § 1508.8 ............................................................................................... 15, 21

40 C.F.R. § 1508.14 .................................................................................................. 15

50 C.F.R. § 402.12 ..................................................................................................... 6

50 C.F.R. § 402.13 ................................................................................................. 6, 27

50 C.F.R. § 402.14 ................................................................................. 6, 25, 27, 29

51 Fed. Reg. 19,926 (June 3, 1986) ........................................................................ 28

37 Fed. Reg. 2877 (Feb. 8, 1972) ............................................................................ 2

42 Fed. Reg. 26,959 (May 24, 1977) ....................................................................... 3

61 Fed. Reg. 25813 (May 23, 1996) ......................................................................... 7

66 Fed. Reg. 3219 (Jan. 12, 2001) ........................................................................... 3

70 Fed. Reg. 68264 (Nov. 9, 2005) ............................................................. 2, 3, 4, 16

Exec. Order No. 11644 .............................................................................................. 3

1   **I.      INTRODUCTION**

2          In the management of our shared public lands, one of the most difficult issues is the question of

3   what areas should and should not be open to motorized vehicles, in particular off-road vehicles

4   ("ORVs" or "OHVs").[1]   In this case, notwithstanding clear statutory, regulatory and executive

5   directives to identify and establish the minimal necessary road network for a given national forest, and

6   to minimize impacts of ORV use on forest resources, Defendants (collectively, "the Forest Service")

7   approved a travel plan for the Eldorado National Forest that adds well over 1,000 miles of previously

8   unauthorized motorized-vehicle routes and utterly fails to minimize the impacts of ORVs on sensitive

9   forest resources.

10         Plaintiffs Center for Sierra Nevada Conservation, Center for Biological Diversity and Forest

11  Issues Group (collectively "Plaintiffs") bring this challenge in an attempt to restore a lawful balance to

12  ORV management on the Eldorado National Forest.  Specifically, Plaintiffs challenge as arbitrary and

13  unlawful the Forest Service's (1) approval of the Eldorado National Forest Public Wheeled Motorized

14  Travel Management ROD ("Eldorado Travel Planning decision"), dated March 31, 2008; (2) FEIS for

15  the Eldorado Travel Planning decision dated March, 2008; and (3) the June 27, 2008, denial of

16  Plaintiffs' administrative appeals of the Eldorado Travel Planning decision.  Taken together, these

17  actions have resulted in the designation of well over miles of routes across the Eldorado National Forest

18  as open for motorized vehicle use.

19         As detailed below, the Forest Service's actions violate the procedural and substantive

20  requirements of the National Environmental Policy Act ("NEPA"), the National Forest Management

21  Act ("NFMA"), the Endangered Species Act ("ESA"), and relevant executive orders, as well as the

22  agency's own regulations governing travel management on national forests.  Plaintiffs seek an order

23  setting aside the Forest Service's unlawful decision and remanding to the agency to issue a new

24  decision consistent with the law.

25

26

27  [1] The terms off-road vehicles ("ORVs") and off-highway vehicles ("OHVs") are generally synonymous
    and are used interchangeably here.  Specifically, they refer to vehicles designed to travel cross-country

28  and on roads and trails not suitable for street-legal passenger vehicles.

## II.    LEGAL FRAMEWORK

### A.    The National Forest Management Act, The Sierra Nevada Forest Planning Amendment And The Eldorado National Forest Plan

Under the National Forest Management Act ("NFMA"), all forest uses must be "consistent with land management plans." 16 U.S.C § 1604(i). As explicitly set forth by the Forest Service Travel Management Rule ("TMR"), route designations for ORVs must "be consistent with the applicable land management plan." 70 Fed. Reg. 68264, 68268 (Nov. 9, 2005).  In 2001, and as amended in 2004, the Forest Service issued what is commonly known as the Sierra Nevada Forest Planning Amendment ("SNFPA"). AR 010938. The SNFPA amended the land management plans for 11 national forests, including the Eldorado National Forest Plan ("ENF Plan"). The SNFPA governs the management of the forests within its geographic reach, and consists of extensive standards, guidelines and land allocations that comprise a comprehensive management strategy. AR 010986. These measures replace any conflicting standards and guidelines in the ENF Plan, unless such existing plan standards and guidelines are more restrictive.  Relevant here, the SNFPA established guidelines for the management of activities, such as ORV use, in aquatic and riparian areas.  Any lawful decision affecting such areas must therefore be consistent with the SNFPA.

### B.    The Travel Management Rule and ORV Executive Orders

The Forest Service's duties to conserve the environment in the face of ORV degradation stretches back to at least the 1970s. In 1972, President Richard Nixon signed Executive Order 11644: "Use of off-road vehicles on the public lands." The Order explains that:

> The widespread use of [off-road] vehicles on the public lands – often for legitimate purposes but also in frequent conflict with wise land and resource management practices, environmental values, and other types of recreational activity – has demonstrated the need for a unified Federal policy toward the use of such vehicles on the public lands.

Exec. Order No. 11644, § 1; 37 Fed. Reg. 2877 (Feb. 8, 1972). Section 3 of the Executive Order mandates that agencies such as the Forest Service designate "specific areas and trails on public lands on which the use of off-road vehicles may be permitted, and areas in which the use of off-road vehicles may not be permitted…." *Id.* § 3. The Order also requires that agency-specific off-road vehicle regulations "shall be in accordance with" a series of conservation-oriented designation criteria which

obligate the Forest Service to "minimize" adverse impacts to forest resources and "minimize conflicts" between off-road vehicle use and other forest users.[2]

In 2001, the Forest Service approved a Road Management Strategy ("Roads Policy"). 66 Fed. Reg. 3219 (Jan. 12, 2001) (subsequently codified at 36 C.F.R. § 212.5(b)(1)). The Roads Policy provides a framework for assessing and reducing the impacts of a given national forest's road system. The policy established a more ecologically sound approach to roads management than that which had previously existed, and was meant to shift the Forest Service's focus from expanding its road system to management of a more efficient, affordable, safer and environmentally responsible road system. *Id.*

Most relevant here, the Roads Policy requires the agency to determine the "minimum road system needed for safe and efficient travel and for utilization, and protection of National Forest System lands." 36 C.F.R. § 212.5(b)(1). In addition, the Roads Policy emphasizes the need to harmonize the road system with forest management objectives and to decommission unneeded roads. Accordingly, each Forest Supervisor, "must review the road system on each National Forest  . . . and identify the roads . . . that are no longer needed to meet forest resource management objectives and that, therefore, should be decommissioned or considered for other uses, such as for trails." 36 C.F.R. § 212.5(b)(2).

In 2005, the Forest Service promulgated a "Travel Management Rule" ("TMR") to "implement" Executive Order 11644, as amended by Executive Order 11989, by requiring stricter management of ORV use on forest lands. 70 Fed. Reg. 68264 (Nov. 9, 2005). The TMR revised portions of the 2001 Road Policy and consolidated otherwise disparate sections of Forest Service regulations into 36 C.F.R Part 212. Under 2005 TMR, the 2001 Roads Policy requirement to establish a minimum road system is now contained in "Subpart A" of the regulations, and additional ORV-specific rules were promulgated and are contained in "Subpart B" of 36 C.F.R. Part 212.

The determination of a minimum road system under Subpart A and designation of routes for motor vehicles under Subpart B are now part of a coordinated strategy to address the unmanaged

---

[2] On May 24, 1977, President Carter signed Executive Order 11989 which amended Executive Order 11644, adding Section 9. Section 9 obligates the Forest Service to "immediately close" areas or trails "causing considerable adverse effects" to conservation resources. Exec. Order No. 11989, § 2; 42 Fed. Reg. 26,959 (May 24, 1977).

1  recreation and under-maintained road system that had resulted from decades of increasing and under-

2  regulated ORV use on the national forests. In so doing, the TMR provides a coherent "national

3  framework under which [ORV] designations are made at the local level." 70 Fed. Reg. at 68265.

4         The TMR mandates that each National Forest eliminate cross-country recreational ORV use and

5  restrict off-road motorized vehicle use to specific roads and trails designated for that purpose. 36 C.F.R.

6  § 212.55(a). The Forest Service explained that the TMR revision was necessary because:

7         Current regulations at 36 CFR part 295, which provide for allowing, restricting, or
          prohibiting motor vehicle travel, were developed when OHVs were less widely
8         available, less powerful, and less capable of cross-country travel than today's models.
          The growing popularity and capabilities of OHVs demand new regulations, so that the
9         Forest Service can continue to provide these opportunities while sustaining the health of
          [National Forest System] lands and resources.
10

11  70 Fed. Reg. at 68265; *see also id.* ("the magnitude and intensity of motor vehicle use have increased to

12  the point that the intent of [Executive Order] 11644 and [Executive Order] 11989 cannot be met while

13  still allowing unrestricted cross-country travel").

