IGNACIA S. MORENO
Assistant Attorney General
United States Department of Justice
Environment and Natural Resources Division

JASON A. HILL (DC 477543)
JOHN P. TUSTIN (TX 24056458)
Trial Attorneys
Natural Resources Section
J. BRETT GROSKO (Maryland Bar)
Trial Attorney
Wildlife and Marine Resources Section
Benjamin Franklin Station, P.O. Box 663
Washington, D.C.  20044-0663
Tel:    202-514-1024 (Hill)
         202-305-3022 (Tustin)
         202-305-0342 (Grosko)
Fax:    202-305-0506 (Hill and Tustin)
         202-305-0275 (Grosko)
Jason.Hill2@usdoj.gov
John.Tustin@usdoj.gov
Brett.Grosko@usdoj.gov

*Attorneys for Federal Defendants*

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CENTER FOR SIERRA NEVADA CONSERVATION, et al., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES FOREST SERVICE, et al., <br><br> Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) | Case No. 2:09-CV-02523-LKK-JFM <br><br> FEDERAL DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT AND IN RESPONSE TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT |

1

**TABLE OF CONTENTS**

2   I.      INTRODUCTION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

3   II.     LEGAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

4           A.    National Environmental Policy Act ("NEPA") . . . . . . . . . . . . . . . . . . . . . . . . . . 1

5           B.    Endangered Species Act ("ESA") . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

6           C.    National Forest Management Act ("NFMA") . . . . . . . . . . . . . . . . . . . . . . . . . . 5

7           D.    The Travel Management Rule . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

8           E.    Standards of Review  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

9                 1.     Summary Judgment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

10                2.     The Administrative Procedure Act ("APA") . . . . . . . . . . . . . . . . . . . . . 7

11  III.    FACTUAL AND PROCEDURAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . 10

12          A.    Project Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

13          B.    Endangered Species Act Consultation as to the California Red-Legged Frog  . . 12

14  IV.     ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

15          A.    The Forest Service Has the Discretion to Determine When to Identify the
                  Minimum Road System Relative to Route Designation  . . . . . . . . . . . . . . . . . . 15

16
                  1.     The Travel Management Regulations Do Not Require the Forest Service
17                       to Identify the Minimum Road System Prior to Designating Routes  . . . 15

18                       a.     The Court-Imposed Deadline Required the Forest Service to
                                Designate Routes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
19
                         b.     There Is No Requirement in the Plain Language of the Travel
20                              Management Rule that Requires Minimum Road System
                                Identification Prior to Route Designation  . . . . . . . . . . . . . . . . . 16
21
                         c.     Deference to Agency Interpretation Permits Route Designation
22                              Prior to Minimum Road System Identification  . . . . . . . . . . . . . . 17

23                       d.     Plaintiffs' Approach to Travel Management Is Unconvincing and
                                Second-Guesses the Forest Service's Reasonable Interpretation of
24                              Its Own Regulations  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

25                2.     The Forest Service Has Not Yet Identified the Minimum Road System . 22

26          B.    The FEIS Contains Site-Specific Analysis and Complies with NEPA . . . . . . . . 23

27                1.     Plaintiffs Incorrectly Quote and Summarize the FEIS When Arguing that
                         the FEIS Relies Upon Inappropriate Data . . . . . . . . . . . . . . . . . . . . . . . 25

28

2.    Plaintiffs' Criticisms of the Forest Service's Reliance Upon Route Evaluation Forms Is Misplaced . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

3.    The Forest Service's Reliance Upon GIS Data Is Reasonable and Entitled to Deference . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

4.    Plaintiffs Remaining Allegations Lack Merit . . . . . . . . . . . . . . . . . . . . . 30

C.    The Decision Is Consistent with the Forest Plan as Amended and Does Not Violate NFMA or NEPA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

1.    Under NFMA, Forest Plan Direction Is Set Forth in the Forest Plan, as Amended By Appendix A of the SNFPA ROD, and the Travel Management ROD, Not in any BE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

2.    Plaintiffs Fail to Identify Any Violation of the ENF Forest Plan's Standards and Guidelines Based Upon RCO#2 in the SNFPA ROD, Appendix A . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

3.    The Decision Included Forest Plan Non-Significant Amendments that Allow Specific Routes to Cross Meadows . . . . . . . . . . . . . . . . . . . . . . . 34

D.    The Forest Service Considered an Adequate Range of Alternatives and Should Be Accorded Deference to Its Choice of Alternatives . . . . . . . . . . . . . . . . . . . . . . 35

E.    Plaintiffs' ESA Claim Also Fails . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

1.    The Forest Service's Determination and FWS's Concurrence that the Routes Authorized by Modified Alternative B Meet the Design Criteria is Rational and Supported by the Record . . . . . . . . . . . . . . . . . . . . . . . . . 39

2.    ENF Personnel Surveyed the Two Routes Along the North Fork Cosumnes River . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

3.    Hunter's Staging Area Was Not in Suitable CRLF Habitat . . . . . . . . . 43

4.    Plaintiffs' Arguments Concerning Core Areas and Ephemeral Streams Also Fail . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

V.    CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

**TABLE OF AUTHORITIES**

**CASES**

Auer v. Robbins,
    519 U.S. 452 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Balt. Gas & Elec. Co. v. Natural Res. Def. Council,
    462 U.S. 87 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9

Bar MK Ranches v. Yuetter,
    994 F.2d 735 (10th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Bassiri v. Xerox Corp.,
    463 F.3d 927 (9th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Bayview Hunters Point Cmty. Advocates v. Metro. Transp. Comm'n,
    366 F.3d 692 (9th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.,
    419 U.S. 281 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Cal. Native Plant Soc'y v. U.S. E.P.A.,
    No. 06-03604, 2007 WL 2021796 (N.D. Cal. July 10, 2007) . . . . . . . . . . . . . . . . . . . 44

California v. Bergland,
    483 F. Supp. 465 (E.D. Cal 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 29

Camp v. Pitts,
    411 U.S. 138 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Ctr. for Biological Diversity v. Traffic Safety Admin.,
    538 F.3d 1172 (9th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.,
    – F. Supp. 2d –, No. 06-4884, 2009 WL 7036134 (N.D. Cal. Sept. 28, 2009) . . . . 21, 38

Ctr. for Sierra Nevada v. Berry,
    No. 2:02-cv-00325-LKK-JFM (E.D. Cal. Aug. 16, 2005) . . . . . . . . . . . . . . . . . . . . . . 10

Chevron U.S.A., Inc. v. Natural Res. Def. Council,
    467 U.S. 837 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Churchill County v. Norton,
    276 F.3d 1060 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Citizens Against Burlington, Inc. v. Busey,
    938 F.2d 190 (D.C. Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Citizens to Pres. Overton Park v. Volpe,
    401 U.S. 402 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Colo. Envtl. Coal. v. Dombeck,
    185 F.3d 1162 (10th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Conservation Nw. v. Kempthorne,
    No. 04-1331, 2007 WL 1847143 (W.D. Wash. June 25, 2007)  . . . . . . . . . . . . . . . . . 44

Cronin v. U.S. Dep't of Agric.,
    919 F.2d 439 (7th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Earth Island Inst. v. U.S. Forest Serv.,
    351 F.3d 1291 (9th. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Fla. Power & Light Co. v. Lorion,
    470 U.S. 729 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Friends of Endangered Species, Inc. v. Jantzen,
    760 F.2d 976 (9th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Friends of the Earth v. Hintz,
    800 F.2d 822 (9th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Friends of the Earth v. U.S. Forest Serv.,
    114 F. Supp. 2d 288 (D. Vt. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Fund for Animals v. Rice,
    85 F.3d 535 (11th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 44

Fund for Animals v. Thomas,
    127 F.3d 80 (D.C. Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 40

Gleichman v. United States Dep't of Agric.,
    896 F. Supp. 42 (D. Me. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Ground Zero Ctr. for Non-Violent Action v. U.S. Dep't of Navy,
    383 F.3d 1082 (9th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 40

Half Moon Bay Fishermans' Mktg. Ass'n v. Carlucci,
    857 F.2d 505 (9th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Headwaters, Inc. v. Bureau of Land Mgmt,
    914 F. 2d 1174 (9th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 39

Hells Canyon Alliance v. U.S. Forest Serv.,
    227 F.3d 1170 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 22, 27

Idaho Conservation League v. Mumma,
    956 F.2d 1508 (9th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 33, 35, 37

Idaho Sporting Cong., Inc. v. Rittenhouse,
    305 F.3d 957 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Inland Empire Pub. Lands Council v. Schultz,
    807 F. Supp. 649 (E.D. Wash. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Inland Empire Public Lands Council v. U.S. Forest Service,
    88 F.3d 754, 763 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 31

Island Range Ch. of the Mont. Wilderness Ass'n v. U.S. Forest Serv.,
    45 F. Supp. 2d 1006 (D. Mont. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Kleissler v. U.S. Forest Serv.,
    183 F.3d 196 (3rd Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Kleppe v. Sierra Club,
    427 U.S. 390 (1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 24, 29, 31

Laguna Greenbelt, Inc. v. U.S. Dep't of Transp.,
    42 F.3d 517 (9th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 37

Lands Council v. McNair,
    537 F.3d 981 (9th Cir. 2008) (en banc) . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9,  24, 30, 33

League of Wilderness Defenders' Blue Mountains Biodiversity Project v. U.S. Forest Serv.,
    549 F.3d 1211 (9th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Marsh v. Or. Natural Res. Council,
    490 U.S. 360 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8-9, 24, 31

McBride Cotton & Cattle Corp. v. Veneman,
    290 F.3d 973 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,
    463 U.S. 29 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Natural Res. Def. Council v. U. S. Forest Serv.,
    421 F.3d 797 (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Natl. Parks & Conservation Ass'n v. U.S. Dep't of Transp.,
    222 F.3d 677 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Nat'l Wildlife Fed'n v. Burford,
    871 F.2d 849 (9th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Nat'l Wildlife Fed'n v. Nat'l Park Serv.,
    669 F. Supp. 384 (D. Wyo. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Native Ecosystems Council v. Dombeck,
    304 F.3d 886 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Native Ecosystems Council v. Tidwell,
    599 F.3d 926 (9th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Native Ecosystems Council v. U.S. Forest Serv.,
    418 F.3d 953 (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 22

Natural Res. Def. Council v. Morton,
    458 F.2d 827 (D.C. Cir. 1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

N. Alaska Envtl. Ctr. v. Kempthorne,
     457 F.3d 969 (9th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Nw. Envtl. Advocates v. Nat'l Marine Fisheries Serv.,
     460 F.3d 1125 (9th Cir. 2006)   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.,
     18 F.3d 1468 (9th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Nw. Res. Info. Ctr., Inc. v. Nat'l Marine Fisheries Serv.,
     56 F.3d 1060 (9th Cir. 1995)   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Occidental Eng'g Co. v. Immigration & Naturalization Serv.,
     753 F.2d 766 (9th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Ohio Forestry Ass'n, Inc. v. Sierra Club,
     523 U.S. 726 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Or. Natural Desert Ass'n v. Bureau of Land Mgmt.,
     531 F.3d 1114 (9th Cir. 2008), amended and superceded by
     – F.3d –, 2010 WL 3398386 (9th Cir. 2010)   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Perkins v. Bergland,
     608 F.2d 803 (9th Cir. 1979)   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Preserve Endangered Areas of Cobb's History v. U.S. Army Corps of Engr's,
     916 F. Supp. 1557 (N.D. Ga. 1995), aff'd 87 F.3d 1242 (11th Cir. 1996) . . . . . . . . 4, 40

Robertson v. Methow Valley Citizens Council,
     490 U.S. 332 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 17

S.W. Ctr. for Biological Diversity v. Bartel,
     470 F. Supp. 2d 1118 (S.D. Cal. 2006)   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Seattle Audobon Soc'y v. Mosely,
     80 F.3d 1401 (9th Cir. 1996)   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Sierra Forest Legacy v. U.S. Forest Serv.,
     652 F. Supp. 2d 1065 (N.D. Cal. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

State of California v. Block,
     690 F.2d 753 (9th Cir. 1982)   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 28, 35

Swanson v. Forest Serv.,
     87 F.3d 339 (9th Cir. 1996)   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Thomas Jefferson Univ. v. Shalala,
     512 U.S. 504 (1994)   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

United States v. Carlo Bianchi & Co.,
     373 U.S. 709 (1963)   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council,
     435 U.S. 519 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 8, 36

1

## STATUTES

2    5 U.S.C. § 706 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

3    7 U.S.C. § 1011(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7

4    7 U.S.C. § 6912(e)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

5    16 U.S.C. § 551 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 8

6    16 U.S.C. § 1531(b)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

7    16 U.S.C. § 1532(6)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

8    16 U.S.C. § 1532(5)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

9    16 U.S.C. § 1533 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

10   16 U.S.C. § 1536 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

11   16 U.S.C. § 1536(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

12   16 U.S.C. § 1536(b)(3)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

13   16 U.S.C. § 1536(c)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

14   16 U.S.C. § 1540(g)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

15   16 U.S.C. § 1604 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 33

16   16 U.S.C. §§ 1600-14 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

17   23 U.S.C. §§ 101-610 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

18   42 U.S.C. § 4321 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

19   42 U.S.C. § 4332(c)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

20

21

## REGULATIONS

22   36 C.F.R. Part 212 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6, 15

23   36 C.F.R. Part 215 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

24   36 C.F.R. § 212.1  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

25   36 C.F.R. § 212.5  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 23

26   36 C.F.R. § 212.5(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17-19

27   36 C.F.R. § 212.5(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 18

28

36 C.F.R. § 212.5(b)(1)-(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

36 C.F.R. § 212.5(b)-(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

36 C.F.R. § 212.51 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18

36 C.F.R. § 212.55 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 18, 19

36 C.F.R. § 212.55(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

36 C.F.R. § 212.55(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 21, 47

36 C.F.R. § 212.55(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

36 C.F.R. § 212.81(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

36 C.F.R. § 212.81(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

36 C.F.R. § 261.13 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

36 C.F.R. §§ 212.1 - 212.21 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

36 C.F.R. §§ 212.50, 212.51; 212.55 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

36 C.F.R. §§ 212.50 - 212.57 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

36 C.F.R. §§ 215.14 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

40 C.F.R. § 1500.3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

40 C.F.R. § 1501.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

40 C.F.R. § 1502.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

40 C.F.R. § 1502.14 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

43 C.F.R. § 8342.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

50 C.F.R. Part 402 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

50 C.F.R. § 402.12(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

50 C.F.R. § 402.13(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 13, 18

50 C.F.R. § 402.14 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 5, 39

Exec. Order 11644 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7, 19

Exec. Order 11989 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7, 19

**TABLE OF ACRONYMS**

| APA | Administrative Procedure Act |
|---|---|
| BE | Biological Evaluation |
| BLM | Bureau of Land Management |
| CEQ | Council on Environmental Quality |
| CNSC | Center for Sierra Nevada Conservation |
| CRLF | California Red-Legged Frog |
| DEIS | Draft Environmental Impact Statement |
| EIS | Environmental Impact Statement |
| ENF | Eldorado National Forest |
| ESA | Endangered Species Act |
| FEIS | Final Environmental Impact Statement |
| FWS | Fish & Wildlife Service |
| GIS | Geographic Information System |
| NEPA | National Environmental Policy Act |
| NFMA | National Forest Management Act |
| NFS | National Forest System |
| NFTS | National Forest Transportation System |
| NMFS | National Marine Fisheries Service |
| OHV | Off-Highway Vehicle |
| ORV | Off-Road Vehicle |
| RCO | Riparian Conservation Objective |
| ROD | Record of Decision |
| SNFPA | Sierra Nevada Forest Plan Amendment |

# I. **INTRODUCTION**

Plaintiffs' argument that the Forest Service was required to identify the minimum road system before designating Off-Road Vehicle ("ORV") travel routes should be rejected by the Court.  First, the Forest Service was under order of this Court to designate ORV travel routes by a certain date.  Second, no such requirement exists.  Third, the agency is entitled to deference in interpreting the meaning of its own regulations.  Finally, Plaintiffs' arguments are unconvincing.  Therefore, this Court should uphold Defendants' Decision.