14         Under the TMR, when designating routes that will be open to ORV use, the Forest Service:

15         shall consider effects on National Forest System natural and cultural resources, public
          safety, provision of recreational opportunities, access needs, conflicts among uses of
16         National Forest System lands, the need for maintenance and administration of roads,
          trails, and areas that would arise if the uses under consideration are designated; and the
17         availability of resources for that maintenance and administration.

18

19  36 C.F.R. § 212.55(a). These ORV route designations must reflect the Executive Orders' substantive

20  mandate obligating the Forest Service to minimize damage to soils, watersheds, and other resources;

21  minimize disruption of wildlife and their habitat; and minimize conflicts with other recreational uses.

22  36 C.F.R. § 212.55(b)(1)-(4). Additionally, the Forest Service must consider the "[c]ompatibility of

23  motor vehicle use with existing conditions in populated areas, taking into account sound, emissions, and

24  other factors." *Id.* at § 212.55(b)(5).

25         Recently, the Northern District of California decided a case involving the parallel Bureau of

26  Land Management ("BLM") travel management regulations implementing the same Executive Orders.

27  The court's decision confirms that a failure to show specifically how the minimization criteria are

28  reflected in route designation decisions is fatal to a decision implementing the regulations and Orders.

*Ctr. for Biological Diversity v. BLM*, 2009 U.S. Dist. LEXIS 90016 (N.D. Cal. Sept. 28, 2009) (finding BLM failed to demonstrate that "minimization criteria were in fact applied when OHV routes were designated"); *compare* 43 C.F.R. § 8342.1 (BLM regulations) *with* 36 C.F.R. § 212.55(b) (Forest Service regulations). As the court further explained:

> Nor does the fact that the BLM closed almost two-thirds of the evaluated routes constitute evidence that the BLM complied with 43 C.F.R. § 8342.1. "Minimize" as used in the regulation does not refer to the number of routes, nor their overall mileage. It refers to the **effects** of route designations, i.e. the BLM is required to place routes *specifically* to minimize "damage" to public resources, "harassment" and "disruption" of wildlife and its habitat, and minimize "conflicts" of uses.

*CBD v. BLM*, No. C 06-4884-SI, Opinion and Order at 62 (**bold** emphasis in original, *italicized* emphasis added).

## C.   The National Environmental Policy Act

The National Environmental Policy Act ("NEPA") is the "basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a). NEPA "help[s] public officials make decisions that are based on [an] understanding of environmental consequences, and take actions that protect, restore, and enhance the environment." *Id.* at § 1500.1(c). NEPA directs federal agencies to prepare a detailed environmental impact statement ("EIS") for major federal actions that may significantly affect the quality of the environment. 42 U.S.C. § 4332(2)(C). The EIS must address all adverse environmental effects which cannot be avoided should the proposal be implemented, alternatives to the proposed action, potential mitigation measures, and any irreversible and irretrievable commitment of resources which would be involved. *Id.*

The information presented in an EIS must be of high quality. 40 C.F.R. § 1500.1(b). "Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA." *Id.* "It is [a court's] role to see that important legislative purposes are not lost or misdirected in the vast hallways of the federal bureaucracy." *Sierra Club v. Thomas*, 105 F.3d 248, 250 (6th Cir. 1997). "The procedures prescribed both in NEPA and the implementing regulations are to be strictly interpreted 'to the fullest extent possible' in accord with the policies embodied in the Act . . . '[g]rudging, *pro forma* compliance will not do.'" *Ctr. for Biological Diversity v. U.S. Forest Serv.*, 349 F.3d 1157, 1166 (9th Cir. 2003) (citations omitted).

D.      The Endangered Species Act

Congress enacted the Endangered Species Act ("ESA") in 1972 to provide a program for the conservation of threatened and endangered species and the ecosystems upon which those species depend. 16 U.S.C. § 1531(b); *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 185 (1978). To implement this purpose, Section 7 of the ESA requires that all federal agencies "in consultation with" the U.S. Fish & Wildlife Service ("FWS") "insure that any action authorized, funded, or carried out" by the agency "is not likely to jeopardize the continued existence" of any listed species. 16 U.S.C. § 1536(a)(2); *see W. Watersheds Project v. Kraayenbrink*, 2010 U.S. App. LEXIS 18250, *56 (9th Cir. Sept. 1, 2010) (describing Section 7(a)(2) as "the heart of the ESA" and explaining consultation).

Under Section 7, a federal agency proposing an action (the "action agency") first determines whether the action "may affect" a listed species, and if so, "consultation is required." 50 C.F.R. § 402.14(a). Next, the action agency must decide whether to initiate formal or informal consultation with FWS. To make this determination, the agency typically prepares a "biological assessment" ("BA") evaluating how the action will affect listed species, using "the best scientific and commercial data available." *Id.* § 402.12(a), (k); 16 U.S.C. § 1536(a)(2). If the action agency concludes the action is "likely to adversely affect" a listed species, the agency must formally consult with FWS. 50 C.F.R. § 402.14(a). During formal consultation, FWS prepares a "biological opinion" evaluating whether the proposed action is likely to jeopardize the continued existence of the species. *Id.* § 402.14(h)(3).

Alternatively, if the action agency determines in its BA that the proposed action "may affect," but is "not likely to adversely affect" listed species, the agency may seek informal consultation with FWS. Informal consultation includes "discussions and correspondence" between FWS and the action agency, and if (but only if) FWS issues a "written concurrence" agreeing with the action agency's not likely to adversely affect determination, consultation is complete, and Section 7 is satisfied. 50 C.F.R. § 402.13(a).

III.    FACTUAL AND PROCEDURAL BACKGROUND

The Eldorado National Forest ("ENF" or "Forest"), located in the heart of the Sierra Nevada mountain range, is situated in central California, east of Sacramento and west of Lake Tahoe. Parts of Alpine, Amador, Eldorado, and Placer Counties lie within the ENF. The Forest contains a total of over

789,994 acres of forestlands of diverse topography, soil type, vegetation, and habitat type.  The Forest is located just one hour from the metropolitan area of Sacramento with a population of over one million people, and two to three hours driving time from the San Francisco Bay area with a population of over six million.

The Forest provides habitat for numerous endangered, threatened, and sensitive wildlife species, species of concern, and management indicator species, including the Bald eagle, California red-legged frog, California spotted owl, Great gray owl, Northern goshawk, Willow flycatcher, Pacific fisher, American marten, Sierra Nevada red fox, California wolverine, Foothill yellow-legged frog, Mountain yellow-legged frog, Northwestern pond turtle, Yosemite toad, Mule deer, and assorted species of trout.

Of all the sensitive species in the ENF, among the most imperiled is the California red-legged frog (*Rana aurora draytonii*) ("red-legged frog" or "frog") which was listed as threatened under the Endangered Species Act ("ESA") in 1996.  61 Fed. Reg. 25813 (May 23, 1996).  The Forest contains essential recovery habitat for the red-legged frog.  *See* FWS, Recovery Plan for the California Red-legged Frog (2002) (AR 015835) (providing a roadmap for recovery of the species).  The red-legged frog is the largest frog in the western United States. AR 015844. The species is named for the red coloring on its hind legs and abdomen.[3] *Id.*  Although its range once covered nearly the length of California from the coast to the Sierra Nevada mountains, the species has been extirpated from 70 percent of its original range. Recovery Plan at 4-5 (AR 015846-47).

The current status of red-legged frogs in the Sierra Nevada is largely unknown because "[m]uch of the Sierra Nevada range is unsurveyed." *Id.* at 7 (AR 015844). However, in 2002 FWS deemed the Sierra Nevada population of red-legged frogs to have "low" recovery status, meaning there are "[f]ew existing populations" and "high levels of threats." *Id.* at 45 (AR 015887). FWS has specifically identified "recreation and off road vehicles" as a primary threat to the Sierra Nevada red-legged frog population. *Id.* at 22 (AR 015864). ORV use can "damage riparian vegetation, increase siltation to pools, compact soils, disturb in stream channels and crush" red-legged frogs. *Id.* In fact, FWS found that red-legged frogs "were eliminated" in several rivers in California due, in part, to "off road vehicle

---

[3] Scientists and historians believe that California red-legged frogs inspired Mark Twain's short story "Celebrated Jumping Frog of Calaveras County." AR 015840.

activities." *Id.*

Although there have been no forest-wide frog surveys, there have been 20 detections of red-legged frogs on or near the ENF since 1974, all along the Forest's western border. FEIS at 3-184 (AR 002681). Forest Service mapping indicates that there are 150 miles of perennial streams and 50 waterbodies that provide potential breeding habitat in the Forest, and an additional 12 miles of seasonal streams that provide potential non-breeding habitat. *Id.* Further, the Recovery Plan for the species identifies two "core" habitat areas within the Forest that were selected to protect viable frog populations or because the locations provide for key habitat connectivity and dispersal of frog populations. Recovery Plan at 50, 133 (AR 015892, 015974).