Plaintiffs' criticisms of the methodologies employed by the Forest Service should also be rejected by this Court.  In designating routes under this decision, the Forest Service took the "hard look" required by National Environmental Policy Act ("NEPA"), and Plaintiffs would impermissibly seek to substitute their judgment for that of the agency experts in determining the proper methodologies to employ in conducting the necessary sit-specific analysis.

Plaintiffs' arguments regarding the National Forest Management Act ("NFMA") should fail because they fail to identify any violation of NFMA's mandates or any inconsistency with the governing Forest Plan, as amended, for the Eldorado National Forest ("ENF").

The Court should also reject Plaintiffs' Endangered Species Act ("ESA") argument.  Their claim fails because Defendants consulted with the United States Fish and Wildlife Service ("FWS") on each aspect of the Modified Alternative B, and reasonably determined that the designated routes were not likely to adversely affect the California red-legged frog ("CRLF"), thereby fully complying with the ESA.  That decision is amply supported by the Administrative Record and therefore the Court should therefore uphold Defendants' decision.

# II. **LEGAL BACKGROUND**

## A.   **National Environmental Policy Act ("NEPA")**

NEPA is intended to foster better decision-making and informed public participation for actions that affect the environment.  <u>See</u> 42 U.S.C. § 4321; 40 C.F.R. § 1501.1.  NEPA provides that when a federal agency proposes a "major Federal action[ ] significantly affecting the quality of the human environment," the agency must prepare an Environmental Impacts Statement

1  ("EIS") analyzing the potential impacts of the proposed action and possible alternatives.  42

2  U.S.C. § 4332(C).  To meet this obligation, all federal agencies must follow NEPA regulations

3  promulgated by the Council on Environmental Quality ("CEQ").  40 C.F.R. § 1500.3; see also

4  Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 354 (1989).  "NEPA imposes

5  procedural requirements on agencies and does not mandate substantive outcomes."  Northwest

6  Envtl. Advocates v. National Marine Fisheries Serv., 460 F.3d 1125, 1133 (9th Cir. 2006) (citing

7  Natural Res. Def. Council v. U. S. Forest Serv., 421 F.3d 797, 811 (9th Cir. 2005)); see also

8  Robertson, 490 U.S. at 350; Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council,

9  435 U.S. 519, 558 (1978) (stating that NEPA's mandate is "essentially procedural").

10      Judicial review of an EIS is "extremely limited."  National Parks & Conservation Ass'n

11  v. U.S. Dep't of Transp., 222 F.3d 677, 680 (9th Cir. 2000).  A court evaluates an EIS only to

12  determine whether it "contains a reasonably thorough discussion of the significant aspects of the

13  probable environmental consequences" of a challenged action.  Northwest Envtl. Advocates,

14  460 F.3d at 1133.  A court "need not fly-speck the document and hold it insufficient on the basis

15  of inconsequential, technical deficiencies, but will instead employ a rule of reason."  Swanson v.

16  Forest Serv., 87 F.3d 339, 343 (9th Cir. 1996) (internal quotations omitted).

17  **B.**   **Endangered Species Act ("ESA")**

18      The ESA was enacted "to provide a means whereby the ecosystems upon which

19  endangered species and threatened species depend may be conserved, [and] to provide a program

20  for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b).

21  The Secretary of the Interior jointly administers the ESA with the Secretary of Commerce.  The

22  Secretary of the Interior has delegated this authority to the FWS, and the Secretary of Commerce

23  has delegated this authority to the National Marine Fisheries Service ("NMFS").  In 1986, the

24  Services jointly promulgated ESA implementing regulations.  See 50 C.F.R. Part 402 (2010).

25

26

27

28

1   Species are listed as endangered or threatened through the rule-making procedures mandated by

2   16 U.S.C. § 1533.[1]/

3       Under ESA § 7(a)(2), each federal agency must, in consultation with either FWS or

4   NMFS,[2]/ insure that any action authorized, funded, or carried out by the agency is not likely to

5   jeopardize the continued existence of any endangered or threatened species or result in the

6   destruction or adverse modification of the designated "critical habitat" of the species.  16 U.S.C.

7   § 1536(a)(2).   To help action agencies comply with this provision, ESA § 7 and the

8   implementing regulations set out a detailed consultation process for determining the biological

9   impacts of a proposed activity.  16 U.S.C. § 1536; 50 C.F.R. Part 402.

10      First, an agency proposing an action must determine whether the action "may affect"

11  species listed as threatened or endangered under the ESA.  50 C.F.R. § 402.14.  If a

12  determination is made that the action "may affect" listed species, the action agency must pursue

13  some form of consultation ("informal" or "formal," explained below) with either FWS or NMFS,

14  depending on the species involved.  In certain circumstances, a federal agency must prepare a

15  "biological assessment" to evaluate the potential effects of a proposed action.  16 U.S.C. §

16  1536(c)(1); 50 C.F.R. § 402.12(a).

17      An action agency may meet its procedural obligations under ESA § 7(a)(2) by conducting

18  "informal consultation" or "formal consultation" as appropriate.  The implementing regulations

19  provide for "informal consultation" to assist an action agency in determining whether and when

20  further consultation is necessary.  Informal consultation is "an optional process that includes all

21  discussions, correspondence, etc., between [NMFS or FWS] and the Federal agency . . . designed

22  to assist the [action agency] in determining whether formal consultation . . . is required."  50

23

24  [1]/    "Endangered" and "threatened" species are defined at 16 U.S.C. §§ 1532(6) and (20).

25  [2]/    In general, FWS has authority over terrestrial and freshwater species, and NMFS has
26  authority over marine species.  See, e.g., Northwest Res. Info. Ctr., Inc. v. National Marine Fisheries
27  Serv., 56 F.3d 1060, 1065 (9th Cir. 1995) (discussing the division of responsibility for listed
    species).

28

C.F.R. § 402.13(a).  "If during informal consultation it is determined by the [action agency], with the written concurrence of the Service, that the action is not likely to adversely affect listed species or critical habitat, the consultation process is terminated, and no further action is necessary."  Id.  Therefore, even where an agency determines that an action "may affect" species, thus triggering the need to initiate some form of consultation, but the action agency determines (and the Services concur) that the action is "not likely to adversely affect" a listed species, formal consultation is not required.  Ground Zero Ctr. for Non-Violent Action v. U.S. Dep't of Navy, 383 F.3d 1082, 1091-92 (9th Cir. 2004); Fund for Animals v. Thomas, 127 F.3d 80, 84 (D.C. Cir. 1997); Preserve Endangered Areas of Cobb's History v. U.S. Army Corps of Engr's, 916 F. Supp. 1557, 1569 (N.D. Ga. 1995), aff'd, 87 F.3d 1242 (11th Cir. 1996).  As explained in the preamble to the Services' implementing regulations, this informal consultation process  is intended, among other things, to address the situation where the agency action "may affect" a listed species, thereby technically triggering the ESA § 7(a)(2) consultation requirement, but that effect is likely to be beneficial or discountable.  Interagency Cooperation-Endangered Species Act of 1973, as amended; Final Rule, 51 Fed. Reg. 19,926, 19,949 (June 3, 1986) ("through this informal consultation process, those activities which are found to have beneficial, discountable, or insignificant effects upon listed species or their critical habitats could be deemed to be in compliance with section 7(a)(2) without formal consultation").  Agencies can also satisfy their duty to obtain concurrence through programmatic criteria developed specifically for a given type of decision.[3]/

---

[3]/     Such programmatic consultations are commonplace and serve to streamline the consultation process. See, e.g., Revised Designation of Critical Habitat for Bull Trout in the Coterminous United States, 75 Fed. Reg. 63,898, 63,903 (Oct. 18, 2010) ("tools such as streamlining and programmatic consultations are commonly implemented to minimize the administrative costs associated with consultation within the range of bull trout."); Critical Habitat for the Endangered Distinct Population Segment of Smalltooth Sawfish, 74 Fed. Reg. 45,353, 45,361 (Sept. 2, 2009) ("there are a number of mechanisms that will allow consultation without impeding the [Corps of Engineer's] response to water level emergencies, such as emergency consultations or programmatic consultations.").

1    If an action agency chooses to forego informal consultation, or the informal consultation

2    has not resolved the issue, "formal consultation" must be undertaken.  50 C.F.R. § 402.14.

3    Formal consultation procedures require FWS or NMFS to prepare a biological opinion, including

4    a conclusion as to whether the proposed action is likely to jeopardize the continued existence of

5    a listed species or result in destruction or adverse modification of critical habitat.  Id.  If the

6    action is likely to jeopardize the continued existence of a listed species, then NMFS or FWS will

7    set forth a reasonable and prudent alternative to the action, if any is available.  16 U.S.C. §

8    1536(b)(3)(A).

9    **C.    National Forest Management Act ("NFMA")**

10    The Forest Service's administration of the National Forest System ("NFS") is chiefly

11    governed by the NFMA.  16 U.S.C. §§ 1600-14.  NFMA is based on a two-stage approach to

12    planning on National Forests.  Ohio Forestry Ass'n, Inc. v. Sierra Club, 523 U.S. 726, 728-32

13    (1998);  Idaho Conservation League v. Mumma, 956 F.2d 1508, 1511 (9th Cir. 1992).  The first

14    level is embodied by the Forest Plan, which is a broad, programmatic document, accompanied by

15    an appropriate public review process.  Ohio Forestry, 523 U.S. at 729-30.  16 U.S.C. § 1604.  At

16    the second level, the Forest Service undertakes site-specific actions to achieve the desired

17    conditions in the Forest Plan.  Id.  Proposed projects must be consistent with the Forest Plan.

18    See 16 U.S.C. § 1604(I).  NFMA provides substantial discretion to the Forest Service in

19    managing the NFS lands.  See e.g., Perkins v. Bergland, 608 F.2d 803, 806 (9th Cir. 1979).

20    **D.    The Travel Management Rule**

21    The Forest Service travel management rule at 36 C.F.R. Part 212 is divided into Subparts

22    A, B, and C.  Subpart A implements the Forest Service's authority under the Federal-Aid

23    Highway Act, 23 U.S.C. §§ 101-610, and governs the administration of the forest transportation

24    system.  Subpart A covers issues such as the inventorying of roads in administrative units of the

25    NFS, as well as maintenance, construction, traffic rules, and other administrative components of

26    the forest transportation system.  36 C.F.R. §§ 212.1 - 212.21.  Subpart A also requires the Forest

27    to identify the minimum road system needed for safe and efficient travel and for administration,

28

1   utilization, and protection of NFS lands.  36 C.F.R. § 212.5(b)(1).  "The minimum system is the

2   road system determined to be needed to meet resource and other management objectives adopted

3   in the relevant land and resource management plan."  Id.

4          By contrast, Subpart B implements the Forest Service's authority under its Organic Act,

5   16 U.S.C. § 551; the Bankhead Jones Farm Tenant Act, 7 U.S.C. § 1011(f); and Executive

6   Order 11644, 37 Fed. Reg. 2,877 (Feb. 9, 1972) and Executive Order 11989, 42 Fed. Reg.

7   26,959 (May 25, 1977).  Subpart B designates NFS roads, NFS trails, and areas on NFS lands for

8   motor vehicle use by vehicle type and time of year.  36 C.F.R. §§ 212.50 - 212.57.  Once the

9   roads, trails and areas are designated for motor vehicle use, all motor vehicle uses inconsistent

10  with those designations are prohibited.  36 C.F.R. § 261.13.  Responsible officials are to

11  designate roads, trails and areas for motor vehicle use

>   consider[ing] effects on National Forest System natural and cultural resources,
>   public safety, provision of recreational opportunities, access needs, conflicts
>   among uses of National Forest System lands, the need for maintenance and
>   administration of roads, trails, and areas that would arise if the uses under
>   consideration are designated; and the availability of resources for that
>   maintenance and administration.

36 C.F.R. § 212.55(a).  In addition to the criteria set forth in 36 C.F.R. § 212.55(a), when

designating trails and areas, the responsible official "shall consider effects…with the objective of

minimizing" (1) damage to soil, watershed, vegetation and other forest resources; (2) harassment

of wildlife and significant disruption of wildlife habitats; and (3) conflicts between motor vehicle

use and existing or proposed recreational uses of NFS lands or neighboring Federal lands.

36 C.F.R. § 212.55(b).  When designating roads, the responsible official shall consider: (1)

speed, volume, composition, and distribution of traffic on roads; and (2) compatibility of vehicle

class with road geometry and road surfacing.  36 C.F.R. § 212.55(c).  Thus, the authorities,

purposes, and legal standards in 36 C.F.R. Part 212, Subpart A, are entirely distinct from the

authorities, purposes, and legal standards in 36 C.F.R. Part 212, Subpart B.[4]/

---

[4]/      Although not relevant to this action, the authorities, purposes, and legal standards of Subpart
C also are entirely distinct from those for Subparts A or B.  Subpart C implements the Forest
Service's authority under its Organic Act, 16 U.S.C. § 551; the Bankhead Jones Farm Tenant Act,

1   **E.**     **Standards of Review**

2       **1.**     **Summary Judgment**

3       The Ninth Circuit has endorsed the use of summary judgment motions under Rule 56 of

4   the Federal Rules of Civil Procedure for review of agency actions under the Administrative

5   Procedure Act ("APA").   See, e.g., Northwest Motorcycle Ass'n v. U.S. Dep't of Agric., 18 F.3d

6   1468, 1471-72 (9th Cir. 1994).  The court's role in cases involving decisions of an administrative

7   agency is not to resolve facts, but to "determine whether or not as a matter of law the evidence in

8   the administrative record permitted the agency to make the decision it did."  Occidental Eng'g

9   Co. v. Immigration & Naturalization Serv., 753 F.2d 766, 769 (9th Cir. 1985).  The

10  administrative agency itself is the fact-finder; summary judgment is appropriate for determining

11  the legal question of "whether the agency could reasonably have found the facts as it did."  Id. at

12  770.