On July 20, 2007, the Forest Service published its Eldorado National Forest Public Wheeled Motorized Travel Management Draft Environmental Impact Statement ("DEIS"), proposing to prohibit motorized cross country travel and to designate certain roads and trails as open to motor vehicle use. ROD at 13 (AR 03275). Specifically, the agency considered whether roads previously designated as Maintenance Level 1 ("ML-1") and ML-2 and previously unauthorized, user-created routes should be designated as open for motorized vehicle use.[4] DEIS at iv, x (AR 001481, 001487). ML-1 roads are "intermittent service roads" not intended for public motorized traffic. *See* FEIS at 4-22 (AR 002843). ML-2 roads are open for high-clearance vehicles. *Id.* "Unauthorized routes" are roads or trails created by OHV or resource users that were never adopted as part of the official National Forest Transportation System. *Id.* at 3-206 (AR 002703).

The DEIS did not discuss the Subpart A minimum road system determination requirement, but proposed five alternatives that would designate between 1,141 and 888 miles of routes for motorized use, including designating between 17 and 45 miles of previously unofficial, unauthorized routes for

---

[4] The agency states throughout its FEIS that it is only considering motorized vehicle use on ML-1, ML-2, and unauthorized routes, not ML-3 to -5 roads that are maintained for passenger cars. *See* FEIS at ix ("[e]xisting NFS roads managed for standard four wheel passenger vehicles (NFS ML-3 to -5 surfaced roads) are already regulated by state and federal law. Therefore motorized use of such roads will not be reconsidered in this proposal."); *id.* at xviii ("The miles of [ML-3 to -5] roads are not included in the total miles shown for each alternative below."). The agency ultimately downgraded some ML-3 roads to ML-2, but does not explain how this change affects its decision. *See* FEIS at 2-30; 2-8 (AR 002477; 002455).

1   motorized use. DEIS at xiv (AR 001491). In the DEIS, the agency's "Preferred Alternative" was

2   Alternative D, which would have designated 1,061 miles of routes for motorized use, including 34.8

3   miles of previously unauthorized routes, which, when added to the ML-3, ML-4 and ML-5 roads that

4   were not part of the analysis, resulted in a grand total of 1,545 miles of motorized routes across the

5   Forest. DEIS at 35, 41 (AR 001541, 001547).

6      On March 31, 2008, defendants approved the Eldorado National Forest Public Wheeled

7   Motorized Travel Management ROD and FEIS. (AR 003270). The ROD adopts a new Alternative,

8   Modified Alternative B, which authorizes 1,212 miles of routes for motorized use, including 23 miles

9   of previously unauthorized routes, which, when added to the ML-3, ML-4 and ML-5 roads resulted in a

10  total of 1,847 miles of motorized routes across the Forest. FEIS at 2-28 (AR 002475). This includes

11  nearly 40 miles of routes on soils susceptible to erosion, 4 miles of routes within meadows, 290 miles

12  of routes within riparian areas with 485 stream crossings, and four routes in federally-listed red-legged

13  frog suitable habitat. FEIS at 3-28; 3-75 (AR 002525; 002572); 2008 Biological Evaluation at 27-28

14  (AR 012777-78). Plaintiffs filed an administrative appeal challenging the ROD and FEIS, and on June

15  27, 2008, defendants denied plaintiffs' administrative appeals. (AR 000321; 000804).

16  **IV.   STANDARD OF REVIEW**

17     Judicial review of this case arises under both the APA and the ESA. "Agency decisions that

18  allegedly violate [the] NEPA and [the] NFMA are reviewed under the . . . [APA], and may be set aside

19  only if they are 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

20  law.'" *Envtl. Prot. Info. Ctr. v. U.S. Forest Serv.,* 451 F.3d 1005, 1008-09 (9th Cir. 2006) (quoting 5

21  U.S.C. § 706(2)(A)). Although the "arbitrary and capricious" standard of review is deferential, the

22  agency must "articulate a satisfactory explanation for its action including a 'rational connection

23  between the facts found and the choice made,'" and this Court must "consider whether the decision

24  was based on a consideration of the relevant factors and whether there has been a clear error of

25  judgment." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43

26  (1983) (citations omitted).  Additionally, separate from the APA, the citizen suit provision of the ESA

27  provides that any person may commence a suit "to enjoin any person, including the United States and

28  any other  . . . agency . . . , who is alleged to be in violation of any provision of [the statute] or

1 | regulation issued under the authority thereof . . . ." 16 U.S.C. § 1540(g)(1)(A).

2 | **V.    PLAINTIFFS HAVE STANDING TO BRING THIS ACTION**

3 |     To establish standing, a plaintiff must: (1) allege a particularized injury; (2) fairly traceable to

4 | the defendant's conduct, which; (3) is likely to be redressed by the requested relief. *Idaho Conservation*

5 | *League v Mumma*, 956 F.2d 1508, 1513 (9th Cir. 1992).

6 |     Plaintiffs have standing to bring this action because the groups have members who use, enjoy

7 | and plan to return to the ENF land affected by the challenged decision. Declarations of: Jeffery Miller

8 | (Dkt. # 45-2) at ¶¶ 13-15; Karen Schambach (Dkt. # 45-3) at ¶¶ 9-14; Donald Rivenes (Dkt. # 45-4) at

9 | ¶¶ 6-11; Vivian Parker (Dkt. # 45-5) at ¶¶ 6-8; Howard Wilshire (Dkt. # 45-6) at ¶¶ 2-9, 11-14, and;

10 | Supplemental Declaration of Jeffery Miller (Dkt. # 46-1) at ¶¶ 3-10. Plaintiff-organizations endeavor to

11 | protect the natural resources that would be adversely affected by the ENF travel plan and the interests of

12 | the groups and their members would be injured should it be implanted in its current form. Declarations

13 | of: Jeffery Miller (Dkt. # 45-2) at ¶¶ 7, 16-17; Karen Schambach (Dkt. # 45-3) at ¶¶ 7, 9, 16-17; Donald

14 | Rivenes (Dkt. # 45-4) at ¶¶ 2, 11; Vivian Parker (Dkt. # 45-5) at ¶¶ 3, 7-8, and; Howard Wilshire (Dkt.

15 | # 45-6) at ¶ 14. Finally, only this Court can provide Plaintiffs with relief for these injuries. Plaintiffs

16 | have established their standing to bring this action.

17 | **VI.    ARGUMENT**

18 |     **A.    The Forest Service Failed to Identify the Minimum Road System Before**
19 |          **Designating ORV Travel Routes on the Eldorado National Forest**

20 |         *1.    Subpart A of the Travel Management Rule Obligates the Forest Service to*
             *Identify the Eldorado's Minimum Road System*

21 |

22 |     Pursuant to Subpart A of the Forest Service's Travel Management Regulation, the Forest

23 | Service is required to determine "the minimum road system needed for safe and efficient travel and for

24 | administration, utilization, and protection of National Forest System lands." 36 C.F.R. § 212.5(b)(1).

25 | Specifically, the Forest Service must identify the road system:

26 |     needed to meet resource and other management objectives adopted in the relevant land
and resource management plan . . . to meet applicable statutory and regulatory
27 |     requirements, to reflect long-term funding expectations, [and] to ensure that the
identified system minimizes adverse environmental impacts associated with road
28 |     construction, reconstruction, decommissioning, and maintenance.

*Id.* Identifying the minimum road system needed provides the Forest Service with the necessary basis to later determine the number and extent of specific routes that should be designated for motorized vehicle use, including ORV use, as required by Subpart B.[5]   Subpart A is an essential prerequisite to route designation under Subpart B.   Subpart A sets the direction and parameters of travel management on a particular National Forest unit by determining the minimum road system necessary. Subpart B then provides for designation of specific routes for motorized use within that minimum system to provide for recreational ORV use.[6]

> As Subpart B provides, reflecting key elements derivative of the Subpart A decision:

> In designating National Forest System roads, National Forest System trails, and areas on National Forest System lands for motor vehicle use, the responsible official shall consider effects on . . . natural and cultural resources, public safety, provision of recreational opportunities, access needs, conflicts among uses of National Forest System lands, the need for maintenance and administration of roads, trails, and areas that would arise if the uses under consideration are designated; and the availability of resources for that maintenance and administration.

36 C.F.R. § 212.55(a). Without first complying with Subpart A and identifying a minimum road system, the Forest Service cannot know how ORV route designations fit within the broader travel system needed to meet Forest resource management objectives, long-term administrative needs and funding expectations, and road construction, reconstruction, decommissioning, and maintenance efforts. Moreover, the Forest Service simply cannot "consider effects" of its ORV route decisions and, accordingly, make ORV route decisions that "minimize" those effects to the Eldorado's environment without first identifying the minimum road system needed on the Forest overall. Exec. Or. 11644 § 3; 36 C.F.R. § 212.55(b).