13      **2.**     **The Administrative Procedure Act ("APA")**

14      "Judicial review of agency decisions under NEPA . . . and the ESA is governed by the

15  [APA], which specifies that an agency action may be overturned only where it is found to be

16  'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'"  Native

17  Ecosystems Council v. Dombeck, 304 F.3d 886, 891 (9th Cir. 2002) (quoting 5 U.S.C. §

18  706(2)(A)).  "[T]he scope of review under the [APA] is narrow and a court is not to substitute its

19  judgment for that of the agency."  Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,

20  463 U.S. 29, 43 (1983).  A court may reverse a decision as arbitrary and capricious only if an

21  agency "relied on factors Congress did not intend it to consider, 'entirely failed to consider an

22  important aspect of the problem,' or offered an explanation 'that runs counter to the evidence

23  before the agency or is so implausible that it could not be ascribed to a difference in view or the

24

---

25  7 U.S.C. § 1011(f); and Executive Orders 11644 and 11989, to provide for, but not require,
26  regulation of over-snow vehicle use.  36 C.F.R. § 212.81(a) (authorizing responsible official to
    allow, restrict, or prohibit over-snow vehicle use).  Regulation of over-snow vehicle use under
27  36 C.F.R. Part 212, Subpart C, is subject to the same requirements as designation of motor vehicle
    use under 36 C.F.R. Part 212, Subpart B.  36 C.F.R. § 212.81(c).
28

1  product of agency expertise.'" <u>League of Wilderness Defenders' Blue Mountains Biodiversity</u>

2  <u>Project v. U.S. Forest Serv.</u>, 549 F.3d 1211, 1215 (9th Cir. 2008) (internal quotations and

3  citation omitted).  "In other words, there must be "'a clear error of judgment.'"  <u>Id.</u> (quoting

4  <u>Marsh v. Oregon Natural Res. Council</u>, 490 U.S. 360, 378 (1989)).  Under § 706(2) of the APA,

5  "administrative action is upheld if the agency has 'considered the relevant factors and articulated

6  a rational connection between the facts found and the choice made.'"  <u>Friends of Endangered</u>

7  <u>Species, Inc. v. Jantzen</u>, 760 F.2d 976, 982 (9th Cir. 1985) (quoting <u>Baltimore Gas & Electric</u>

8  <u>Co. v. Natural Res. Def. Council</u>, 462 U.S. 87, 105 (1983)).  The court's role is solely to

9  determine whether "the decision was based on a consideration of the relevant factors and

10 whether there has been a clear error of judgment."  <u>Citizens to Pres. Overton Park v. Volpe</u>, 401

11 U.S. 402, 416 (1971).

12      This standard is "exceedingly deferential."  <u>Fund for Animals v. Rice</u>, 85 F.3d 535, 541

13 (11th Cir. 1996); <u>see also</u> <u>The Lands Council v. McNair</u>, 537 F.3d 981, 992-94 (9th Cir. 2008)

14 (en banc).  "While we may not supply a reasoned basis for the agency's action that the agency

15 itself has not given, we will uphold a decision of less than ideal clarity if the agency's path may

16 reasonably be discerned."  <u>Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.</u>, 419 U.S.

17 281, 285-86 (1974) (internal citation omitted); <u>see</u> <u>Friends of the Earth v. Hintz</u>, 800 F.2d 822,

18 831 (9th Cir. 1986) ("The court may not set aside agency action as arbitrary and capricious

19 unless there is no rational basis for the action.").  "The [agency's] action . . . need be only a

20 reasonable, not the best or most reasonable, decision."  <u>National Wildlife Fed'n v. Burford</u>, 871

21 F.2d 849, 855 (9th Cir. 1989).  The APA does not require – or even allow – a court to overturn

22 an agency action because it disagrees with the agency's decision or even with its conclusions

23 about the scope, breadth or effect of the environmental impacts of the project at issue.  <u>Vermont</u>

24 <u>Yankee Nuclear Power Corp. v. Natural Res. Def. Council</u>, 435 U.S. 519, 553 (1978).  The

25 reviewing court's task is simply "to insure a fully informed and well-considered decision, not

26 necessarily a decision [that the court] would have reached had [it] been [a] member [ ] of the

27 decisionmaking unit of the agency."  <u>Id.</u> at 558.

28

1    In deciding disputes that involve primarily issues of fact that "'require[] a high level of

2  technical expertise,' [the court] must defer to 'the informed discretion of the responsible federal

3  agencies.'"  <u>Marsh</u>, 490 U.S. at 377 (quoting <u>Kleppe v. Sierra Club</u>, 427 U.S. 390, 412 (1976));

4  <u>see</u> <u>Baltimore Gas</u>, 462 U.S. at 103 ("When examining this kind of scientific determination . . . a

5  reviewing court must generally be at its most deferential").  "Forest management is fairly viewed

6  as the sort of technical field where courts should defer to the findings of specialized

7  administrative agencies."  <u>Inland Empire Pub. Lands Council v. Schultz</u>, 807 F. Supp. 649, 652

8  (E.D. Wash. 1992) (citing <u>Cronin v. U.S. Dep't of Agric.</u>, 919 F.2d 439, 444 (7th Cir. 1990)).

9  Thus, when dealing with public lands management issues, a federal agency such as the Forest

10  Service "must have discretion to rely on the reasonable opinions of its own qualified experts."

11  <u>Marsh</u>, 490 U.S. at 378.  "We are to be most deferential when the [Forest Service] is making

12  predictions, within its area of special expertise, at the frontiers of science[, and] we are to

13  conduct a particularly deferential review of [the Forest Service's] predictive judgments about

14  areas that are within the agency's field of discretion and expertise . . . as long as they are

15  reasonable."  <u>McNair</u>, 537 F.3d at 993 (quotation marks and citations omitted) (en banc).

16    Judicial review of federal agency actions under the APA is restricted, with limited

17  exceptions, to the administrative record lodged by the agency.  5 U.S.C. § 706.  The Supreme

18  Court has held that "in cases where Congress has simply provided for review [under the APA], .

19  . . [judicial] consideration is to be confined to the administrative record and . . . no de novo

20  proceedings may be held."  <u>United States v. Carlo Bianchi & Co.</u>, 373 U.S. 709, 715 (1963)

21  (citations omitted); <u>see</u> <u>Florida Power & Light Co. v. Lorion</u>, 470 U.S. 729, 743-44 (1985);

22  <u>Camp v. Pitts</u>, 411 U.S. 138, 142 (1973) (holding that the "focal point for judicial review [of an

23  agency decision] should be the administrative record already in existence, not some new record

24  made initially in the reviewing court").  "The complete administrative record consists of all

25  documents and materials directly or indirectly considered by the agency."  <u>Bar MK Ranches v.</u>

26  <u>Yuetter</u>, 994 F.2d 735, 739 (10th Cir. 1993).

27

28

1

## II.  FACTUAL AND PROCEDURAL BACKGROUND

2

### A.    Project Background

3       On October 26, 2005, the Forest Service published a notice of intent to prepare an EIS in

4 support of a travel management decision for the ENF.  See FEIS at 1-9 (TMAR02440), Chapters

5 1-3 of FEIS (TMAR02430 - 02821)[5]/.  The notice of intent was published in conformance with

6 this Court's Order in Center for Sierra Nevada v. Berry, No. 2:02-cv-00325-LKK-JFM (E.D.

7 Cal. Aug. 16, 2005) (Order on Remedies (Dkt. 163)) ("Berry Order"), a related case to the

8 present action.  That order required the Forest Service, among other things, to withdraw a prior

9 1990 Off-Highway Vehicle ("OHV") Plan previously prepared for the ENF and to "issue a Final

10 Environmental Impact Statement and Record of Decision on a new ENF OHV Plan (or

11 site-specific area plans)" by December 31, 2007 (subsequently extended to April 2, 2008).

12 Order at 1.  The notice was also prepared in anticipation of a forthcoming rule that was

13 promulgated on November 9, 2005 regarding travel management on NFS lands across the

14 country.  See 70 Fed. Reg. 68,264 (Nov. 9, 2005).  Among other things, the new rule requires the

15 Forest Service to designate a system of NFS roads, trails, and areas for motor vehicle use[6]/ for all

16 administrative units of the NFS in accordance with certain criteria.

17       Following the publication of the notice, multiple public meetings, and the solicitation of

18 written public comments on the scope of the issues to be considered, the Forest Service prepared

19 and circulated for public comment on July 20, 2007, a draft environmental impact statement

20 ("DEIS") on proposed travel management in the ENF.  See FEIS at 1-10 (TMAR02441).  The

21

22

23 [5]/    The Travel Management Administrative Record ("TMAR") has been bates numbered, such
that references to documents in the record will be cited as TMAR followed by a 5 digit bates number
24 (e.g. TMAR02440).  On occasion, when references are made to major documents, such as the Final
Environmental Impact Statement ("FEIS") or Record of Decision ("ROD"), it may use the actual
25 page numbers from that document, and be referred to as FEIS followed by the internal page number
of that document which include the chapter number followed by the page number for that chapter
26 (e.g. FEIS at 1-9).  For convenience both formats may be used.

27 [6]/    NFS roads are distinguishable from NFS trails managed for OHV use and open for public
use, and the terms "roads" and "trails" are not interchangeable.  Infra at 7 - 8; 36 C.F.R. § 212.1.

28

1    DEIS considered in detail a total of five alternatives.  See id. at xviii (TMAR02403).  These

2    alternatives ranged from the "no action alternative," which would designate a total of 2,188

3    miles of existing roads and trails and allow cross-country travel, see id., to Alternative E, which

4    would allow motorized vehicular travel on a total of 714 miles of roads and 131 miles of trails

5    and prohibit cross-country motor vehicle use.  See id. at xviii-xix (TMAR02404-05).  The

6    preferred alternative – Alternative D – would designate and allow public motorized vehicular

7    travel on a total of 847 miles of roads and 216 miles of trails and prohibit cross-country motor

8    vehicle use.  See id. at 2-14 (TMAR02461).  The routes under consideration for designation

9    under these alternatives were in addition to "334 miles of State, county, and private roads on the

10   ENF and 311 miles of roads and trails within the Rock Creek Recreational Trails Area," which

11   were outside the scope of the Decision.  Id. at 2-2 (TMAR02449); see also id. at ix

12   (TMAR02395) ("Existing NFS roads managed for standard four wheel passenger vehicles . . .

13   are already regulated by state and federal law.  Therefore, motorized use of such roads will not

14   be reconsidered in this proposal.").

15          After publication of the DEIS, the Forest Service extended the original 45-day comment

16   period, scheduled to close on September 4, 2007, based on requests from the public.  See id. at

17   1-10 (TMAR02441).  The Forest Service also held six public meetings on the draft EIS between

18   July 25 and August 14, 2007.  See id.  Over 6,000 comments on the draft EIS were submitted.

19   See id.  Based on these comments, the Forest Service made various revisions to the DEIS,

20   including adding a sixth alternative, modified Alternative B.  See id. at 2-2 (TMAR02449).

21   Modified Alternative B, which became the new preferred alternative, would designate and allow

22   motor vehicle use on 1,002 miles of ML-2 roads[7]/ and 242 miles of NFS trails and prohibit

23   cross-country motor vehicle use within the ENF.  See id. at xviii (TMAR02403).

24   

25   [7]/     ML-2 roads are NFS roads maintained for high clearance vehicles and are generally not
26   suitable for standard four wheel passenger vehicles.  TMAR02395.  As such, ML-2 roads are not
     subject to the Federal Highway Safety Act like ML-3 to ML-5 surfaced roads.  Id.  ML-1 roads were
27   designed to be intermittently used service roads and were intended to be closed to public wheeled
     vehicle use.  TMAR02396.
28

1    On March 31, 2008, the ROD adopting Modified Alternative B was signed.  On April 2,

2    2008, the Forest Service published a notice of availability of the FEIS.  The FEIS responded in

3    detail to the public comments submitted on the draft EIS.  See id. at Appendix C (TMAR02885-

4    03088).  As described in the ROD, Modified Alternative B was selected "because it provides a

5    balanced response to the public comments by satisfying many recreation and social benefit

6    criteria while providing increased protection for resources."  ROD at 8 (TMAR03277).

7    By its terms, the approved Decision "regulate[s] unmanaged public wheeled motor

8    vehicle use by allowing use on specific National Forest Transportation System (NFTS) roads and

9    trails and prohibiting cross country travel."  See id. at 4 (TMAR03273).  The Decision

10   contemplates that additional access for mining and other purposes may be granted pursuant to a

11   separate administrative process.  See id. at 6 (TMAR03275) ("Any unauthorized route not

12   included as part of this decision is not precluded from consideration in future projects with the

13   associated NEPA analysis."); FEIS at 3-212 (TMAR02609).  The Decision further recognizes

14   that motor vehicle use may occur on an additional "635 miles of surfaced roads suitable for

15   passenger cars," which were "not a part of this decision."  ROD at 4 (TMAR03273).

16   **B.    Endangered Species Act Consultation as to the California Red-Legged Frog**

17   The CRLF is endemic to California and Baja California, Mexico and its known

18   elevational range extends from near sea level to elevations of about 1,500 meters (5,200 feet).

19   TMAR15843.  Populations remain in approximately 256 streams or drainages in 28 California

20   counties.  Id.  Threats to the CRLF include a wide variety of human impacts to its habitat,

21   including urban encroachment, construction of reservoirs, and water  diversions, contaminants,

22   agriculture, and livestock grazing.  Id.  The introduction of non-native predators and competitors

23   also continues to threaten the viability of many CRLF populations.  Id.  The CRLF was listed as

24   a threatened species in 1996, and critical habitat was designated on March 17, 2010.[8]/  61 Fed.

25

26

27   [8]/    The ESA defines "critical habitat" to mean those areas containing those physical or
     biological features that the FWS determines warrant "special management considerations or

28   protection" or are "essential to the conservation of the species."  16 U.S.C. § 1532(5)(A).

Reg. 25,813 (May 23, 1996) (listing decision); 75 Fed. Reg. 12,816 (March 17, 2010) (final CRLF critical habitat rule).  None of the routes authorized as part of the selected alternative, Modified Alternative B, runs through or near CRLF critical habitat.  75 Fed. Reg. 12,816.

To assess the potential impacts of the Decision on the CRLF and comply with the ESA, Defendants consulted with FWS from 2006 to 2008 in three phases.[2]/  First, in 2006 Forest Service, Region 5, and FWS engaged in informal consultation under the ESA to develop a set of generally applicable route designation project design criteria ("Design Criteria").  The Design Criteria were established to ensure that the Forest Service's travel management activities would remain consistent with the high "no effect" or "may affect not likely to adversely affect" conclusion for the CRLF.  TMAR12899, 00031; 50 C.F.R. § 402.13(a) (if action agency determines with FWS concurrence that action is not likely to adversely affect listed species, the consultation process is terminated and no further action is necessary).  Six Design Criteria were identified through this consultation:

(1). Routes or areas may not have the potential to capture surface run-off and then deliver sediment into a stream associated with CRLF.

(2). In suitable CRLF habitat, routes must avoid Riparian Reserve and Riparian Conservation Areas except where necessary to cross streams.

(3). Routes or areas may not cross any stream or waterbody within 500 feet of known occupied CRLF sites or be within 500 feet of wetlands (i.e. springs, wet meadows, ponds marshes).

(4). In habitat occupied by CRLF, routes or areas may not have the potential to capture or divert stream flow.  The approaches to stream crossings should be downsloped toward the stream on both sides.

(5). If within CRLF habitat, areas must be located outside of Riparian Reserve Riparian Conservation Areas, meadows and wetlands.

(6). No route or areas may be within Critical Aquatic Refuges for CRLF.