---

[5] Route designation under Subpart B includes the designation of both roads and trails for motorized vehicle use. *See* 36 C.F.R. § 212.51(a). In its Eldorado travel management decision, the agency designates 1,000 miles of ML-2 roads and 210 miles of trails for motorized use. *See* FEIS at xxii (AR 002408).

[6] The Forest Service may argue that its Subpart A and B responsibilities are not so linked. But this contention would defy common sense and logic and, as explained below, the agency's own position as established by the record. While it is true "[t]ravel analysis for purposes of identification of the minimum road system is separate from travel analysis for purposes of designation of roads, trails, and areas for motor vehicle use," FSM 7700, Chapter 7710 ("Travel Planning") § 7712(2), the Agency cannot rationally explain how it can comply with Subpart B if has not first complied with Subpart A.

Yet, here, the Forest Service never properly identified the minimum road system for the Eldorado National Forest. By ignoring this key link in the chain of decision-making, the Forest Service deprived itself of the rational connection between these analytical processes, reflected primarily but not exclusively in the EIS, and the ultimate, substantive decisions adopting the ORV route designations.

### 2. The Forest Service Failed to Provide a Legally Adequate Minimum Road System Designation

In responding to Plaintiffs' administrative appeal, the Forest Service did not deny that the agency must make the Subpart A minimum road system determination to support the agency's Subpart B ORV route designations. Instead, without any support in the record, the appeal decision claimed that the Agency had, in fact, made such a determination, stating "the FEIS and ROD succeed in designating a minimum system as required by the Travel Rule." (AR 000882). The appeal decision stated:

> The analysis of effects from implementing each of the alternatives presented in Chapter 3 of the FEIS informs the Forest Supervisor in making a *decision regarding the minimum system* considering among other elements, the safe and efficient utilization of the ENF by the public along with potential adverse impacts.

Appeal Decision at 17 (AR 0822) (emphasis added) (also referring to the agency's "determination" of a minimum road system). That may be the case, but absent from this conclusory statement is any reference to where in the record this "decision" actually exists. The fact that the Forest Supervisor could, after the fact. look to the NEPA documents to assist in identifying a minimum road system is quite different from an actual decision that clearly identifies that minimum road system and provides supporting rationale for that determination.

Similarly, in its FEIS Response to Comments section, the agency recites the very same vague and conclusory statement regarding the minimum road system "decision" without disclosing where the determination can be found because, bluntly, there is no evidence that the Forest Service actually made a proper minimum road system determination. FEIS at C-14 (AR 00822). Waiting until the FEIS and appeal denial stage to announce that a minimum road system "decision" had been made at some indeterminate time previously is certainly not the type of public process or substantive analysis required

by Subpart A and is thus, legally inadequate.[7]

Attempting to distract from the lack of compliance with Subpart A and failure to actually identify a minimum road system, the appeal decision further noted that "[t]he Forestwide Roads Analysis completed in 2003 also helped to identify the minimum road system." Appeal Decision at 17 (AR 0822). While the Forest Service did indeed prepare a Forestwide Roads Analysis in 2003, that analysis does not constitute a *minimum road system determination*; in the words of the agency's own policies, "[t]ravel analysis is not a decisionmaking process," "[r]ather, travel analysis informs decisions relating to administration of the forest transportation system." FSM 7700, Chapter 7710 at § 7712.

Indeed, several parts of the record make clear there is no legally adequate "minimum road system determination" to support the Forest's ORV designations. For example, in the October 25, 2005, scoping letter that initiates the agency's NEPA process, there is no mention of a prospective minimum road system designation process. (AR 10568). Similarly, the agency's "Notice of Intent to Prepare an Environmental Impact Statement To Designate Routes for Public Off-Highway Wheeled Motor Vehicles" ("NOI") states the agency's intent to initiate a process "to designate a portion of the inventoried routes on the Eldorado National Forest open to public off-highway wheeled motor vehicle use, and assign the type of use(s) and season of use allowed on each road and trail or portion thereof."

---

[7] Moreover, any minimum road system decision would also have had to comply with NEPA and Travel Management Regulation procedural requirements. NEPA requires that an agency clearly inform the public about what actions are proposed so that the public can participate in the decision-making process and ensure that the agency's decision is fully-informed. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349, 350-51 (1989) (NEPA "guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision"). The importance of this public participation is further evidenced through regulations implementing NEPA that require an early and open process for determining the scope of issues to be addressed in light of the particular proposed action including "the significant issues to be analyzed in depth in the environmental impact statement. 40 C.F.R. § 1501.7(a)(2). Further, the Forest Service's regulations and formal guidance governing travel management explicitly require public participation in travel management decisions. In determining the minimum road system, the responsible official must, "to the degree practicable, involve a broad spectrum of interested and affected citizens, other state and federal agencies, and tribal governments." 36 C.F.R. § 212.5(b)(1). Agency guidance requires the Forest Service to "[i]nvolve the public early and throughout travel planning." Forest Service Manual ("FSM") 7715.3(1)(a). Clearly, defendants did not comply with either NEPA or the TMR's public participation requirements to support any putative Subpart A minimum road designation.

1  *Id.* (footnote omitted). The focus is thus allocation of OHV use on the ENF pursuant to Subpart B, not

2  the identification of a minimum road system as required by 36 C.F.R. Part 212, Subpart A.

3  Additionally, on the second page of the NOI, under the heading "Compliance With Code of Federal

4  Regulations," there are at least eleven bullet-marked items beginning with the term "Minimize," but not

5  a single item pertains to a minimum road system designation. *See, e.g.,* AR 10570.

6      Further, on the following page, the NOI expressly assures the public that "[t]his proposal

7  involves the designation of routes only and in no way authorizes any ground disturbing activities,

8  including . . . (2) the deconstruction of decommissioning of inventoried routes." (AR 10571). As noted

9  above, Subpart A specifically requires the Forest Service to identify unneeded roads: agency officials

10 "must review the road system . . . and identify the roads . . . that are no longer needed to meet forest

11 resource management objectives and that, therefore, should *be decommissioned or considered for other*

12 *uses, such as for trails.*" 36 C.F.R. § 212.5(b) (emphasis added). Because it explicitly precludes the

13 possibility of decommissioning or re-purposing extant routes, or otherwise identifies roads that are no

14 longer needed, the NOI therefore makes clear that there was no Subpart A determination undertaken as

15 part of the ENF travel planning process that is be consistent with agency regulations.[8]

16      In short, there is absolutely nothing in the record constituting a legally adequate Subpart A

17 determination of a minimum road system for the ENF. The Forest Service's effort to conceal this

18 failure in its response to Plaintiffs' administrative appeal by dissembling and pointing generally to the

19 2003 Roads Analysis as well as sections of the ROD and FEIS — none of which identify a "minimum

20 road system" — cannot redeem this fact. The agency thus fails entirely to articulate any explanation for

21 the absence of the minimum road system determination, let alone a legally adequate one. *Motor Vehicle*

22 *Mfrs. Ass'n of U.S., Inc.*, 463 U.S. at 43.

23

24

25 [8] Obviously, under the Subpart B process for identifying roads, trails and areas open to motorized use, the agency designates some routes or portions of routes as closed to such use—but this says nothing

26 about whether these routes will be decommissioned or otherwise eliminated as required for a minimum road system determination as is mandated by Subpart A. Further, the discussions of the preferred

27 alternative in both the ROD and the FEIS make no mention of the preferred or adopted alternative

28 constituting the minimum road system.

**B.** **The Forest Service's Decision Lacks the Site-Specific Analysis Required By Law**

      *1.* *NEPA and the Travel Planning Rule Require Site-Specific Analysis Prior to the Designation of Specific Motorized Roads and Trails*

As noted above, NEPA requires agencies to take a "hard look" at environmental consequences in an EIS before deciding to take "major Federal actions significantly affecting the quality of the human environment." *Kern v. BLM*, 284 F.3d 1062, 1066 (9th Cir. 2002) (internal quotations and citations omitted); *see also* 36 C.F.R. § 220.4 (Forest Service NEPA regulations). The statute "emphasizes the importance of coherent and *comprehensive* up-front environmental analysis [in order to] ensure informed decision-making to the end that the agency will not act on incomplete information, only to regret its decision after it is too late to correct." *Churchill County v. Norton*, 276 F.3d 1060, 1072-73 (9th Cir. 2001) (internal quotations and citation omitted) (emphasis added); 40 C.F.R. § 1500.1(b)-(c).

When an agency undertakes a major Federal action it is required to prepare a detailed EIS that "succinctly describe[s] the environment of the area(s) to be affected by the alternatives under consideration," and describes the direct and indirect environmental effects of the action. 40 C.F.R. §§ 1502.15; 1508.8. An EIS must "provide full and fair discussion of significant environmental impacts." *Id.* at § 1502.1. NEPA and its implementing regulations also require that a "hard look" provide a detailed review and analysis of existing environmental conditions. *See* 42 U.S.C. § 4332(2)(C)(i); 40 C.F.R. §§ 1502.16; 1508.14.