---

[2]/   The Forest Service undertook this consultation even though the only detection of CRLF within lands within the ENF occurred in 2001. TMAR12895, 12788. In that year one adult frog was observed at a location known as "Ralston Ridge."  TMAR12895.  Subsequent surveys have not detected any CRLF at the Ralston Ridge site.  Id.

TMAR00003-04, 00032.  If the action met the Design Criteria, FWS concurred with the Forest

Service's determination that the action would have "no effect" or "may affect" but would be "not

likely to adversely effect" the CRLF, and no further consultation would be required.

TMAR00001, 00032-33, 12890.  This memorandum of law refers to the first phase as the "2006

Consultation."

Subsequently, in 2007, when Alternative D was the preferred alternative, the Forest

Service analyzed the effects of the routes designated for inclusion as part of Alternative D in its

Draft EIS and an accompanying biological assessment ("July 2007 BA").  TMAR12881-85,

12889.[10]/  The July 2007 BA concluded that Alternative D would be "not likely to adversely

affect" the species because either the Design Criteria were met or field surveys showed the

habitat at issue was likely unsuitable or unoccupied by CRLFs.  TMAR12881-84.  It was not

clear, however, whether all of the staging areas included in Alternative D–none of which are at

issue in this litigation–were consistent with the Design Criteria.  TMAR12883.  Defendants

noted that "based on survey results, it is unlikely that [CRLF] are present in the streams adjacent

to the staging areas proposed in Alternative D." TMAR12889 (emphasis added).  Due to this

lack of clarity, Defendants requested FWS's concurrence that Alternative D was "not likely to

adversely affect" the CRLF.  TMAR00013, 02354. FWS concurred in a memorandum dated

August 30, 2007.  TMAR02354-55.  This memorandum of law refers to this second phase as the

"2007 Consultation."

In the Decision, the Forest Service elected to implement a slightly modified alternative,

Modified Alternative B.  Defendants used the Design Criteria to determine whether those few

additional routes included in Modified Alternative B but not Alternative D would also have "no

effect" or would be "not likely to adversely affect" CRLF.  TMAR12889 (Modified Alternative

---

[10]/     The Forest Service undertook this consultation even though the only detection of CRLF
within lands within the Eldorado National Forest occurred in 2001.  TMAR12895, 12788.  In that
year one adult frog was observed at a location known as "Ralston Ridge."
TMAR12895. Subsequent surveys have not detected any CRLF at the Ralston Ridge site.  Id.

1  B had become Preferred Alternative), 12890 (use of Design Criteria).[11]/ To analyze its potential

2  effects, the Forest Service prepared a second biological assessment in March 2008 ("March 2008

3  BA").  The March 2008 BA found that Modified Alternative B fully complied with FWS's

4  Design Criteria.  TMAR12889 (Modified Alternative B "implements route designation as

5  described in the [Design Criteria]" for the CRLF.  Therefore, "no further action pursuant to the

6  Act, is necessary.").  This memorandum of law shall refer to this third phase as the "2008

7  Consultation/Review."

8      Through the 2006, 2007 Consultations, and the 2008 Consultation/Review, the Forest

9  Service and FWS therefore determined via the Design Criteria that all of the routes authorized by

10  Modified Alternative B would have no effect or would be not likely to adversely affect the

11  CRLF.  Id. at 12890; see also TMAR00003-04, 00032, 03287 (ROD stating March 2008 BA

12  "finds that [Modified Alternative B] is consistent with these Project Design Criteria and thus

13  determines that the project will have no effect on or is not likely to adversely affect the [CRLF].

14  Based upon this finding[,] no further consultation is required with [FWS] for th[is] species (FWS

15  memo dated Dec. 27, 2006).").  In so doing, the Defendants have satisfied their procedural and

16  substantive obligations under the ESA.

17                    **IV.  ARGUMENT**

18  **A.    The Forest Service Has the Discretion to Determine When to Identify the Minimum Road System Relative to Route Designation**

19
20          **1.    The Travel Management Regulations Do Not Require The Forest Service To Identify the Minimum Road System Prior to Designating Routes**

21      The Forest Service may designate routes under 36 C.F.R. Part 212, Subpart B, prior to

22  identifying the minimum road system under 36 C.F.R. Part 212, Subpart A.  Plaintiffs' argument

23  to the contrary disregards the import of this Court's prior order, incorrectly interprets the

24  relevant regulations, and second-guesses agency determinations that are entitled to deference.

25  _____

[11]/     Modified Alternative B designated 11.6 fewer miles of unauthorized routes than Alternative
26  D would have.  Id.  It also eliminated use on a number of existing national forest system roads to
minimize impacts to meadows, reduce impacts to stream courses and riparian habitat, and provide
27  for areas of quiet recreation.  TMAR12892; see also id. 12931-33 (Modified Alternative B "likely
to meet" all six of the Forest Service's Riparian Conservation Objectives).
28

1         **a.**       ***The Court-Imposed Deadline Required the Forest Service to Designate Routes***

2         The Forest Service was under an order by this Court to withdraw a 1990 OHV Plan and

3  issue a final EIS on the new OHV Plan by April 2, 2008.[12]/ TMAR05635, 05649-50.  The

4  Court's timeline is reflected in the Forest Service's planning documents.  TMAR05488, 05497,

5  00869.  It is also reflected in the FEIS.  TMAR02394.  Plaintiffs' brief ignores this compelling

6  reason for designating routes prior to identification of the minimum road system.  Given this

7  Court's order to address designation immediately and by a date certain, the Forest Service

8  properly designated routes under Subpart B before identifying the minimum road system under

9  Subpart A.

10        **b.**       ***There Is No Requirement in the Plain Language of the Travel Management***
                     ***Rule that Requires Minimum Road System Identification Prior to Route***

11                   ***Designation***

12        In analyzing agency regulations, courts  begin with the plain language.  See Bayview

13 Hunters Point Cmty. Advocates v. Metropolitan Transp. Comm'n, 366 F.3d 692, 698 (9th Cir.

14 2004) (citation omitted).  "A regulation should be construed to give effect to the natural and

15 plain meaning of its words."  Id.  The plain language of the travel management rule permits the

16 Forest Service to designate routes and identify the minimum road system in any order.  No

17 provision of the travel management rule requires the Forest Service to identify the minimum

18 road system under Subpart A before designating routes under Subpart B.  See 36 C.F.R. § 212.5,

19 212.55.  Nor do any of the designation criteria in Subpart B reference identification of the

20 minimum road system as a prerequisite.  36 C.F.R. § 212.55.  Therefore, the requirement to

21 identify the minimum road system in Subpart A may not be deemed a prerequisite to designation

22 of routes under Subpart B.  Plaintiffs' assertion that "Subpart A is an essential prerequisite to

23 route designation under Subpart B," (Pl. Br. at 11), fails to cite anything in the regulatory

24 language that requires a particular order for completion of the analyses in Subpart A and Subpart

25

26 [12]/     The Court initially set the deadline for the new ENF OHV Plan for December 31, 2007, but
   the date for completion was extended to allow additional time for public comment and response to

27 public comment.  TMAR02394.

28

B.  Their argument that Subpart A must be completed first therefore fails when confronted with

the plain language of the travel management rule.

      **c.**      ***Deference to Agency Interpretation Permits Route Designation Prior to Minimum Road System Identification***

Even assuming there was some ambiguity with regard to the Forest Service's discretion

to determine the sequencing of implementation of Subparts A and B, the Forest Service's

interpretation of its own regulations is entitled to deference unless it is "plainly erroneous or

inconsistent with the regulation." Auer v. Robbins, 519 U.S. 452, 461-63 (1997) (citing

Robertson, 490 U.S. at 359); Chevron U.S.A., Inc. v. Natural Res. Def. Council, 467 U.S. 837,

865-66 (1984); Native Ecosystems Council v. U.S. Forest Serv., 418 F.3d 953, 960 (9th Cir.

2005) ("Agencies are entitled to deference to their interpretation of their own regulations"); see

also Hells Canyon Alliance v. U.S. Forest Serv., 227 F.3d 1170, 1180 (9th Cir. 2000) ("Because

the plan language is susceptible to more than one reasonable interpretation, we defer to the

agency's interpretation.").  Courts are to defer to an agency's interpretation of its own

regulations "unless an alternative reading is *compelled* by the regulation's plain language or by

other indications of the agency's intent at the time of the regulation's promulgation."  Bassiri v.

Xerox Corp., 463 F.3d 927, 931 (9th Cir. 2006) (quoting Thomas Jefferson Univ. v. Shalala, 512

U.S. 504, 512 (1994) (internal quotation marks omitted, emphasis in original).  Any reasonable

interpretation that explains why the Forest Service has concluded it can complete Subpart B

analysis before Subpart A analysis is entitled to deference.  Hells Canyon Alliance, 227 F.3d at

1180.  Several reasonable interpretations explain the Forest Service's actions.

First, as explained in Part III.D supra, the authorities, purposes, and legal standards in

Subpart A are entirely distinct from those in Subpart B.  The regulations in Subparts A and B

were separately promulgated.  66 Fed. Reg. 3,216 (January 12, 2001) and 70 Fed. Reg. 68,264

(Nov. 9, 2005).  The requirement to identify the minimum road system needed for safe and

efficient travel and for administration, utilization, and protection of NFS lands under 36 C.F.R. §

212.5(b), is entirely distinct from the designation of routes and areas under 36 C.F.R. § 212.51.

Identification of the minimum road system focuses on the need for roads in the forest

1   transportation system to administer, utilize, and protect NFS lands and resources and includes

2   decommissioning of roads that are no longer needed to meet forest resource management

3   objectives." 36 C.F.R. § 212.5(b)(1)-(2). Thus, identification of the minimum road system

4   necessarily entails consideration of a broad set of management objectives and encompasses roads

5   that may not be designated pursuant to Subpart B, such as roads needed to support administration

6   of special use authorizations or fire-fighting access. Consistent with the breadth of these

7   considerations, 36 C.F.R. § 212.5(b) does not set forth specific criteria to apply in identifying the

8   minimum system. Rather, § 212.5(b) directs the responsible official to "incorporate a

9   science-based roads analysis at the appropriate scale." 36 C.F.R. § 212.5(b)(1); compare 36

10   C.F.R. § 212.5(b)-(d) with 36 C.F.R. §§ 212.50; 212.51; 212.55.

11        In contrast to the very broad mandate of identifying roads needed (and no longer needed)

12   to administer NFS lands, Subpart B determines where and when motor vehicles may be operated,

13   subject to specific exemptions. The impetus behind Subpart B is the need to provide a better

14   management framework for motor vehicle use by the public on NFS lands, driven largely by the

15   increase in the magnitude and intensity of off-road motor vehicle use. See 70 Fed. Reg. at

16   68,265 (explaining that unrestricted cross-country travel by the public can no longer be

17   sustained). Subpart B is intended to address recreational motor vehicle use by the public, and as

18   a consequence, encompasses roads, trails, and areas. Subpart A is limited to the consideration of

19   roads. In further contrast to Subpart A's requirement for a general, science-based analysis,

20   Subpart B sets forth general and specific criteria for designation of roads, trails, and areas for

21   motor vehicle use. In short, because the authorities, purposes, and legal standards in Subpart A

22   are entirely distinct from those in Subpart B, the requirement to identify the minimum road

23   system under Subpart A therefore cannot be read into the designation requirement in Subpart B.

24        Second, the growing popularity of OHV use on forest transportation system lands created

25   a situation in which containing unmanaged recreation became a priority for the agency. The

26   Forest Service expressed this concern in the preamble of the travel management rule, which cited

27   the growing popularity and increased capabilities of OHVs as the major reason for developing

28

1   new regulations.  70 Fed. Reg. at 68,264-65.  The Forest Service recognized that "[m]otor

2   vehicles are a legitimate and appropriate way for people to enjoy their National Forests," but

3   noted that OHV use is appropriate only "in the right places, and with proper management"

4   because "the magnitude and intensity of motor vehicle use have increased to the point that the

5   intent of E.O. 11644 and E.O. 11989 cannot be met while still allowing unrestricted

6   cross-country travel."  Id.  As one example of the priority the Forest Service placed on

7   containing unmanaged recreation, the Forest Service, the Off Highway Motor Vehicle

8   Recreation Division of California State Parks and the California Off Highway Motor Vehicle

9   Recreation Commission entered into a memorandum of intent on August 11, 2003, to designate

10  routes for OHV use.  TMAR01509; Ex. 1, *available at* TMAR16947.  These entities entered into

11  this memorandum to provide for responsible and consistent OHV use, to provide high quality

12  recreation opportunities, to protect the environment, and to minimize conflicts among

13  recreational uses.  Ex.1, at 1.  Given the priority the Forest Service placed on containing

14  unmanaged recreation on forest transportation system lands, it was reasonable for the Forest

15  Service to prioritize route designation over the minimum road system identification.[13]/

16      Third, current Forest Service Directives support the agency's interpretation with respect

17  to the Decision.  The current directives in the Forest Service Manual ("FSM") implementing the

18  travel management rule were issued through public notice and comment and are entitled to

19  deference with respect to their interpretation of the travel management rule.  The current

20  directives state that they "would require responsible officials to use travel analysis to consider

21  the criteria in 36 C.F.R. § 212.55 [Subpart B] and contribute towards identification of the

22  minimum road system needed for safe and efficient travel and for administration, utilization, and

23  protection of NFS lands (36 C.F.R. § 212.5(b)) [Subpart A].").  72 Fed. Reg. 10,632, 10,635

24  (March 9, 2007).  The FSM expressly states that "[t]ravel analysis for purposes of identification

25

26  _____
    [13]/    In addition, there are many routes on the ENF that served important recreational needs.
    TMAR002397.  Designating these routes before conducting a Subpart A analysis will allow the
27  Agency to consider recreational objectives appropriately when it undertakes further efforts to
    identify the minimum system.
28

1   of the minimum road system is separate from travel analysis for purposes of designation of

2   roads, trails, and areas for motor vehicle use.  Travel analysis for both purposes may be

3   conducted concurrently or separately."  FSM 7712. para. 2.  The same section states that "[a]ny

4   proposals resulting from travel analysis for either purpose may be addressed in the same or

5   different environmental analyses."  Id. at para. 3.  The provision for separate or concurrent travel

6   analyses for Subpart A and Subpart B provides further evidence in support of the Forest

7   Service's interpretation that the two processes are distinct and may be considered in either order

8   or concurrently.

9       The plain language of the travel management rule permits minimum road system

10  identification and route designation to be completed in any order.  Even if there were ambiguity

11  in the rule with respect to the sequencing of Subpart A and Subpart B, which there is not, the

12  Forest Service has proffered other reasonable explanations for why it performed route

13  designation under Subpart B prior to minimum road system identification under Subpart A.

14  These reasonable explanations are entitled to deference.

15          **d.      *Plaintiffs' Approach to Travel Management Is Unconvincing and Second-
                      Guesses the Forest Service's Reasonable Interpretation of Its Own Regulations***

16

17          Plaintiffs boldly assert that "Subpart A is an essential prerequisite to route designation

18  under Subpart B," Pl. Br. at 11:3-4, but this conclusory assertion fails to cite anything in the

19  regulations or Administrative Record requiring Subpart A analysis to be completed first.  To the

20  contrary, the regulations emphasize that travel analysis for purposes of route designation is

21  distinct from travel analysis for purposes of identifying the minimum road system.  FSM 7712,

22  para. 2.  Plaintiffs recognize as much in their brief.  Pl. Br. at 11, n. 6.  Plaintiffs do not

23  acknowledge the Forest Service's urgent need to designate routes and areas for motor vehicle use

24  (under Subpart B), nor do they acknowledge the time constraints imposed on the ENF by this

25  Court's August 16, 2005 order that required a new EIS for an OHV plan.  As explained in the

26  preceding section, minimum road system identification under Subpart A is not necessary prior to

27  route designation under Subpart B.