"Site specific analysis is essential to meaningful environmental analysis" under NEPA. *Cal. v. Bergland*, 483 F. Supp. 465, 483-87 (E.D. Cal. 1980), *aff'd in part, overruled in part* by *California v. Block*, 690 F.2d 753 (9th Cir. 1982) (rejecting the Forest Service's reliance on "worksheets" for assessing impacts of roadless area designations because the worksheets involved checking boxes and lacked description of "specific or unique characteristics of any area" and the "reader of these worksheets is not left with any concrete description of any area"). Analysis of site-specific impacts must "contain a reasonably thorough discussion of the significant aspects of the probable environmental consequences." *Block*, 690 F.2d at 761. An agency may not "rely upon forecasting difficulties or the task's magnitude to excuse the absence of a reasonably thorough site-specific analysis of the decision's environmental consequences." *Id.* at 765; *see also Salmon River Concerned Citizens v. Robertson*, 32

1   F.3d 1346, 1357 (9th Cir. 1994) (site-specific analyses for approval of multiple sites required when the

2   agency makes a "critical decision . . . to act on site development") (citations omitted).

3          The designation of a road, trail or area for ORV use is a project-level decision and requires site-

4   specific analysis under NEPA. *See Montana Wilderness Ass'n v. McAllister*, 658 F.Supp.2d 1249, 1256

5   (D. Mont. 2009) (in travel planning context, Forest Service's failure to consider and explain site-

6   specific data pertaining to area's use, and expected impacts, violates NEPA). "General statements about

7   'possible' effects and 'some risk' do not constitute a 'hard look' absent a justification regarding why

8   more definitive information could not be provided." *Neighbors of Cuddy Mt. v. United States Forest*

9   *Serv.,* 137 F.3d 1372, 1380 (9th Cir. 1998); *see also Cal. v. Block*, 690 F.2d at 765 (rejecting agency's

10  delineation of roadless areas because agency failed to do site-specific analysis of the "unique . . .

11  attributes" of each area).

12         In addition to NEPA, the Forest Service's TMR requires site-specific analysis of route impacts:

13         This [TMR] rule will be implemented through travel management decisions at the
           administrative unit or Ranger District level, which may have environmental impacts.
14         *These site-specific decisions will involve appropriate environmental analysis and*
           *documentation.*
15

16  70 Fed. Reg. 68264, 68286 (emphasis added). "Advance planning based on public involvement, careful

17  design, *and site-specific environmental analysis* provide the best hope for a sustainable, managed

18  system of motor vehicle routes and areas addressing user needs and safety with a minimum of

19  environmental impacts. *Id*. at 68269 (emphasis added). Accordingly, "[d]esignation decisions are best

20  left to local managers, working closely with State, tribal, and local governments, users, and other

21  members of the public and *informed by site-specific evaluation of environmental impacts*." *Id*. at 68270

22  (emphasis added). Indeed, it was precisely because the Forest Service presumed that site-specific route

23  analysis would occur at the individual forest level, that the agency elected to explicitly forego NEPA

24  compliance when it promulgated the TMRs themselves: "The [Forest Service] believes that the scope,

25  content, and documentation of NEPA analysis associated with designating routes and areas for motor

26  vehicle use will ultimately *depend on site-specific factors,* including the local history of travel planning,

27  public input, and environmental impacts at the local level. Therefore, the [Forest Service] is not

28  addressing NEPA compliance in this final rule." *Id*. at 68268 (emphasis added).

The Forest Service cannot rationally claim here that it was not required to perform a site-specific analysis of the impacts of the routes it approved.  As shown below, it carried out no such analysis.

### 2.   *The FEIS Fails to Provide the Site-Specific Analysis Required by Law*

#### a.   *The FEIS relies upon incomplete and inappropriate data*

According to the FEIS, "the primary data source used for this analysis was existing GIS data, collected from past surveys and inventories." FEIS 3-1 (AR 02498). However, the GIS data – which served as the basis of the analysis in the FEIS – was, as demonstrated *infra*, of an inappropriate scale to provide the site-specific analysis required. A second data source noted in the FEIS was route evaluation forms. While Route Evaluation forms were completed for non-system routes and Maintenance Level 1 (ML-1) roads proposed for change to ML-2, existing ML-2 roads were not evaluated, despite the knowledge that ML-2 roads are causing direct and indirect, as well as cumulative impacts on water quality, wildlife and non-motorized recreation. FEIS 3-1 (AR 02498). These failings alone render the FEIS deficient.  As demonstrated below, the lack of site-specific data and the reliance on inappropriate scale data sets, along with the Forest Service's failure to address these data gaps, prevented the agency from taking a hard look at the actual real-world, site-specific impacts of routes on the sensitive environment of the ENF.

#### b.   *The FEIS fails to account for site-specific impacts of erosion and sedimentation related to hillslope stability and soils*

Among the most important variables affecting whether a given vehicle route will cause adverse impacts on the environment are how steep the route is, what kind of soil it traverses, and whether it will cross aquatic areas such as wet meadows and streams.  As common sense (and record evidence) dictate, routes on steeper slopes, on more erosive soils, and in wet areas are more susceptible to damage than those elsewhere.  FEIS at 3-20 (AR 002517).  As the FEIS explains:

> There is a greater possibility of hillslope instability when roads and trails meet a set of conditions. The two conditions that have the most influence of slope instability are 1) hillslopes with gradients greater than 57% and, 2) presence of springs.

FEIS at 3-19 (AR 02516).

To evaluate the risks associated with motorized vehicle use on unstable hillslopes, the FEIS

1  indicates that a GIS exercise was completed to measure road or trails lengths that crossed terrain where

2  gradients exceeding 57% and the presence of springs, were present. *Id*.  However, the Forest Service

3  admits it conducted this analysis at an inappropriate scale. As the Forest Service concluded, "[t]here are

4  no direct, indirect, or cumulative effects from any of the alternatives *because geologic hazards relative*

5  *to roads and trails evaluated at this scale (1:24000) are not measurable*." FEIS at 3-20 (AR 02517,

6  emphasis added). Simply because the Forest Service did not measure impacts at the appropriate scale

7  does not mean there are no effects.  Rather, the absence of such analysis renders the exercise arbitrary.

8  "The government's inability to fully ascertain the precise extent of the effects" of a decision "is not . . .

9  a justification for failing to estimate what those effects might be before irrevocably committing to the

10  activity." *Conner v. Burford*, 848 F. 2d 1441, 1450 (9th Cir. 1988) (citations omitted).[9]

11       As with its slope stability discussion, the Soil Resources chapter of the FEIS is replete with

12  statements that point out the need for — as well as the lack of — site-specific analysis of the impacts of

13  routes on differing soil types.[10] For example, in discussing the characteristics of one of the three

14  dominant soil temperature zones present on the ENF, the FEIS states:

15       The Mesic zone includes a large portion of the motorized routes, including many NFS
         ML-1 and ML-2 roads. *Soils are generally deeper, finer-textured, and susceptible to*

16       *rutting and compaction.*

17  FEIS at 3-24 (AR 02521, emphasis added). An appropriate scale, site-specific, analysis based on this

18  conclusion was therefore necessary to identify specific roads in this zone currently or potentially at risk

19

20

---

21  [9] The cursory and conclusory nature of defendants' disregard of the need for appropriate scale analysis
     is driven home by the fact the selected alternative — Modified B — is not even mentioned in the

22  Geology portion of FEIS' "Affected Environment" section. While there is much discussion and a
     number of tables addressing the comparable impacts and hazards of all the other alternatives

23  considered, the FEIS is silent regarding the *actual* option the agency chose to implement.

24  [10] It is clear that the Soil Resources section of the FEIS was not based on site-specific analysis of
     routes. The FEIS explained  that the analysis was premised upon:

25       a comparison of seasonal closures during wet weather period and the following
         information collected from the GIS database: soils susceptible to gully erosion, total

26       miles of routes open by alternative, and condition of native surfaced roads based on field
         assessments. Since sustained, steep gradients are also an indicator of the risk of erosion a

27       query of routes with gradients of 15 percent or greater and 200 feet or more in length was
         attempted. *It was unsuccessful due to limitations in the data base.*

28  FEIS 3-26, "Data" section, (AR 02523, emphasis added).

1  for rutting and compaction. This, however, was not done.[11]

2      Discussing the environmental impacts associated with roads, the FEIS stated that: "Maintaining

3  drainage structures is the key to minimizing erosion on system roads. Drainage structures are

4  particularly susceptible to damage during the wet season by motorized vehicles." FEIS at 3-25 (AR

5  02522). The FEIS should have consequently noted which routes are suffering damage to drainage

6  structures during the wet season.  It does not.  Likewise, when addressing the adverse effect of runoff

7  from designated OHV trails, the FEIS said:

8          Many OHV trails [ ] were not originally designed and constructed for OHV use but were
9          converted from roads. Road prisms are well-compacted and provide a firm running
           surface but the compacted surface makes installing OHV rolling dips difficult. *The long*
10         *sustained gradients of trails converted from roads demand more attention to drainage*.