28

1    Plaintiffs cite to <u>Center for Biological Diversity v. U.S. Bureau of Land Mgmt.</u>,

2  – F. Supp. 2d –, No. 06-4884, 2009 WL 7036134 (N.D. Cal. Sept. 28, 2009), for the proposition

3  that "parallel" Bureau of Land Management ("BLM") travel management regulations require

4  minimization criteria to be applied to route designations.  Pl. Br. at 4-5.  The BLM regulations

5  are not parallel to the Forest Service's travel management rule, and the case is distinguishable

6  from the one at bar.  The BLM regulation at issue in <u>Center for Biological Diversity</u> was 43

7  C.F.R. § 8342.1, which provides that "all designations shall be based on the protection of the

8  resources of the public lands, the promotion of the safety of all the users of the public lands, and

9  the minimization of conflicts among various uses of the public lands; and in accordance with the

10 following criteria."  43 C.F.R. § 8342.1 (emphasis added).  The specific criteria require, for

11 example, that "trails *shall be located to minimize damage* to soil, watershed, vegetation, air, or

12 other resources of the public lands."  <u>Id.</u> § 8342.1(a) (emphasis added).

13    This language substantively differs from the language of the Forest Service's travel

14 management rule, 36 C.F.R. § 212.55(b).  That regulation states: "in designating National Forest

15 System trails and areas on National Forest System lands, the responsible official *shall consider*

16 *effects on the following, with the objective of minimizing*: (1) [d]amage to soil, watershed,

17 vegetation, and other forest resources…."  <u>Id.</u> at 43 C.F.R. § 8342.1(b)(1) (emphasis added).

18 Thus, in implementing section 3(a) of Executive Order 11644, the travel management rule does

19 not require the Forest Service to minimize these impacts.  Rather, the travel management rule

20 calls for the Forest Service to *consider* effects as it evaluates potential route designations, with

21 the *objective* of minimizing damage to various forest resources.  Plaintiffs' contention that the

22 court's conclusion in <u>Center for Biological Diversity</u> is controlling in this case disregards the

23 fact that the BLM regulations are prescriptive, while the Forest Service regulations require

24 consideration of effects without mandating a particular outcome, thus preserving agency

25 discretion.  The Forest Service's interpretation is consistent with Executive Order 11644, which

26 does not dictate a particular result.

27

28

1    The Forest Service has proffered several reasonable explanations for why it designated

2    routes prior to identifying the minimum road system.  Plaintiffs' preferred approach ignores this

3    Court's earlier order and is an  unconvincing attempt to second-guess the agency's approach to

4    travel management.  The Court should defer to the plain language of the travel management rule

5    and the Forest Service's interpretation of its own regulations and disregard Plaintiffs' efforts to

6    force their own interpretation on the Forest Service.  Native Ecosystems Council v. U.S. Forest

7    Serv., 418 F.3d 953, 960 (9th Cir. 2005); Hells Canyon, 227 F.3d at 1180.

8         **2.       The Forest Service Has Not Yet Identified the Minimum Road System**

9    Citing to a single statement by an appeals officer that "the FEIS and ROD succeed in

10   designating a minimum system as required by the Travel Rule," Plaintiffs contend that the Forest

11   Service failed to make a legally adequate minimum road system identification.  Pl. Br. at 12

12   (citing TMAR00822).  It is clear from the record that the appeals officer's statement was in

13   error.  There is no support in the Administrative Record for a Subpart A minimum road system

14   identification, and the comment relied upon by the appeals officer indicates that the minimum

15   road system identification has not been made.[14]/

16   Although the Forest Service has not completed the minimum road system identification

17   for purposes of Subpart A, the Agency has initiated this process.  In 2003 the Agency performed

18

19

20   _____

21   [14]/    The comment reads in full:

22   The analysis of effects from implementing each of the alternatives presented in
     Chapter 3 of the FEIS *informs* the Forest Supervisor in making a decision regarding

23   the minimum system, considering among other elements, the safe and efficient
     utilization of the ENF by the public along with potential adverse impacts.  In making

24   his determination, the Forest Supervisor *will consider* the direction provided in the
     ENF LRMP.

25

26   TMAR02898 (emphasis added).  By using the present tense for how the analysis informs the Forest
     Supervisor, and the future tense for what the Forest Supervisor will consider, it is evident that the

27   minimum road system identification has not yet been made and that the appeals officer
     misinterpreted the comment.

28

*Federal Defendants' MPA in Support of*                          2:09-CV-2523-LKK-JFM
*Cross-Motion for Summary Judgment*            - 22 -

a roads analysis and identification for collector and arterial roads.[15]/  TMAR07557-07742.
Collector and arterial roads provide primary access to large portions of the ENF and connect to
the remainder of the forest transportation system.  TMAR07560.  Together, collector and arterial
roads comprise approximately one-fourth of the forest transportation system.  See TMAR07577.
The local road system, which has not been analyzed, comprises the remaining three-fourths.  See
id.  The ENF performed the collector and arterial roads analysis to provide a context for
identification of the minimum road system.  The collector and arterial roads analysis itself does
not constitute minimum road system identification under 36 C.F.R. § 212.5.  As discussed in Part
IV.A.1 supra, a minimum road system identification is not a prerequisite to route and area
designation.

**B.     The FEIS Contains Site-Specific Analysis and Complies with NEPA**

The Forest Service undertook its obligation to comply with this Court's previous mandate
to complete site-specific environmental analysis for OHV use in the ENF, and took the requisite
"hard look" at the environmental impacts based upon site-specific analysis which is evidenced
throughout the FEIS and ROD.   In taking the required "hard look" the Forest Service engaged in
extensive analysis of impacts to the various resources.

Plaintiffs' arguments seek to impermissibly substitute their judgment for the judgment of
the agency experts concerning the type of site-specific analysis necessary to comply with the
"hard look" required under NEPA.  Plaintiffs' main criticism is that the Forest Service's reliance
upon Geographic Information System ("GIS") data and route evaluation forms was arbitrary and
capricious because these were insufficient methodologies.   Plaintiffs' argument is based upon
misquotations, misunderstandings, and omissions regarding the sources of data used by the
Forest Service to conduct the extensive site-specific analysis incorporated into this Decision.
That criticism is without merits and Federal Defendants are entitled to judgment as to the NEPA
claims.

---

[15]/      The responsible official has the discretion and duty to determine whether or not a roads
analysis below the forest scale is needed and the degree of detail that is appropriate and practical for
that analysis.  TMAR007560 (citing FSM 7712.13, para. (a) through (c)); see TMAR007504.

1    Under NEPA, an EIS must contain a "reasonably thorough" discussion of an action's

2    environmental consequences.  State of California v. Block, 690 F.2d 753, 761 (9th Cir. 1982).

3    An EIS must "provide full and fair discussion of significant environmental impacts."  40 C.F.R.

4    § 1502.1.  The EIS must show that agency officials have "[thought] through the consequences

5    of-and alternatives to-their contemplated acts," and must ensure that "citizens get a chance to

6    hear and consider the rationales the officials offer."  Id.; Kleppe, 427 U.S. at 410 n. 21; see also

7    Block, 690 F.2d at 761.

8    However, what constitutes a "hard look" is a standard that "is not susceptible to refined

9    calibration."  Churchill County v. Norton, 276 F.3d 1060, 1071 (9th Cir. 2001) (internal

10   quotation marks and citation omitted).  Rather than apply a rigid standard, a court must make a

11   "pragmatic judgment" as to whether the agency has fostered the two principal purposes of an

12   EIS: informed decisionmaking and informed public participation.  Id.; see also Block, 690 F.2d

13   at 761.  In so doing, a court may not interject itself within the area of discretion of the expert

14   agency as to the choice of the action to be taken; only if the agency's analysis of the

15   environmental impact is "arbitrary and capricious" or "contrary to the procedures required by

16   law" can the reviewing court conclude that the agency did not take the requisite "hard look."

17   Kleppe, 427 U.S. at 410 n. 21; Inland Empire Public Lands Council v. U.S. Forest Service, 88

18   F.3d 754, 763 (9th Cir. 1996).  "The reviewing court may not 'flyspeck' an EIS."  Half Moon

19   Bay Fishermans' Mktg. Ass'n v. Carlucci, 857 F.2d 505, 508 (9th Cir. 1988).

20   Plaintiffs would have this Court engage in exactly the sort of "flyspecking" which is

21   prohibited by second-guessing the methodologies chosen by the Forest Service in conducting the

22   site-specific analysis for this Decision.  The Forest Service's decision to rely upon its databases

23   contained in the GIS, which is based upon site-specific information, is identical to the type of

24   decision to rely upon its own databases which was approved by the Ninth Circuit in McNair, 537

25   F.3d at 1000.  In McNair, the Court held, "'[w]hen specialists express conflicting views, an

26   agency must have discretion to rely on the reasonable opinions of its own qualified experts even

27   if, as an original matter, a court might find contrary views more persuasive."  (citing Marsh, 490

28

U.S. at 378).  Thus, mindful of the Forest Service's discretion, we conclude that it did not act

arbitrarily and capriciously "in relying on its own data and discounting the alternative evidence

offered" by [Plaintiffs]. See Earth Island Inst. I, 351 F.3d at 1302."

       **1.**      **Plaintiffs Incorrectly Quote and Summarize the FEIS When Arguing that the FEIS Relies Upon Inappropriate Data**

Plaintiffs incorrectly quote the FEIS, misunderstand the extent of the site-specific

evaluations performed, and omit any reference to site-specific, field collected data in arguing

that site-specific analysis was not performed.  When these misquotations, misunderstandings,

and omissions are corrected, it is apparent that the ROD is based upon, and the FEIS contains, an

extensive amount of site-specific information that was generated and used in developing the

alternatives and conducting the environmental analysis, including: on-site visitation and surveys;

analysis from aerial photography; geospatial data pertaining to specific road and trail locations as

well as surrounding areas; and information collected from FS staff; available literature; and the

public.

The introduction to the "Affected Environment & Environmental Consequences" section

(Chapter 3) of the FEIS explains the sources of the data used to analyze the effects of the

alternatives on various resources, including recreation, wildlife, heritage resources, sensitive

plants, noxious weeds and hydrology, to name a few (FEIS, pp. 3-1 through 3-316).  It states

that:

> The primary data source used for this analysis was existing GIS data, collected from past *field*[16]/ surveys and inventories. The ENF has numerous GIS layers that contributed to conducting an effective analysis, such as: spotted owl protected activities centers, northern goshawk protected activities centers, riparian conservation area boundaries, hydrologic watersheds, inventoried roadless areas, dispersed camping areas, vegetation, sensitive plant occurrences, and recorded cultural resource sites.

> The second data source used for this analysis originated from route evaluation[] forms (see project record) completed by Forest specialists, District OHV managers, and a variety of District program managers and field personnel. Forest specialists completed forms for targeted routes of concern related to the[ir] area of expertise. District personnel completed forms for all NFS ML-1 and *ML-2*

---

[16]/    Plaintiffs' Brief, omitted the word "field" when quoting this portion of the FEIS in their brief.  Pl. Br. at 17, lines 6-7 (citing TMAR02498).

*roads*[17]/, as well as some unauthorized routes being considered for designation in the action alternatives (Alternatives B, Modified B, C, D, and E). This information is based on the extensive experience and expertise of Forest specialists and District personnel. The data acquired from these forms was attached to each specific route in our GIS inventory and used extensively during alternative development. The data was also used in a variety of ways by the specialists conducting this analysis.

The third data source[18]/ used for this analysis was *collected in the field* by the Forest trails specialist and Recreation specialist for this project. *Field assessments and photo documentation were collected on specific routes* of concern identified by project specialists and all unauthorized routes proposed to allow use as NFS ML-2 roads and NFS trails in Alternatives B, Modified B, C, D, E. Primary field measurements on these routes included: (1) route conditions to assess vertical and horizontal alignments, soil stability and compaction, potential resource problems (e.g. proximity to sensitive resources and signs of route proliferation), and indications of natural revegetation and rehabilitation of routes; and (2) potential for enhancing the motorized recreation system. Finally, cultural resource inventory surveys were *conducted in the field* by a Forest archaeologist on all moderate to high use unauthorized routes proposed for designation in the alternatives, as directed by the Region 5 OHV Programmatic Agreement (USDA FS 2006). These surveys involved the identification of cultural sites on or adjacent to these routes.

TMAR02498-99 (emphasis added).

Plaintiffs mistakenly omit the word "field" when quoting the first paragraph this portion of the FEIS in their brief.  Pl. Br. at 17, lines 6-7 (citing TMAR02498). This omission is important because it lends itself to a misunderstanding that these surveys may not have been based upon actual site-specific work in the field.  In point of truth, the decision at issue in this case was based upon analysis of numerous site-specific field surveys and field inventories.[19]/

---

[17]/   Plaintiffs' Brief erroneously states that "existing ML-2 roads were not evaluated."  Pl. Br. at 17:11 (citing TMAR02498).

[18]/   Plaintiffs omit any reference to this third data source of field-collected data.

[19]/   Examples include the following: Forest soil survey, California Spotted Owl and Northern Goshawk study and observation results (including nest site locations), survey results for aquatic species occurrences (including amphibians and fish species), noxious weeds inventories, sensitive plant surveys, heritage resource inventories, Gold Note OHV trail system soil and hydrologic assessment report (TMAR19937), hydrologic assessment of the Marshall Mine Fuels Reduction Project (including road condition information) (TMAR19817), a table and aerial photos of individual routes crossing meadows (TMAR06378), and aerial photo assessment of high risk routes near streams (TMAR06503).

1    Moreover, Plaintiffs mistakenly state that "existing ML-2 roads were not evaluated."  Pl.

2    Br. at 17, line 11 (citing TMAR02498).  As stated above, however, Forest specialists, District

3    OHV managers, and a variety of District program managers and field personnel completed forms

4    for ML-1 roads, as well as ML-2 roads and some unauthorized routes being considered for

5    designation in the action alternatives (Alternatives B, Modified B, C, D, and E).  Letters of

6    direction were sent to the District Rangers for filling out the route evaluation forms specifically

7    requesting the completion of evaluation forms for ML-2 roads. (TMAR13369).  The route

8    evaluation forms (TMAR13370, 13948, 14505, and 15493) clearly demonstrate that ML-2 roads

9    were individually evaluated, and that each Ranger District engaged in extensive site-specific

10   analysis in completing these forms.[20]/

11   In addition, public meetings and field trips were held during the summer of 2006 and

12   2007 in which individuals and groups identified specific routes and areas that they use frequently

13   or that have specific resource concerns. TMAR10523-10802, and FEIS Appendix A

14   (TMAR02847-49).  This information was used in the development of the alternatives and the

15   analysis.  FEIS 2-1, 2-2 (TMAR02448, 02449).  Alternative B was modified based in part on

16   comments received from the public upon release of the Draft Environmental Impact Statement

17   ("DEIS").  ROD at 7 (TMAR03276).