11 *Id*. (emphasis added).  Accordingly, the Forest Service should have identified which trails were

12 converted from roads and suffer drainage problems to determine if these specific trails were suitable for

13 addition to the system or, in accord with the minimum road system determination, had it been

14 completed, required decommissioning. The Forest Service did not, however, complete this hard look.[12]

15

16 [11] The Forest Service's "analysis" with regard to the other two types of soil zones was similarly
   cursory.  Regarding the second type of soil zone, the FEIS noted:
17         The effects of public wheeled motor vehicle use on the soils in this [Frigid] zone are
18         typically related to 4WD routes, to late fall damage to drainage structures such as
           waterbars or rolling dips, to vehicle use in meadows and riparian areas, and to trail
19         capture of sideslope runoff.
   *Id*. Accordingly, the Forest Service should have identified which specific routes are suffering late fall
20 damage to drainage structures, vehicle use in meadows and riparian areas, and trail capture of sideslope
   runoff. Similarly, addressing the impact risks associated with the third type of soil zone, the FEIS
21 recognized:
22         The effects of public wheeled motor vehicle use on the soils in this [Cryic] zone are
           typically related to erosion of shallow soils, inadequate drainage, and vehicle use within
23         wet meadows.
   *Id*. The Forest Service should have therefore identified which routes are suffering erosion of shallow
24 soils, inadequate drainage, and vehicle use within wet meadows, all threats acknowledged by the FEIS.
   The Agency did none of this.
25 [12] With regard to unauthorized routes the FEIS acknowledged that such routes:
26         lack drainage structures, roll the grade only by chance, and may include unsustainably
           steep gradients. Because unauthorized routes were not constructed, treads are in loose
27         topsoil rather than well-compacted subsoil. As topsoil is eroded, treads become
           entrenched, concentrating runoff and resulting in deeper erosion.
28 *Id*. As the FEIS further notes.
           Concentrated runoff is the primary agent of erosion on native surfaced roads and trails

Nor does the FEIS disclose whether any route designated in Modified Alternative B was analyzed for any of the limiting conditions described above. The Forest Service's failure to generate site-specific data based on the macro-scale limitations of data it chose to use cannot fulfill its legal duties under NEPA. The agency admitted that that this information failure directly, and adversely, affects its management of motorized use designations:

> Not designating routes in poor condition would remove from the system routes that require high maintenance. This would allow more effective use of limited maintenance resources. *However, the condition surveys did not specifically address causes, so some poor condition ratings could be due to a lack of maintenance, and not necessarily due to poor location.*

FEIS 3-29 (AR 02526, emphasis added.). In order to determine whether to designate specific routes it admits are in poor condition, the Forest was required to develop sufficient information to determine whether the poor road conditions were due to poor location or lack of maintenance before making its decision. It utterly, and arbitrarily, failed to do so.

### c.    The FEIS Fails to Look at Site-Specific Impacts on Aquatic Habitat

In addition to its failure to look at site-specific impacts related to erosion from steep slopes and soils quality, the FEIS also utterly fails to look at site-specific impacts to aquatic resources. As discussed *infra*, approval of routes in wet meadows violates the substantive requirements of NFMA that actions be consistent with forest plans. Moreover, for NEPA purposes, the lack of site-specific data or analysis on such impacts renders the FEIS deficient. In the Draft Biological Evaluation prepared for the route decision, the agency cautions that:

> •The type and condition of stream crossings has not been spatially identified. Therefore, site-specific analysis of these characteristics is generally lacking. As a result, site-specific and localized adverse effects may be understated.

---

> and unauthorized routes. Mechanical displacement of soil by wheeled motor vehicle traffic is also important although most mechanically displaced soil is ultimately transported by concentrated runoff. *Mechanical displacement becomes more significant as route gradients become excessively steep.* Mechanical erosion and soil loss by dusting *are problems on unauthorized routes* because treads in surface soils are high in organic matter and generally not well compacted.

FEIS at 3-26 (AR 02523, emphasis added). The FEIS should have analyzed whether the unauthorized routes being designated have acceptable drainage structures, contain unsustainably steep gradients, loose topsoils, rutting and erosion. The FEIS, however, does not do this.

• Data sets regarding type and condition of stream crossings are limited and therefore may not totally reflect forest-wide riparian condition. Because of the lack of forest-wide stream crossing information, site-specific and localized adverse effects may be under- or over-stated.

Draft BE at 18 (AR 12656).  Absent such site-specific data the FEIS fails to provide the requisite "hard look," site-specific, analysis of the current conditions, and the direct, indirect, or cumulative impacts of the existing road system. 40 C.F.R. §§ 1502.15; 1508.8; 1502.1; *McAllister*, 658 F. Supp .2d at 1256.

### C.  Defendants' Failure to Explain and Ensure Consistency with Forest Plan Requirements Violates NFMA and NEPA

The Forest Service prepared draft and final Biological Evaluations ("BE") for aquatic species impacts for purposes of ensuring consistency of the ENF travel management decision with the Sierra Nevada Forest Plan Amendments' ("SNFPA") Riparian Conservation Objectives ("RCOs"). *See, e.g*, Draft BE (AR 12638), Final BE (AR 12748), as required by NFMA. 16 U.S.C § 1604(i).  However, as detailed below, the actual route designation process carried out by the Forest Service was not consistent with the requirements of the SNFPA nor the specific BEs prepared by the agency.

The SNFPA established six RCOs as components of the Plan's aquatic, riparian, and meadow ecosystem strategy. *See, e.g.,* SNFPA ROD (AR 10970). RCO #2 was developed to:

Maintain or restore (1) the geomorphic and biological characteristics of special aquatic features including lakes meadows bogs fens wetlands vernal pools springs; (2) streams including in stream flows; and (3) hydrologic connectivity both within and between watersheds to provide for the habitat needs of aquatic-dependant species.

Riparian Conservation Objective #2, SNFPA ROD (AR 10970).

In order to determine consistency with RCO #2, the agency's BE adopts specific criteria to evaluate each route. Specifically, conformity with RCO #2 is established if "Routes do not bisect or go through meadows." Final BE at A-4, (AR 12828). However, the challenged ROD establishes 20 separate roads or routes, totaling almost 5 miles, in protected meadow areas, in direct contravention of the BE's proscription. *See, e.g*., FEIS at 3-84 (AR 002581). The FEIS does not explain how the action complies with SNFPA requirements when the action clearly contravenes the criteria adopted to ensure consistency with RCOs imposed by the SNFPA – *i.e*., that there be no motorized routes crossing meadows.  This violates the substantive requirements of NFMA as well as the procedural mandates of

NEPA.[13]

D.    **The Forest Service Failed to Consider an Adequate Range of Alternatives**

1.    *An EIS must include a reasonable range of alternatives*

The "heart" of the NEPA process is an agency's duty to consider "alternatives to the proposed action" and to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. §§ 4332(2)(C)(iii), 4332(2)(E). The CEQ regulations require the Forest Service to "rigorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated." 40 C.F.R. § 1502.14(a). "A 'viable but unexamined alternative renders [the] environmental impact statement inadequate.'" *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 814 (9th Cir. 1999) (quoting *Citizens for a Better Henderson v. Hodel*, 768 F.2d 1051, 1057 (9th Cir. 1985)).

1.    **The Forest Service Should Have Considered an Alternative that Did Not Authorize Any User-Created Routes.**

The Forest Service considered an unlawfully narrow range of alternatives in its Eldorado Travel Management Planning decision. While the agency proposed six alternatives, each alternative added previously unauthorized routes for motorized vehicle use. *See* FEIS at xxii (AR 002408). Prior to the Forest Service's travel planning decision, there were 526 miles of identified unauthorized (generally user-created) motorized routes across the Eldorado National Forest, in addition to the 1,180 miles of previously-authorized routes. *Id.* at x, 1-4, 2-30 (AR 002369; 002435; 002477). The action alternatives

---

[13] The Forest Service's violation of plan requirements is made even more clear when one reviews the draft BE for Aquatic Species which identified 3 distinct criteria for consistency with RCO #2 that are more protective of the meadow habitat than the single factor identified in the final BE. The draft BE established the following criteria:

1. RCAs in 7th field watersheds do not exceed route densities of more than 5 mi/sq mile (Table A-7).
2. Watersheds do not have more than 30 crossings per mile of RCAs (Table A-8).
3. Routes in RCAs are not in poor condition (Table A-9).