18   Finally, the appeal decision again explains that the FEIS does contain site-specific

19   information for existing and designated routes sufficient to allow the Forest Supervisor to make a

20   reasoned decision from the range of alternatives.  TMAR00809.  Specifically, the appeal

21   decision states as follows:

22

23        **Issue 1: The FEIS is almost completely lacking in site-specific analysis of
          routes that have been designated. The No Action Alternative failed to show**

24        **all the existing routes that are on the ground and being used. (Appeal 27, pp.
          2-4; Appeal 29, pp. 6-8; Appeal 34, pg. 4; Appeal 47, pp. 4-31)**

25

26   ─────────────────────
     [20]/    Examples of analysis describing specific roads and trails can be found in the FEIS at 3-76

27   (TMAR02573), 3-164 through 3-166 (TMAR02661-63), 3-189(TMAR2686), 3-192 (TMAR02689),
     3-220 (TMAR02717), 3-227 (TMAR2724), 3-233 through 3-236 (TMAR02730-33), 3-245 through

28   3-246 (TMAR02742-43), and 3-294 through 3-306 (TMAR02791-02803).

**Response:** In order to compile the route inventory used in this project, the ENF undertook an extensive effort to spatially locate all of the NFS roads and trails along with the unauthorized routes which showed current or past motor vehicle use and which could be interpreted as travel ways for motor vehicles (FEIS, pg. 2-1; and Appendix C, C-171). Data collection for this inventory began in 1999 and was finalized in February 2006. This inventory was used as the basis for all alternatives, including the No Action (FEIS 2-1).

The FEIS contains an extensive analysis of existing and proposed routes for many different resources, as they pertain to each alternative (including the No Action Alternative) in the Environmental Consequences section. Effects on recreation, wildlife, heritage resources, sensitive plants, noxious weeds and hydrology, to name a few, are included in this section (FEIS, pp. 3-1 through 3-316). Another example of analyses that has extensive site specific information includes the Riparian Conservation Objective (RCO) Analysis, which addresses each route (Aquatic Species Biological Evaluation, Appendix A). The data compiled for this analysis is from many sources, including on-site visitation and known geospatial data pertaining to specific road and trail locations as well as surrounding areas (FEIS, pg. 2-1).

In summary, I find that the FEIS contains site specific information of existing and designated routes, sufficient for the Forest Supervisor to make a reasoned decision from the range of alternatives.

TMAR00809. Accordingly, when considered in full, it is clear the FS completed the necessary analysis to support the Decision.

2. **Plaintiffs' Criticisms of the Forest Service's Reliance Upon Route Evaluation Forms Is Misplaced**

Plaintiffs' reliance upon California v. Bergland, 483 F. Supp. 465, 483-87 (E.D. Cal 1980), aff'd in part, overruled in part by Block, 690 F.2d at (9th Cir. 1982), in drawing a comparison to the completion of worksheets in that case and the route evaluation forms in this case is completely misplaced. In that case, the Court criticized the worksheets in that case because they were a "selective, non-descriptive scoring system" that did not consider the resource but "only its comparative score to generalized attributes." Id. at 486.    The ENF carefully crafted and chose the format of these evaluation forms, so that resource specialists and field personnel would gather the same resource information consistently for each route evaluated and cover all resource issues and concerns for each road, trail, and route evaluated, resulting in an evaluation form that provided site-specific resource information, as well as specialists' opinions regarding each route evaluated.  The route evaluation forms were not used for any sort of comparative scoring, as in Bergland.  The evaluation forms for specific routes encompass

nearly 2500 pages of the administrative record.  TMAR13369-15834.  These evaluation forms were not mere checklists, but were designed to gather substantive site-specific information regarding each route evaluated.  Each evaluation form was completed by Forest specialists, District OHV managers, and a variety of District program managers and field personnel based on extensive experience and expertise, and asked 28 site-specific questions.  TMAR02498.  The route evaluation forms provided opportunities for explanation of answers and included a section for comments, which the directions for filling out the evaluation forms requested to be used to note routes that personnel did not want to have designated based upon resource reasons. TMAR13369.  Moreover, unlike <u>Bergland</u>, the route evaluation forms are not being proffered as the sole source of site-specific analysis, which is in fact based upon extensive GIS analysis, backed up by field-gathered data.

Moreover, Plaintiffs already made these same criticisms regarding the evaluation forms in their comments on the DEIS (TMAR01264-65) and in their appeal (TMAR00327-28).  The response to comments addressed this issue (Appendix C of FEIS, TMAR03018, 03048):

> ***Response:*** *The data collection forms were only one of the items used in the analysis of impacts on resources. Each resource used existing information concerning impacts associated with public wheeled motor vehicle use. This information comes from a variety of field-data based sources, such as vegetation mapping, inventories of cultural resources, ongoing monitoring of wildlife species occurrences and activity, including occupied nest sites, presence of sensitive amphibian populations, etc. Analysis of existing and potential conflicts with nonmotorized recreationists can be found in the Recreation section, pages 3-269 to 3-302. Analysis of existing and potential conflicts with wildlife can be found in the Terrestrial Wildlife section, pages 3-81 to 3-160. Analysis of existing and potential conflicts with cultural resources can be found in the Heritage Resources section, pages 3-259 to 3-264. Analysis of existing and potential conflicts with sensitive plants can be found in the Endangered, Threatened, and Sensitive Plant Species section, pages 3-55 to 3-75. Analysis of existing and potential conflicts risks of spreading noxious weeds can be found in the Noxious Weed Risk Assessment section, pages 3-77 to 3-80.*

TMAR03018 (italics in original); <u>see also</u> TMAR00809.

The route evaluation forms were not the sole site-specific analysis undertaken for this Decision, they were just one of many tools employed by the Forest Service in analyzing the routes for designation.  Plaintiffs fail to identify any data they can show was excluded from the

analysis.  The Forest Service's reliance on these forms, as simply one of many tools relied upon in conducting the site specific analysis for this decision, was reasonable and the Court should defer to its use of this chosen methodology.  McNair, 537 F.3d at 997.

### 3. The Forest Service's Reliance Upon GIS Data Is Reasonable and Entitled to Deference

It appears that Plaintiffs' main complaint concerning reliance upon GIS data results from a misunderstanding as to the scale of analysis possible.  The ENF's geospatial databases consist of a wide variety of data sets and information sources, including data from field measurements, observations and monitoring pertaining to specific road and trail locations, as well as surrounding areas.  TMAR02498.  Data incorporated into the geospatial database is collected to meet National Map Accuracy Standards.  Forest Service Handbook 7109.13a, Chapter 10.  This data allows analyses at a broad range of scales, from a seven meter by seven meter cell to forest wide.[21]

The Forest Service's decision to rely upon the field data contained in its GIS databases, and completed route evaluation forms, as well as numerous other site-specific studies, was entirely reasonable, and should therefore be accorded the proper deference.  McNair, 537 F.3d at 1000.  Accordingly, Plaintiffs' claims must fail.

### 4. Plaintiffs' Remaining NEPA Allegations Lack Merit

Overall, Plaintiffs couch their argument regarding the soil impacts as a failure to disclose and analyze site-specific impacts, but in making their argument, Plaintiffs merely cite to a provision in the FEIS, and then state what they believe "the Forest Service should have" done.[22]

---

[21] Plaintiffs seem to be under the mistaken belief that GIS data only goes down to a 1:24,000 scale.

[22] Plaintiffs' argument further relies upon a misunderstanding of a statement in the Geology section of the FEIS, namely that "[t]here are no direct, indirect, or cumulative effects from any of the alternatives *because geologic hazards relative to roads and trails evaluated at this scale (1:24000) are not measurable*."  Pl. Br. at 18:3-5 (citing FEIS 3-20 (emphasis added by Plaintiffs)).  The use of the phrase "are not measurable" as used in this context means that the potential for effects is extremely small, and analyzing for effects below that scale level would not yield any appreciable new information upon which to analyze the issue.  It does not mean that the analysis could not have been carried out at a smaller scale, nor does it mean there would be no data for this smaller scale analysis.  This is explained more fully on pages 3-19 through 3-20 of the FEIS.  TMAR02517-18.

1    Therefore, Plaintiffs' argument impermissibly seeks to substitute their judgment for how and

2    what routes were analyzed and selected.  Kleppe, 427 U.S. at 410 n. 21; Inland Empire, 88 F.3d

3    at 763. Under such circumstances, the Forest Service is clearly within its discretion to rely on the

4    reasonable opinions of its own qualified experts.  Marsh, 490 U.S. at 378 (An agency is within

5    its "discretion to rely on the reasonable opinions of its own qualified experts even if, as an

6    original matter, a court might find contrary views more persuasive.").[23]/

7           Finally, for the reasons set out more thoroughly in the next section, Plaintiffs' claim

8    regarding the Forest Service's alleged failure to take a "hard look" at impacts on aquatic habitat

9    also fails.  Plaintiffs are simply mistaken in asserting that "the FEIS also utterly fails to look at

10   site-specific impacts to aquatic sources."  Pl. Br. at 20, line 16.  Extensive site-specific data

11   regarding aquatic habitat is presented in the RCO Analysis, Aquatic Species BE, and other

12   supporting documentation.  See e.g., TMAR12926 (RCO Analysis); TMAR12748 (Aquatic

13   Species BE); and TMAR12906 (Aquatic MIS Report).   The RCO Analysis provides an analysis

14   of specific streams and routes with respect to water quality and aquatic habitat for each

15   alternative.  TMAR12926-53.  This stream and route-specific analysis is contained in a series of

16   tables, with each table focusing on a particular aspect of relevant analysis. Several tables from

17   the RCO analysis provide examples of the site-specific analyses performed to analyze the

18   alternatives:  Table 7 of the RCO identifies 51 specific system routes that bisect or border

19   meadows (TMAR12946-47); Table 8 analyzes specific non-system routes within 200 feet of

20   streams with regard to consistency with RCOs (TMAR12948-51); Table 9 analyzes specific

21   Maintenance Level 1 roads that are associated with streams at high risk of adverse effects to

22   aquatic habitat (TMAR12952-53).

23          Moreover, the FEIS shows the analysis of the risk of adverse affects to aquatic resources

24   at three different scales – the entire ENF,  the four drainage basins in the ENF, and four

25   individual stream systems – for the existing road system (Alternative A - No Action) and each

26   _____

         [23]/    Plaintiffs allegation that the FEIS fails to look at a site-specific impacts to aquatic resources
27   is based upon data gaps identified in the draft BE (TMAR12656).  Plaintiffs argument overlooks the
     fact that the draft BE was superceded by the final BE for the FEIS, which did not identify any data
28   gaps.  TMAR12774-75.

action alternative.  FEIS 3-33 through 3-48 (TMAR02530-45). The risk of cumulative watershed effects for all seventh field watersheds in the ENF is addressed in the FEIS.  FEIS 3-49 through 3-52 (TMAR02546-49).  Appendices G and H in the FEIS contain site-specific data on resources associated with site-specific routes.  TMAR03126-32, 03133-75.

**C.**    **The Decision Is Consistent with the Forest Plan as Amended and Does Not Violate NFMA or NEPA**.

Plaintiffs allege that the Decision is inconsistent with the Forest Plan, as amended, and is therefore in violation of a violation of NFMA and NEPA[24]/, because it allows specific, limited portions of routes (totaling approximately 4.8 miles) to cross meadow areas in violation of standards Plaintiffs allege are set forth in the Sierra Nevada Forest Plan Amendment ("SNFPA") Biological Evaluation ("BE").  Plaintiffs' argument fails for three reasons: (1) the Forest Plan direction for the specific aspects of project planning is set forth in the Forest Plan's Riparian Conservation Objective #2 ("RCO#2") and its Standards and Guidelines, as amended in Appendix A of the SNFPA ROD, and not in any BE; (2) Plaintiffs have failed to identify any violation of the Forest Plan's Standards and Guidelines; and (3) the Decision included a specific Forest Plan amendment that allows for some specific routes to cross meadows.

**1.**    **Forest Plan Direction Is Set Forth in the Forest Plan, as Amended By Appendix A of the SNFPA ROD, and the Travel Management ROD, Not In any BE**

Plaintiffs argue that the SNFPA BE does not allow roads to cross meadows.[25]/  Pl. Br. at 21.  Plaintiffs' assertion is premised upon a fundamental misunderstanding that a BE can impose any sort of standard or guideline which must be followed.

NFMA sets forth the relevant statutory framework and specifies the procedural and substantive requirements under which the Forest Service is to manage the ENF.  Native

---

[24]/    To the extent it can be discerned, Plaintiffs appear to argue that any violation of NFMA is a per se violation of NEPA.  Accordingly to the extent a successful defense to Plaintiffs' NFMA argument can be set forth, it should also eliminate any claim Plaintiffs make under NEPA.

[25]/    The Forest Service has already responded to Plaintiffs' concerns regarding the designation of routes through meadows with Alternative Modified B (the chosen alternative), which eliminated public motorized vehicle use on portions of all ML-1 roads and unauthorized routes that passed through meadows, TMAR02456, and in FEIS Appendix C, TMAR02980-81.

1    Ecosystems Council v. Tidwell, 599 F.3d 926, 932 (9th Cir. 2010); Lands Council v. McNair,

2    537 F.3d 981, 988 (9th Cir. 2008).  Pursuant to NFMA, proposed projects must be consistent

3    with the Forest Plan.  See 16 U.S.C. § 1604(i); Idaho Sporting Congress, Inc. v. Rittenhouse, 305

4    F.3d 957, 962 (9th Cir. 2002) ("all management activities undertaken by the Forest Service must

5    comply with the forest plan").  The Forest Plan for the ENF was completed in 1989, and

6    amended in 2004 by SNFPA, and amended again by the ROD for the Travel Management

7    Decision.  See FEIS at vii-viii (TMAR02393-94); ROD at 5 (TMAR03273-74).  Implementation

8    of Forest Plan standards and guidelines occurs at site-specific projects in accordance with the

9    Forest Plans.  Idaho Conservation League v. Mumma, 956 F.2d 1508, 1512 (9th Cir. 1992).  The

10   Standard and Guidelines for the ENF Forest Plan are found, in part, within Appendix A of the

11   SNFPA ROD.  TMAR10966-11007.

12       Plaintiffs mistakenly assert that RCO#2 found in the SNFPA ROD, Appendix A,

13   prohibits routes that bisect or go through meadows.  Their argument is based upon a statement in

14   a BE for the Travel Management Decision.  Plaintiffs argue that the Decision authorizes routes

15   that bisect or go through meadows, which they allege violates the Forest Plan, as amended by the

16   SNFPA, and thus violates NFMA.  However, Plaintiffs' argument is flawed because it relies

17   upon the wrong document – the Travel Management BE – and must fail.