Draft BE at A-55 (AR 12693). None of these criteria are analyzed in the FEIS, much less complied with in the ROD. And while the Final BE imposed only the single criteria for consistency with the SNFPA: "Routes do not bisect or go through meadows.," Final BE at A-4 (AR 12828), as noted above, the defendants' travel plan still violates, *without explanation*, even this less restrictive criteria.

considered in the FEIS ranged between adding 21 to 46 miles of newly authorized recreational ORV

routes. *Id.* at xxii-xxiii (AR 002408-09). The agency failed and refused to consider the any alternative

that would close all unauthorized, user-created routes to vehicle use.[14]

The Ninth Circuit has repeatedly rejected NEPA documents that fail to even consider more

protective land use options because the agency cannot "uncritically assume that a substantial portion of

the . . . areas should be developed and consider only those alternatives with that end result." *Block*, 690

F.2d at 767 (rejecting Forest Service decision that failed to consider designating more than a third of

evaluated acres for wilderness). For example, in *Oregon Natural Desert Association*, the Ninth Circuit

rejected ORV designations in a land use plan because the agency:

> did not consider any alternative that would have closed more than 0.77% of the planning
> area to ORVs. Indeed, every alternative would have reduced the extent of closed areas
> from that in effect previously. It is precisely this sort of 'uncritical[ ]' privileging of one
> form of use over another that we have held violates NEPA.

*Oregon Natural Desert Ass'n v. BLM*, 531 F.3d 1114, 1116 (9th Cir. 2008) (citing *Block*, 690 F.2d at

767); *see also Ctr. for Biological Diversity v. BLM*, 2009 U.S. Dist. LEXIS 90016, *84-85 (N.D. Cal.

Sept. 28, 2009) (holding alternatives analysis flawed because "[a]ll of the alternatives . . . considered

the same OHV route network, with variations on the extent to which the routes would be designated

'open' versus 'limited': no alternative proposed closing additional routes to OHV use"). Similarly, the

Ninth Circuit has held that an agency's range of alternatives was too narrow where each action

alternative, like here, was "hardly different from the option that [the agency] ultimately adopted." *Ctr.

for Biological Diversity v. Natl. Hwy. Traffic Safety Admin.*, 538 F.3d 1172, 1218 (9th Cir. 2008).

In its response to comments by Plaintiffs and others, the Forest Service acknowledges that it

"considered" but rejected detailed analysis of any alternative that did not add previously unauthorized,

user-created routes. (AR 002469). The Agency summarily rejected this alternative because "[p]art of

the purpose and need is to . . . provide a diversity of road and trail opportunities." *Id.* However,

because the agency failed to make its minimum road system determination, as required by Subpart A of

---

[14] Plaintiffs specifically requested consideration of an alternative that limited the number of newly
authorized roads. *See* TMAR001373.002-00172 (Appendix B of Plaintiffs' appeal recommending
routes that should not be authorized); TMAR0107122.007 (scoping comments stating "[t]he existing
level of allowed [O]RV activity, on system routes only, should be the No Action Alternative").

the travel management regulations, the agency had no proper basis to conclude that the *current* system of authorized routes is somehow insufficient to "provide a diversity of road and trail opportunities." *Id.*; *see City of Tenakee Springs v. Clough*, 915 F.2d 1308, 1311-12 (9th Cir. 1990) (finding agency's "failure seriously to consider any alternative to the rigid application of its own interpretation of the contract requirements raises serious questions of compliance with" NEPA).

Moreover, as the Ninth Circuit has noted, "[i]t is precisely this sort of 'uncritical[ ]' privileging of one form of use over another that we have held violates NEPA." *Oregon Natural Desert Ass'n*, 531 F.3d at 1116; *see also New Mexico ex rel. Richardson v. BLM*, 565 F.3d 683, 710 (10th Cir. 2009) ("It is past doubt that the principle of multiple use does not require [an agency] to prioritize development over other uses"). Indeed, the very purpose of the Executive Orders governing motorized recreation, as well as the Forest Service's own TMR, is not to uncritically adopt the user created routes haphazardly spread across the National Forests, but to affirmatively "minimize" the impacts and conflicts caused by motorized recreation. Exec. Or. 11644 § 3; 36 C.F.R. § 212.55(b).

By limiting the alternatives considered to actions that add previously unauthorized motorized roads and trails to a motorized route system that has already lead to significant environmental degradation, and thereby disregarding its broad duties to the Eldorado's non-motorized resources and interests, the agency failed to consider a reasonable range of alternatives. *See Block*, 690 F.2d at 765-69 (9th Cir. 1982); *ONDA*, 531 F.3d at 1116.

### E.   The Forest Service Failed to Consult on Effects to Threatened Red-Legged Frogs in Violation of the ESA

Pursuant to the ESA, the Forest Service was required to consult with FWS regarding the effects of its Eldorado Travel Management decision because the action "may affect" the red-legged frog. 16 U.S.C. § 1536(a)(2). The agency failed to do so. The Forest Service acknowledged at several points in record that the project "may affect" red-legged frogs. In fact, the agency initially consulted with FWS regarding the effects of its original preferred alternative for the Eldorado travel plan. AR 012884. However, although the agency ultimately adopted a *different* alternative that includes additional routes in suitable red-legged frog habitat in areas that have *not* been surveyed for frogs, the agency failed to consult on the new expanded action.

Further, the Forest Service's Biological Assessment for the adopted alternative concedes the point, concluding that the action "may affect" threatened red-legged frogs because routes occur in suitable frog habitat, thus triggering ESA consultation requirements for that alternative. AR 012902; 50 C.F.R. § 402.14(a); *see also Cal. ex rel. Lockyer v. USDA*, 575 F.3d 999, 1018 (9th Cir. 2009) ("consultation is required whenever a federal action 'may affect listed species'"). In short, the Forest Service violated the ESA by failing to consult with FWS regarding the impacts on red-legged frogs of the ORV use *actually* authorized under the decision.

### 1. The Forest Service's "May Affect" Determination Triggered ESA Consultation Requirements

In 2006, in anticipation of upcoming travel management planning and upon request of the Forest Service, FWS issued a programmatic consultation document for 11 National Forests in California, including the Eldorado. *See* FWS, Route Designation Project Design Criteria Concurrence (Dec. 27, 2006) (AR 000031); USFS, Route Designation: Project Design Criteria for "No effect" or "May Affect Not Likely to Adversely Affect" Determination for TE Species (Oct. 6, 2006) (AR 000001). This concurrence letter stated that, if any Forest's route designation complied with a set of design criteria for certain listed species, the travel management plan could be deemed "not likely to adversely affect" or to have "no effect" on listed species, and further consultation would be unnecessary. AR 000032.

The design criteria for red-legged frogs stated that the Forest Service may avoid consultation if no motorized routes or ORV areas are authorized within Forest Plan-designated "Riparian Conservation Areas" ("RCA") that contain suitable frog habitat.[15] AR 000003-04. RCAs include the land within 300 feet on each side of any perennial stream, and within 150 feet of any intermittent stream. *See* Sierra

---

[15] Specifically, the Forest Service may avoid consultation if, *inter alia*: (1) "[i]n suitable California red-legged frog habitat, routes avoid . . . Riparian Conservation Areas except where necessary to cross streams…," and (2) "within California red-legged frog habitat, areas are located outside of . . . Riparian Conservation Areas, meadows, and wetlands.  AR 000003-04. "Routes" refer to roads and trails designated for motorized use, and "areas" refer to broader areas within the forest designated for motorized use.  *Id.*  The Eldorado Travel Management decision designates 23 new miles of routes and 75 ORV "staging areas," although the FEIS does not describe the purpose or size of those staging areas. FEIS at xxii, 3-187 (AR 002408, 002684).

Nevada Forest Plan Amendment ROD at 42 (AR 010979).

When the Forest Service issued its DEIS for the Eldorado Travel Management decision, the agency identified Alternative D as its Preferred Alternative. *See* DEIS at 22 (AR 001528). In July of 2007, the Forest Service prepared a Biological Assessment ("2007 BA") to consider Alternative D and concluded that designation of motorized routes "may affect but is not likely to adversely affect" red-legged frogs. USFS 2007 BA, at 16-17 (July 17, 2007) (AR 012884-85). Specifically, the Forest Service found that Alternative D "do[es] not meet the . . . Design Criteria" identified in the FWS programmatic consultation because Alternative D authorizes two ORV staging areas and five motorized routes (totaling 1.4 miles) in suitable red-legged frog habitat, within an RCA. AR 012884, 018881-82.

Because the Forest Service found the proposed action "may affect" red-legged frogs, the Forest Service initiated consultation with FWS. AR 000013.  In August of 2007, FWS issued a letter concurring with the Forest Service's not likely to adversely affect determination. FWS reasoned that, although routes and staging areas would be authorized in suitable habitat, *each area had been surveyed* and deemed unoccupied by the species, and thus "no routes are located near frog populations." *See* FWS, Concurrence Letter (Aug. 30, 2007) (AR 000028).