18       It is the ENF Forest Plan, as amended by the SNFPA ROD, which governs all

19   management activities on the ENF.  The Standards and Guidelines in Appendix A of the SNFPA

20   ROD provide the conditions that ensure consistency with RCOs found in the SNFPA ROD.

21   SNFPA ROD at 62-66 (TMAR10999-11003).  On the other hand, the Travel Management

22   Decision BE analyzes the effects of each alternative within the FEIS on Forest Service Region 5-

23   designated sensitive species.  TMAR12751.  The BE informs the environmental analysis in the

24   FEIS and ROD for the Travel Management Decision – *it is not part of the ENF Forest Plan, or*

25   *any plan amendments, and does not impose a requirement that must be met or implemented*.   In

26   other words, a BE informs a NEPA decision, but does not establish conditions or impose specific

27   criteria under NFMA to which a decision must adhere.  Therefore, Plaintiffs' claim fails to look

28

to the proper authority – the ENF Forest Plan, as amended – for determining compliance with NFMA.

**2.      Plaintiffs Fail to Identify Any Violation of the ENF Forest Plan's Standards and Guidelines Based Upon RCO#2 in the SNFPA ROD, Appendix A**

Plaintiffs allege that the Decision is inconsistent with RCO#2 of Appendix A of the SNFPA ROD, which amended the ENF Forest Plan.[26]/ Pl. Br. at 21. Plaintiffs' argument reflects a fundamental misunderstanding of RCO#2 and associated Standards and Guidelines. Contrary to Plaintiffs' argument, nothing in RCO#2 or the associated Standards and Guidelines prohibits NFS roads or trails from bisecting or going through meadow areas. Id. As a result Plaintiffs have failed to identify any violation of the NFMA.

In fact, the Standards and Guidelines associated with RCO#2, contemplate roads and trails in such areas as long as certain conditions are met. For example, Standard and Guideline #100, implementing RCO#2, merely requires the identification of such roads and trials under specific circumstance, and the implementation of "corrective actions where necessary to restore connectivity."   SNFPA ROD at 63 (TMAR11000). Plaintiffs' argument must ultimately fail because they have failed to identify any prohibition in either the SNFPA ROD's RCO#2 or its Standards and Guidelines amending the ENF Forest Plan that would prohibit NFS roads or trails in meadow areas. Thus, the Decision is consistent with both RCO#2 and its Standards and Guidelines.

**3.      The Decision Included Forest Plan Non-Significant Amendments That Allow Specific Routes to Cross Meadows**

Even if Plaintiffs had identified the correct ENF Forest Plan Standard and Guideline, the Decision made non-significant amendments to the ENF Forest Plan that allowed a limited portion of specific routes (totaling approximately 4.8 miles) to cross meadows.[27]/ Thus, the ENF Forest Plan, as amended, allows for certain authorized routes through some meadows, as

---

[26]/      The SNFPA ROD at 33 (TMAR10970), states management of certain areas, including meadows, is to be consistent with the RCOs and associated Standards and Guidelines. Id. at 63 - 69 (TMAR10999-11003)(Associated Standards and Guideline for RCOs).

[27]/      The 1989 ENF Forest Plan has management direction and Standards and Guidelines relating to meadows. TMAR03274.

1   approved by the Decision.[28]/  Specifically, the Forest Supervisor amended the Forest Plan's

2   Standards and Guidelines to allow specific portions of 20 routes passing through meadows based

3   on his finding that "these routes provided a unique recreation opportunity (such as a high

4   elevation trail experience), enhance the recreation experience by connecting routes or areas,

5   provide access to an area of interest, or allow access to dispersed camping."  TMAR03274.

6   Plaintiffs have not challenged the use of Forest Plan amendments.  Therefore, the Decision is

7   consistent with the Forest Plan, as amended, and does not violate NFMA and NEPA.

8          Accordingly, summary judgment should be granted in Defendants' favor as to Plaintiffs'

9   NFMA and NEPA claims regarding consistency with the ENF Forest Plan, as amended.

10  **D.     The Forest Service Considered an Adequate Range of Alternatives and Should Be
            Accorded Deference to Its Choice of Alternatives**.

11

12         Plaintiffs next contend that the Forest Service failed to consider an adequate range of

13  alternatives because it did not consider an option that would have closed all unauthorized, user-

    created routes to vehicle use.  Pl. Br. at 22-24.  In fact, the Forest Service, did consider, but

14  rejected, such an alternative as inconsistent with the purpose and need of the EIS.

15         The consideration of alternatives constitutes "the heart" of an environmental analysis

16  under NEPA, and agencies are obligated to evaluate all reasonable alternatives to a proposed

17  action.  40 C.F.R. § 1502.14.  Whether the range of alternatives considered is reasonable

18  depends upon the "nature and scope of the proposed action."  Mumma, 956 F. 2d at 1520

19  (quoting Block, 690 F.2d at  761).  An agency need not consider alternatives which do not meet

20  the purpose and need of the proposed action, Laguna Greenbelt, Inc. v. U.S. Dep't of Transp., 42

21  F.3d 517, 524-25 (9th Cir. 1994), or which can be rejected as "too remote, speculative, or

22  impractical or ineffective."  Colorado Envtl. Coalition v. Dombeck, 185 F.3d 1162, 1174 (10th

23  Cir. 1999) (internal ellipsis and quotation marks omitted); The Island Range Chapter of the

24  Montana Wilderness Ass'n v. U.S. Forest Serv., 45 F. Supp. 2d 1006, 1101 (D. Mont. 1996).

25

26  [28]/     Contrary to Plaintiffs' assertions, routes within meadows that are closed to public motor
    vehicle use pursuant to the Decision.  ROD at 8 (TMAR03277).  Alternative Modified B eliminated

27  public motorized use of portions of routes bisecting meadows that were inconsistent with RCO#2.
    Id.  To ensure further consistency, the Decision includes monitoring activities described on pages

28  2-19 of the FEIS (TMAR02466).

1   Rather, the agency need only set forth those alternatives "sufficient to permit a reasoned choice."

2    Natural Res. Def. Council v. Morton, 458 F.2d 827, 836 (D.C. Cir. 1972); see also Headwaters,

3   Inc. v. Bureau of Land Mgmt, 914 F. 2d 1174, 1181 (9th Cir. 1990) (noting an agency's

4   consideration of alternatives is adequate "if it considers an appropriate range of alternatives,

5   even if it does not consider every available alternative").  An agency's decision regarding the

6   appropriate range of alternatives is a matter within the agency's discretion to which the courts

7   should provide deference. Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council,

8   435 U.S. 519, 551-52 (1978).

9       In this case, the purpose and need of the proposed action was focused on regulating

10   unmanaged public wheeled motor vehicle travel, complying with the United States District Court

11   for the Eastern District of California final order, and limiting changes to the ENF NFS roads and

12   trails.  The 2005 Notice of Intent identified that the Travel Management Decision did not include

13   the deconstructing or decommissioning of inventoried routes, installation of gates or barriers,

14   restoration/rehabilitation projects, or other ground disturbing activities.  TMAR010571; 70 Fed.

15   Reg. 61,780 (Oct. 26, 2005).  The Forest Supervisor limited the scope of the Decision at the

16   outset in order to keep the scope manageable and to be able to comply with the Court mandated

17   deadline.  The implementation strategy presented in Chapter 2 of the FEIS recognizes the need to

18   deal with restoration and closing of routes not designated for public use at a later date.

19   TMAR02467-68.

20       The alternatives considered by the Forest Service directly respond to the purpose and

21   need of the project - to stop resource damage from use of inappropriate routes and cross country

22   motor vehicle travel and redirect this use to sustainable NFS roads and trails.  TMAR02396,

23   2404-05.  The Forest Service closely examined a wide range of six possible alternatives to meet

24   the purpose and need of the project.  The Forest Service examined a No Action Alternative

25   (Alternative A) as well as five action alternatives.  The six alternatives considered a full range of

26   reasonable management options.  TMAR02404-05.  These alternatives were developed in

27   response to extensive public input that included public meetings, open houses, and written

28   comments from individuals, organizations, tribes, and government agencies.  TMAR02440-41;

1   see TMAR00860-02354; TMAR10523-10816.

2          In addition to these six alternatives examined in detail, the Forest Service considered, but

3   eliminated from detailed study, fourteen other alternatives.[29]/  See TMAR02468-74.  One such

4   alternative (#3) eliminated from further consideration included the alternative advocated by

5   Plaintiffs, that the Forest Service not designate any unauthorized routes.  TMAR02469.  In

6   rejecting this alternative from further consideration, the Forest Service stated that "[p]art of the

7   purpose and need is to '. . . provide a diversity of road and trail opportunities for experiencing a

8   variety of environments and modes of travel consistent with the National Forest recreation role

9   and land capability' pursuant to FSM 2353.03(2)."[30]/  TMAR02469.  The Forest Service found

10  that "not designating any unauthorized routes to public wheeled motor vehicles fails to meet this

11  purpose and need for this project and therefore was eliminated from detailed study."  Id.  In other

12  words, because alternative #3 did not provide for a diversity of road and trail opportunities to

13  experience a variety of environments and modes of travel, alternative #3 did not meet the

14  purpose and need of the proposed action.  Alternative #3 was not a reasonable alternative and the

15  Forest Service properly excluded it from detailed study.  Northern Alaska Environmental Center

16  v. Kempthorne, 457 F.3d 969, 978 (9th Cir. 2006) ("Given the policy objectives of the project. . .

17  consideration of the five alternatives satisfied the NEPA requirement to consider a broad range

18  of possible alternatives."); Mumma, 956 F. 2d at 1520; Laguna Greenbelt., 42 F.3d at 524-25.

19          Plaintiffs' allegations that the Forest Service failed to consider more protective land use

20  [29]/     The fourteen alternatives considered but eliminated from detailed study were: (1) prohibit
21  OHV use in the Forest; (2) prohibit over-the-snow travel for public wheeled motor vehicles; (3) do
    not designate unauthorized routes; (4) limit ATV, truck, and automobile use to NFS roads; (5)
22  designate all NFS and unauthorized routes; (6) designate all routes included in the 1977 and 1997
    OHV Plan; (7) designate all NFS roads and trails equivalent to the recent court order; (8) designate
23  routes not included on the current route inventory; (9) designate areas, including OHV use areas and
    dispersed campsites; (10) designate event only trails; (11) trigger seasonal closure on and off
24  throughout the wet season; (12) designate areas for cross-country travel for big game retrieval; (13)
    Blue Ribbon Coalition Alternative R; and (14) Alternative E with Alternative C seasonal closure.
25  TMAR02468-74.

26  [30]/     Plaintiffs truncated this quote after "opportunities," Pl. Br. at 23, but the portion omitted
27  by Plaintiffs makes it clear that the Forest Service considered Plaintiff's overly restrictive approach
    to be contrary to the Forest Service's mission to provide a variety of recreational experiences for its
28  users, which includes wheeled motorized access.  TMAR02469.

1    options or favored motorized access over other uses is baseless. See Pl. Br. at 23-24.  Prior to

2    this travel management plan, the ENF had approximately 526 miles of unauthorized routes.

3    Every single alternative considered in detail, except the no action alternative, prohibited the

4    continued unauthorized use of the majority of these routes.  TMAR02410; TMAR02477.  A very

5    limited number of miles of these unauthorized routes were brought into the forest road system

6    where they could be regulated and used responsibly.  For example, the most permissive

7    alternative, Alternative B, reduced unauthorized routes by 91% and would have brought the

8    remaining 46 miles into the forest system.  TMAR02408.  The preferred alternative, Modified

9    Alternative B, reduced unauthorized routes by an even greater 95% and brought the remaining

10   23 miles into the forest system.  Id.  All alternatives eliminate further unauthorized use,

11   TMAR02410, and all alternatives prohibit cross country travel.  TMAR02410-11.  The Forest

12   Service also discussed why it added certain undesignated routes to the forest transportation

13   system.  For example, the Forest Service noted that "some dispersed recreation activities. . . are

14   dependent on motor vehicle access" and that "[w]ithout additions to the NFTS [National Forest

15   Transportation System], implementation of the Travel Management Rule will severely limit

16   motorized recreation opportunities relative to current levels."  TMAR02437.  Modified B, the

17   selected alternative, did not designate any unauthorized routes across meadows or that had a high

18   potential for impacts to riparian conservation areas.  TMAR02455-56.  For Plaintiffs to contend

19   that the Forest Service prioritizes development simply ignores the fact that the Forest Service

20   balanced competing resource uses.  The cases cited by Plaintiff are distinguishable because they

21   rely on regulations not relevant to the Forest Service.  Pl. Br. at 23 (citing Oregon Natural Desert

22   Ass'n v. Bureau of Land Mgmt., 531 F.3d 1114 (9th Cir. 2008), amended and superceded by –

23   F.3d –, 2010 WL 3398386 (9th Cir. 2010); Ctr. for Biological Diversity, 2009 WL 7036134;

24   Center for Biological Diversity v. Traffic Safety Admin., 538 F.3d 1172 (9th Cir. 2008).  As

25   explained in Part IV.A.1.c, the travel management rule requires the Forest Service to consider,

26   with the objective of minimizing, damage to various forest resources.  36 C.F.R. § 212.55(b).

27   Consistent with its mission, the Forest Service significantly restricted OHV use from prior levels

28   while maintaining a variety of recreational experiences for its users.

1    The Forest Service was not required to re-evaluate an alternative that had previously been

2  rejected and was inconsistent with management objectives.  <u>Seattle Audobon Soc'y v. Mosely</u>,

3  80 F.3d 1401, 1404 (9th Cir. 1996); <u>see</u> <u>also</u> <u>Headwaters</u>, 914 F. 2d at 1180.  The Forest

4  Service's consideration of a range of alternatives was reasonable, as was its detailed discussion

5  of the alternatives.  <u>Citizens Against Burlington, Inc. v. Busey</u>, 938 F.2d 190, 195-96 (D.C. Cir.

6  1991).  The FEIS evaluated a reasonable range of alternatives that directly responded to the

7  stated purpose and need of the proposed action.

8  **E.    Plaintiffs' ESA Claim Also Fails**

9    The Court should also reject Plaintiffs' ESA claim.  Contrary to Plaintiffs' arguments,

10  Defendants consulted in three separate phases with FWS on each aspect of Modified Alternative

11  B, and fully complied with the ESA.  The Court should therefore uphold Defendants' decision.

12          **1.    The Forest Service's Determination and FWS's Concurrence that the Routes
                    Authorized by Modified Alternative B Meet the Design Criteria is Rational
13                  and Supported by the Record**

14    As explained above, the Forest Service consulted with FWS in three phases.  In the first

15  phase, FWS consulted informally to establish the Design Criteria.  The Design Criteria

16  established the circumstances under which the Forest Service–based on its own surveys and

17  analysis–was entitled to move forward secure in the knowledge that FWS had <u>already concurred</u>

18  with any "not likely to adversely affect" finding.  In other words, as long as a given route fit

19  within the four corners of the Design Criteria, no further consultation was required.