After reviewing comments on the DEIS, the Forest Service ultimately adopted Modified Alternative B in its ROD, instead of Alternative D. ROD at 4 (AR 003273). The new Modified Alternative B allows motorized vehicle use on 155 additional miles of roads and 6 additional miles of trails, as compared to Alternative D. FEIS at xxii (AR 002408). Modified Alternative B also adds new routes and an ORV staging area in suitable red-legged frog habitat that had not been considered in the 2007 BA, including two routes that have never been surveyed for frogs. *Compare* 2007 BA at 14 (AR 012882) *with* 2008 BA at 11 (AR 012899) (tables listing routes and locations in potential habitat); AR 012899 ("The proposed routes in the RCA of the North Fork Consumnes [are] upstream of previously surveyed reaches").

In recognition of those differences, in March of 2008, the Forest Service prepared another BA ("2008 BA") to evaluate Modified Alternative B. Because Alternative B authorizes ORV staging areas and routes in suitable red-legged frog habitat in RCAs, the 2008 BA concluded that Modified Alternative B "do[es] not meet the programmatic Project Design Criteria for reaching a determination

1    of Not Likely to Adversely Affect, and Modified Alternative B "may affect but is not likely to

2    adversely affect" red-legged frog."[16] AR 012902.

3           Despite: (1) reaching a "may affect" determination; (2) acknowledging that chosen Alternative

4    B does not meet the programmatic concurrence's design criteria; and (3) acknowledging that authorized

5    routes occur in unsurveyed red-legged frog habitat, the Forest Service did not consult with FWS.

6    Pursuant to the ESA's regulations, if an action "may affect" a listed species, "consultation is required."

7    50 C.F.R. § 402.14(a); *Kraayenbrink*, 2010 U.S. App. LEXIS 18250 (finding the consultation

8    requirement "is triggered under the ESA if [a] proposed action 'may affect' listed species"); *Pac. Rivers*

9    *Council v. Thomas*, 30 F.3d 1050, 1054 n.8 (9th Cir. 1994) (at a minimum, informal consultation is

10   required whenever an agency action "may affect" listed species).

11          Even where informal consultation may be proper, such consultation is not complete until FWS

12   issues a "written concurrence" agreeing with the Forest Service's not likely to adversely affect

13   determination. 50 C.F.R. § 402.13(a); *Pac. Rivers*, 30 F.3d at 1054 n.8 (an action agency's "not likely

14   to adversely affect" determination "does not end the consultation process. The consulting agency must

15   issue a written concurrence in the determination or may suggest modifications" to the action). Because

16   the Forest Service failed to seek and obtain concurrence on its 2008 BA, the agency failed to consult

17   with the Fish & Wildlife Service, violating the ESA and its implementing regulations. 16 U.S.C. §

18   1536(a)(2); 50 C.F.R. § 402.14(a).

19          **2.     The Forest Service Cannot Rely on the 2007 Concurrence to Avoid**
20                 **Consultation**

21          The Forest Service cannot rely on FWS's 2007 concurrence to avoid consultation on its 2008

22   BA. As noted above, the 2007 concurrence evaluated an entirely different Alternative (Alternative D as

23   opposed to Modified Alternative B) with different impacts to red-legged frogs. As described above,

24   Modified Alternative B authorizes two routes in different riparian areas near the North Fork of the

25

26   _____
     [16] The Forest Service's 2008 BA is internally inconsistent and also wrongly concludes that "Modified
27   Alternative B implements route designation as described in the Route Designation Project Design
     Criteria . . . for the red-legged frog . . . [and] no further consultation is required." AR 012889.  Yet the
28   agency failed to provide no any explanation for these contradictory conclusions.

Consumnes River and an additional ORV staging area near the Rubicon River, all within potentially suitable red-legged frog habitat. *Compare* 2007 BA at 14 (AR 012882) *with* 2008 BA at 11 (AR 012899) (tables listing routes and locations in potential habitat). Further, as noted above, Modified Alternative B includes two additional routes in the North Fork Consumnes River that *have never been surveyed* for frogs. 2008 BA at 11 (AR 012899). In 2007, FWS concurred that Alternative D was "not likely to adversely affect" red-legged frog specifically because surveys had been conducted for all routes in suitable habitat, and the habitat had been deemed unoccupied. AR 000028. Without surveys, the FWS must revisit the Forest Service's 2008 "not likely to adversely determination."

As several courts have held, "[t]he minimum threshold for an agency action to trigger consultation with FWS is low," and even small impacts to listed species require consultation. *Kraayenbrink*, 2010 U.S. App. LEXIS 18250, at *59; *Cal. ex rel. Lockyer*, 575 F.3d at 1018 (noting "the threshold for triggering the Endangered Species Act is relatively low"). "*Any possible effect*, whether beneficial, benign, adverse or of an undetermined character, triggers the formal consultation requirement . . ." 51 Fed. Reg. 19,926, 19,949 (June 3, 1986) (emphasis added). Because there are meaningful differences between the action the agency consulted on (Alternative D) and the action it ultimately chose (Modified Alternative B), the agency cannot rely on the 2007 concurrence.

Finally, even if the Forest Service had surveyed each new route and riparian area for frogs, FWS may have nonetheless rejected the Forest Service's not likely to adversely affect determination because the 2008 BA is seriously flawed. For example, the Forest Service's BA entirely failed to consider how the Eldorado Travel Management decision complies with the Red-legged Frog Recovery Plan. As noted above, the 2002 Recovery Plan for the frog identifies two "core" habitat areas within the Eldorado National Forest that were selected to provide for habitat connectivity and dispersal. *Recovery Plan* at 50 (AR 015892). The Forest Service's Travel Management decision authorized numerous routes within the more southern of the core areas.[17] The Recovery Plan clearly identifies the "protect[ion] of . . . core

---

[17] In preparing the TMP, the Forest Service generated GIS data and maps of routes and red-legged frog habitat. As noted in the AR Index, these data and maps were "too large to scan" and were not included in the AR provided to the Court, but are "available . . . at the ENF Supervisor's Office." *See* AR Index entry 468-69. Plaintiff took that GIS data, compared it to the Recovery Plan, and the resulting overlays revealed numerous routes in "core areas," including Route 08N55D, 13E33, 08N43A, 10N83P, 09N16, 09N45, 09N75, and many others.

1   areas" as "actions needed" for the species' recovery, but the Forest's BA fails to acknowledge these

2   routes impact the core areas, or evaluate how the routes will affect habitat connectivity or dispersal for

3   the frog. *Id.* at v (AR 15839).

4          Further, the Forest Service failed to consider impacts on all potentially suitable red-legged frog

5   habitat because the agency failed to evaluate impacts on ephemeral streams in the FEIS, even though

6   red-legged frogs use ephemeral streams for non-breeding habitat. FEIS at 3-37 ("Ephemeral streams

7   were not included in this analysis") (AR 002534); 3-184 (noting there are 12.3 miles of seasonal

8   streams on the Eldorado that provide potential non-breeding red-legged frog habitat) (AR 002681).

9          In sum, the Forest Service violated the ESA by failing to consult with FWS regarding the

10  Eldorado Travel Management decision's effects on threatened California red-legged frogs. Because the

11  Forest Service's decision "may affect" red-legged frogs, the agency was required to consult with the

12  FWS. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(a). The Forest Service could not rely on the previous

13  consultation for a different project alternative or on the earlier programmatic concurrence because the

14  Eldorado Travel Management decision ultimately authorized has different and unique impacts to the

15  red-legged frog and its habitat that must be evaluated through consultation.

16  **VII.   CONCLUSION**

17         For all of the reasons set forth above, the Court should grant Plaintiffs' Motion for Summary

18  Judgment and remand the challenged decisions to the Forest Service.

19

20

21

22

23

24

25

26

27

28

1    DATE: October 25, 2010

2                                       Respectfully Submitted,

3

                                        By: /s/ David A. Bahr
4                                       David A. Bahr (OSB No. 90199)
                                        Bahr Law Offices, P.C.
5                                       1035 ½ Monroe Street
                                        Eugene, OR  97402
6                                       (541) 556-6439 Voice
7                                       davebahr@mindspring.com
                                        *Pro Hac Vice*
8

9                                       Lisa T. Belenky (CSB No. 203225)
                                        Center for Biological Diversity
10                                      351 California St., Suite 600
                                        San Francisco, CA 94104
11                                      (415) 436-9682 x307 Voice
                                        lbelenky@biologicaldiversity.org
12

13                                      Erik Schlenker-Goodrich (New Mexico Bar No. 7875)

14                                      Western Environmental Law Center
                                        P.O. Box 1507
15                                      Taos, New Mexico 87571
                                        (575) 613-4197 Voice
16                                      eriksg@westernlaw.org
                                        *Pro Hac Vice*
17

18                                      Attorneys for Plaintiffs

19

20

21

22

23

24

25

26

27

28