20  TMAR00001, 00032-33.  Plaintiffs do not challenge the validity or integrity of the Design

21  Criteria.

22    In the third phase, the Forest Service drafted the March 2008 BA to consider effects of

23  the additional routes not included in Alternative D.  TMAR12888-12905.  That document

24  determined that those few additional routes met the Design Criteria.  The Forest Service

25  therefore correctly concluded via the Design Criteria that even though they had found that the

26  routes "may affect" CRLF, FWS had already concurred through the Design Criteria that they

27  were not likely to adversely affect the subspecies.  <u>Id.</u>; 50 C.F.R. § 402.14.  Neither the ESA nor

28  FWS required any further concurrence.  <u>Ground Zero Ctr. for Non-Violent Action v. U.S. Dep't</u>

1   *of the Navy*, 383 F.3d 1082, 1091-92 (9th Cir. 2004); Fund for Animals v. Thomas, 127 F.3d 80,

2   84 (D.C. Cir. 1997); Preserve Endangered Areas of Cobb's History v. U.S. Army Corps of

3   Engr's, 916 F. Supp. 1557, 1569 (N.D. Ga. 1995), aff'd, 87 F.3d 1242 (11th Cir. 1996).

4          Plaintiffs suggest that the March 2008 BA "concluded that two routes along the North

5   Fork of the Cosumnes River in Modified Alternative B 'do not meet the [Design Criteria] for

6   reaching a determination of Not Likely to Adversely Affect.'" Pls. Br. at 27.[31]/ To the contrary,

7   however, the March 2008 BA clearly demonstrates that Modified Alternative B did meet the

8   Design Criteria.  For example, on page 11, the March 2008 BA noted that the two proposed

9   routes are upstream of reaches that had been previously subjected to formal FWS protocol-based

10  surveys.  TMAR12899 (emphasis added).  The Forest Service then stated in the very next

11  sentence, "*[h]owever*, similar to the [formally] surveyed reaches, the river adjacent to" the

12  proposed routes lacks the attributes of suitable habitat.  TMAR12899.  Based on this

13  information, in the Determination section, the March 2008 BA stated that at first blush, based on

---

14  [31]/     As an initial matter, the Plaintiffs did not raise this argument during the administrative appeal
15  process and are barred from doing so now.  The exhaustion provision of 7 U.S.C. § 6912(e) is a
    statutory requirement that must be met except in cases raising constitutional concerns.  McBride
16  Cotton & Cattle Corp. v. Veneman, 290 F.3d 973, 980 (9th Cir. 2002)*;* Gleichman v. United States
    Dep't of Agric., 896 F. Supp. 42, 44 (D. Me. 1995) ("it is hard to imagine more direct and explicit
17  language requiring that a plaintiff suing the Department of Agriculture, its agencies, or employees,
18  must first turn to any administrative avenues before beginning a lawsuit.").  Even where a plaintiff
    provides the requisite 60-day notice of intent to sue prior to bringing an ESA suit, 16 U.S.C. §
19  1540(g), for purposes of issues presented in the NMFA administrative appeal context, it is not
    enough to raise *some* issues in an administrative appeal; instead a plaintiff must first have
20  administratively appealed that *particular* issue before litigating an issue in district court.  36 C.F.R.
21  §§ 215.14, 215.21; Kleissler v. U.S. Forest Service, 183 F.3d 196, 202 (3rd Cir. 1999); Sierra Forest
    Legacy v. U.S. Forest Service, 652 F. Supp. 2d 1065, 1081- 82 (N.D. Cal. 2009); Friends of the
22  Earth v. U.S. Forest Service,114 F. Supp. 2d 288, 291 (D. Vt. 2000).  Here, Plaintiffs filed a
    sophisticated, detailed 47 page Notice of Appeal pursuant to Forest Service's appeal regulations.
23  TMAR00321 (citing the Forest Service's appeal regulations, 36 C.F.R. part 215). Despite its length,
24  however, it stated only two ESA arguments: (a) that Defendants were required to consult with FWS
    because a document on which the Forest Service did not rely for ESA compliance "determined" that
25  Modified Alternative B was "likely to adversely affect" the CRLF; and (b) that Defendants had
    materially altered their action thereby requiring reinitiation of ESA consultation.  TMAR00353-54,
26  00362 (discussing TMAR12748-12868).  Plaintiffs have now in their summary judgment brief
    abandoned the former argument.  In contrast, Plaintiffs did not argue, as they do now, that
27  Defendants had violated the ESA because the routes authorized by Modified Alternative B "may
28  affect" the CRLF but did not meet the Design Criteria.  Pl. Br. at 27.  The Plaintiffs, therefore,
    failed to properly raise this ESA issue in the administrative process.

GIS mapping it appeared that these routes would not meet the Design Criteria.  TMAR12902.

But the Forest Service went on to state that "*[f]ield surveys indicate, however*, that [CRLF] do

not occupy any of the stream reaches associated with" the two routes.  Id. (emphasis added).

The Forest Service concluded, "*based on these site-specific findings*," the two routes "may

affect, but [are] not likely to adversely affect" the CRLF.  Id. (emphasis added).  Defendants

reiterated this finding on page 1 of the March 2008 BA.  There, Defendants stated "[this BA

finds that Modified Alternative B implements route designation as described in the [Design

Criteria] for the . . . [CRLF].  The project is therefore not likely to adversely affect these species

and no further consultation is required with [FWS] based on the [FWS] memo dated Dec. 27,

2006." TMAR12889.  Similarly, Defendants' ROD made this exact same statement.

TMAR03287.  FWS had earlier concurred with the Forest Service's 2007 BA, which had made

this same finding.  TMAR00027-28 (noting Rubicon did not constitute suitable CRLF habitat).

Read together, these passages of the March 2008 BA and the ROD demonstrate that the Forest

Service examined the actual modifications of the 2008 action, and determined that all of the

routes authorized by Modified Alternative B were not likely to adversely affect the CRLF.  Id. at

12890.  Significantly, FWS concurred with this finding, and Plaintiffs point to nothing to

undermine this conclusion.

**2.      ENF Personnel Surveyed the Two Routes Along the North Fork Cosumnes River**

Plaintiffs' next suggestion–that the Forest Service was not permitted to rely on its

previous 2007 Consultation with respect to these same two routes because they "have never been

surveyed for frogs"–is also not supported by the record.  Pl. Br. at 27-28 (citing TMAR12899

(first two entries of Table 5)).[32]/  Contrary to Plaintiffs' argument, Defendants had conducted

their own surveys of the areas surrounding these two routes.  At Table 5, for example,

Defendants stated that "field reconnaissance found [the] habitat unsuitable" as to the two routes.

---

[32]/      Again, the Plaintiffs did not raise this argument during the administrative appeal process.
TMAR00353-54, 00362 (discussing TMAR12748-12868).

1   TMAR12899 (Table 5).[33]/  Similarly, in a contemporaneous BE drafted for NEPA purposes,

2   Defendants found that the same two routes have: "not been *surveyed to protocol* for the presence

3   of [CRLF] habitat adjacent to the proposed routes."  TMAR12799.  Defendants then went on to

4   state: "however, data [obtained through the "reconnaissance" referenced in the March 2008 BA

5   at TMAR12899] *indicates* that the river adjacent to these routes" are not suitable CRLF habitat.

6   TMAR12799 (emphasis added).

7          Defendants additionally provided a robust explanation of their conclusion in the March

8   2008 BA.  TMAR12899, 12795.  First, Defendants noted that based on their field surveys the

9   portion of the North Fork Cosumnes River adjacent to the proposed routes lacks deep, slow-

10  moving pools required by CRLF.  TMAR12899.  Second, it is subject to high flushing flows,

11  rendering breeding impossible.  Id.  Third, this portion of the river supports naturally occurring

12  trout fisheries, a key CRLF predator.  Id.  Fourth, water velocities in the adjacent portion of the

13  North Fork Cosumnes River tend to vary greatly in response to precipitation events.  Id.  Fifth,

14  recreationalists have erected rock dams that further alter natural flow regimes.  Id.  All of these

15  factors together rendered these areas unsuitable as CRLF breeding habitat.  Id.  Absent breeding

16  habitat, or proximity to any other breeding habitat, there would be no reason to believe that the

17  two routes would constitute non-breeding or dispersal habitat.  Plaintiffs' contention that the

18  Forest Service lacked the requisite information on these two routes therefore misses the mark.[34]/

19  _____

20  [33]/    To the extent Plaintiffs suggest that formal protocol surveys were required, the record does
    not support that argument.  A large part of the ENF has never been subject to formal protocol
21  surveys for CRLF.  TMAR15849.  FWS demonstrated through the Design Criteria that it was
    confident in the ability of Forest Service professional biologists to evaluate and determine habitat
22  suitability in these areas.  Had FWS required formal protocol-based surveys, FWS would have
    included such a requirement in the Design Criteria.  Moreover, the Forest Service provided FWS
23  the results of its own informal habitat assessments (i.e., Forest Service informal surveys, or
    "reconnaissance") as part of the 2007 Consultation.  See TMAR12883 (Table 6).  FWS did not
24  request additional information or protocol surveys relative to these assessments.

25  [34]/    Defendants went on to explain that because neither was located in suitable CRLF habitat,
    both were consistent with the only potentially applicable criterion, Criteria 2.  Criteria 2 states that
26  the Forest Service must ensure that "in suitable habitat, routes avoid Riparian Reserve and Riparian
    Conservation Areas except where necessary to cross streams."  TMAR12899 (emphasis added).
27  Because Criteria 2 only applied to *suitable* habitat, and Defendants had determined that the two
    routes were not in suitable CRLF habitat, they were compatible with Criteria 2.  Because they met
28

*Federal Defendants' MPA in Support of*                              2:09-CV-2523-LKK-JFM
*Cross-Motion for Summary Judgment*              - 42 -

### 3.    Hunter's Staging Area Was Not in Suitable CRLF Habitat

Plaintiffs also misconstrue the record in contending that Modified Alternative B included "an additional ORV staging area near the Rubicon River" – Hunter's staging area – that was not included in Alternative D, and required further consultation.  Pl. Br. at 28.  Plaintiffs suggest that the area represented "potentially suitable CRLF habitat" and that therefore further concurrence from FWS was necessary.  Id.  However, Defendants found that this area is located along the Rubicon River, and in numerous places explicitly noted that the Rubicon is a "perennial stream that does not provide suitable habitat due to high flows during spring runoff." TMAR12900.  For example, on page 11 of the March 2008 BA, the Forest Service noted that "surveys were conducted along the [Rubicon River] during hydroelectric re-licensing *processes. These surveys determined that [the Rubicon] does not provide suitable [CRLF] habitat.*"  TMAR12899 (emphasis added); see also id. TMAR12899 (same at Table 5 entry citing Cruz, personal communication); see also id. at 12881 (same in 2007 BA); 12882 (same, citing J. Williams 2007, personal communication); 12886 (explaining that J. Williams personal communication concerned a study in progress conducted for a hydropower relicensing project); TMAR19559 (Rubicon River does not provide suitable CRLF habitat).  This finding was restated in the FEIS.  TMAR02684 (FEIS explaining that "Hunters staging area is located along the Rubicon River a perennial stream that does not provide suitable habitat due to high flows during spring runoff and altered flow regimes resulting from hydroelectric facilities").  While both the FEIS and March 2008 BA concluded that the Rubicon River, and therefore Hunter's staging area, did not constitute suitable CRLF habitat, Plaintiffs offer nothing more than their own opinion on its suitability.  Pl. Br. at 28. Plaintiffs' argument that Hunter's Staging Area was in "potentially suitable habitat" is therefore belied by the record.  Id. [35]/

---

all six of the Design Criteria, Defendants properly concluded that designation of the two routes was not likely to adversely affect the CRLF.  TMAR00001, 00032-33, 12890.

[35]/    Defendants went on to explain that because Hunter's staging area was not within CRLF habitat, it complied with the only potentially applicable criterion, Criterion number 5. TMAR12900. That criterion reads: "*[i]f within [CRLF] habitat*, areas are located outside of Riparian Reserve, Riparian Conservation Areas, meadows, and wetlands."  TMAR12900 (emphasis added). Accordingly, any effects flowing from use of Hunter's staging area were deemed with FWS's

### 4. Plaintiffs' Arguments Concerning Core Areas and Ephemeral Streams Also Fail

Finally, Plaintiffs contend that if Defendants had sought further input from FWS concerning the two routes along the Cosumnes River and the Hunter staging area, FWS "may have nonetheless rejected [the Forest Service's] not likely to adversely affect determination." This assertion, too, misses the mark.  Had Defendants requested concurrence, FWS would not have imposed additional criteria, but rather would have reviewed Hunter staging area and these two routes for compliance with the Design Criteria.  TMAR00001 ("forest consultation can tier to this programmatic consultation with no further consultation."), 00032 ("unless otherwise noted, no further consultation on [the CRLF] pursuant to the [ESA] is required with [FWS] for these particular activities . . . .").  The Design Criteria embodied FWS's concerns and obviated the need for further analysis.  This Court should accordingly reject Plaintiffs' attempt to undermine the streamlining effect of the Design Criteria and invent requirements that FWS did not impose.[36]/  TMAR00028 (FWS in 2007 ESA concurrence letter not indicating that Defendants were required to additionally consider ephemeral streams or any aspect of the CRLF recovery plan).

In sum, Defendants took their ESA responsibilities seriously and fully discharged them here.  The Court should accordingly grant Defendants' cross-motion for summary judgment as to Plaintiffs' ESA claim.

---

concurrence to be "not likely to adversely affect" CRLF.  TMAR00003, 00032.  No further consultation concerning Hunter's staging area was required.

[36]/    Recovery plans do not have the force of law and are not binding on federal agencies.  Fund for Animals v. Rice, 85 F.3d 535, 547 (11th Cir. 1996); see also California Native Plant Soc'y v. U.S. E.P.A., No. 06-03604, 2007 WL 2021796, at *21 (N.D. Cal. July 10, 2007); Conservation Northwest v. Kempthorne, No. 04-1331, 2007 WL 1847143, n.2 (W.D. Wash. June 25, 2007); National Wildlife Fed'n v. National Park Service, 669 F. Supp. 384, 388 (D. Wyo. 1987) ("Plaintiffs would urge upon this Court that the language § 1533(f) obligates the Secretary to develop and implement a recovery plan, and that, once developed, all concerned agencies must adhere to it. The language does not so say."); but see S.W. Center for Biological Diversity v. Bartel, 470 F. Supp. 2d 1118 (S.D. Cal. 2006).

1

## V.  CONCLUSION

2          For the reasons discussed above, the Court should deny Plaintiffs' motion for summary

3   judgment and grant Defendants' cross-motion for summary judgment.

4          Respectfully submitted on December 14, 2010.

5

6                                                    IGNACIA S. MORENO
                                                     Assistant Attorney General
                                                     United States Department of Justice
7                                                    Environment and Natural Resources
                                                     Division
8
                                                      /s/ John P. Tustin
9                                                    John P. Tustin
                                                     Jason A. Hill
10                                                   Trial Attorneys
                                                     Natural Resources Section
11
                                                     J. Brett Grosko
12                                                   Trial Attorney
                                                     Wildlife and Marine Resources Section
13
                                                     *Attorneys for Federal Defendants*
14

15

16   OF COUNSEL
     Rose Miksovsky
     U.S. Department of Agriculture
17   Office of the General Counsel
     33 New Montgomery St., 17th Floor
18   San Francisco, CA 94105

19

20

21

22

23

24

25

26

27

28

## CERTIFICATE OF SERVICE

I hereby certify that on December 14, 2010, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

David A. Bahr
davebahr@mindspring.com

Lisa T. Belenky
lbelenky@biologicaldiversity.org

Erik Schlenker-Goodrich
eriksg@westernlaw.org

*Attorneys for Plaintiffs*

Paul A. Turke
pat@msbtlaw.com

*Attorney for Defendant-Intervenors*

                                                    */s/ John P. Tustin*
                                                    John P. Tustin
                                                    *Attorney for Federal Defendants*