UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

CENTER FOR SIERRA NEVADA
CONSERVATION, et al.,

     NO. CIV. S-09-2523 LKK/JFM

     Plaintiff,

   v.

     O R D E R

UNITED STATES FOREST SERVICE,
et al.,

     Defendants.

_____/

    In 2008, the United States Forest Service adopted a "Public
Wheeled Motorized Travel Management Decision" for the Eldorado
National Forest ("Travel Management Decision" and "ENF").  This
decision designates specific roads and trails within the forest as
open to public motor vehicle use and correspondingly prohibits
cross-country motorized travel.  Plaintiffs, three non-profit
organizations dedicated to their perception of environmental
protection, challenge the Travel Management Decision.  Although
plaintiffs invoke a variety of statutes and legal theories, their
general position is that the decision leaves too many routes open
to vehicle use.  Four groups representing the interests of

1

1   recreational vehicle users have intervened as defendants.

2       The parties have filed cross motions for summary judgment. The
3   court resolves these motions on the administrative record, the
4   parties' briefing, and after oral argument.  For the reasons stated
5   below, each motion is granted in part.  The Forest Service violated
6   its obligation under section 7(a)(2) of the Endangered Species Act
7   to consult with the Fish and Wildlife Service, and the decision
8   designates routes through meadows in apparent violation of
9   provisions of the governing forest plan, thereby violating the
10  National Forest Management Act.

**I. BACKGROUND**

**A.   The Eldorado National Forest**

13      The Eldorado National Forest lies west of Lake Tahoe and east
14  of Sacramento, in the Sierra Nevada mountain range.   The ENF
15  contains over 789,994 acres of diverse topography, soil types,
16  vegetation, and habitat types.

17      Plaintiffs assert that the ENF "provides habitat for numerous
18  endangered, threatened, and sensitive wildlife species, species of
19  concern, and management indicator species." Pls.' Br. 7 (Dkt. 52-
20  1).  The only particular species at issue in this order is the
21  California red-legged frog, *Rana aurora draytonii*, as plaintiffs
22  have not provided arguments regarding any other species.

**B.   The National Environmental Policy Act**

24      Plaintiffs' arguments turn on three statutes.  The first is
25  the National Environmental Policy Act, 42 U.S.C. § 4321 et seq.
26  The Forest Service's approval of the challenged Travel Management

Decision was a "major Federal action[] significantly affecting the quality of the human environment."   42 U.S.C. § 4332(C). Accordingly, the NEPA required the Forest Service to prepare an Environmental Impact Statement ("EIS") for the project.  The Ninth Circuit recently summarized the structure and purpose of this requirement:

> In NEPA, Congress declared as a national policy "creat[ing] and maintain[ing] conditions under which man and nature can exist in productive harmony." [42 U.S.C.] § 4331(a).  NEPA's purpose is realized not through substantive mandates but through the creation of a democratic decisionmaking structure that, although strictly procedural, is almost certain to affect the agency's substantive decisions. . . . [B]y requiring agencies to take a "hard look" at how the choices before them affect the environment, and then to place their data and conclusions before the public, NEPA relies upon democratic processes to ensure . . . that the most intelligent, optimally beneficial decision will ultimately be made.

Or. Natural Desert Ass'n v. Bureau of Land Mgmt., 625 F.3d 1092, 1099-1100 (9th Cir. 2010) (some internal citations, quotations, and modifications omitted).

NEPA specifies various information that must be included in an EIS.  The "heart" of the EIS is an examination of reasonable alternatives to the proposed action.  Id. at 1100 (citing 40 U.S.C. § 4332(C); 40 C.F.R. § 1502.14).  "[T]he agency must '[r]igorously explore and objectively evaluate all reasonable alternatives,' and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated."  Id. (quoting 40 C.F.R. § 1502.14).

**C.   The National Forest Management Act and the Multiple-Use Sustained-Yield Act**

The second statute plaintiffs invoke is the National Forest Management Act ("NFMA"), 16 U.S.C. §§ 1600-1614.  NFMA, together with the Multiple-Use Sustained-Yield Act ("MUYSA"), 16 U.S.C. §§ 528-531, provides the primary guidance to the management of the National Forests.  Substantively, MUYSA directs the Forest Service to administer the national forests "for outdoor recreation, range, timber, watershed, and wildlife and fish purposes." 16 U.S.C. § 528.  NFMA adds "wilderness" as an additional purpose, reflecting the passage of the Wilderness Act of 1964. 16 U.S.C. §§ 1604(e), 1311 et seq.

The Forest Service applies NFMA through several layers of management.  At a broad level, NFMA requires the Forest Service to develop a forest plan for each forest.[1]  Once a forest plan is adopted, individual management actions within that forest must comply with the plan. 16 U.S.C § 1604(i); Lands Council v. McNair, 537 F.3d 981, 989 (9th Cir. 2008) (en banc).  The Forest Service evaluates a proposed project's compliance with the applicable forest plan during the NEPA process.  Inland Empire Pub. Lands Council v. U.S. Forest Serv., 88 F.3d 754, 757 (9th Cir. 1996).  NFMA therefore injects a substantive component into the NEPA's otherwise procedural requirements.  In addition to the standard NEPA documents, the Forest service must prepare a "Biological

---

[1] These plans are also referred to as "Land Resource Management Plans" or "LRMPs."

1  Evaluation" for proposed actions "to determine their potential
2  effect on sensitive species."   Forest Service Manual ("FSM")
3  2670.32 ¶ 2.  This document discusses species protected under the
4  Endangered Species Act and those species the Forest Service has
5  itself designated as sensitive.

6      The Forest Service has promulgated a forest plan for the
7  Eldorado National Forest.  Discussion of this plan is complicated
8  by the fact that the plan is not codified in a single document.
9  In 1989, the Forest Service adopted what was then a comprehensive
10  forest plan for the Eldorado National Forest.  Admin. Record ("AR")
11  3396.  In 2004, the Forest Service promulgated the Sierra Nevada
12  Forest Plan Amendments ("SNFPA"), which amended the forest plans
13  for eleven national forests in the Sierra Nevada region, including
14  Eldorado National Forest.  AR 10,938.[2]  The SNFPA did not supersede
15  or modify any pertinent provisions of the ENF Forest Plan, but the
16  SNFPA did add various supplemental provisions.  For convenience,
17  the court refers to the provisions adopted in 1989 as the "ENF
18  Forest Plan" and to the provisions added by the SNFPA in 2004 as
19  the "Sierra Nevada Forest Plan."  See Earth Island Inst. v. U.S.
20  Forest Serv., 351 F.3d 1291, 1296 (9th Cir. 2003) (adopting similar
21  terminology).  The court recognizes, however, that this terminology
22  is technically inaccurate, in that both are aspects of a single
23  forest plan.

24  _____

25      [2] An earlier round of Sierra Nevada Forest Plan Amendments was
   adopted in 2001.  AR 12,530.  The 2001 amendments were superseded
26  by the 2004 amendments, and as such, the 2001 amendments are not
   at issue here.  AR 10,938.

5

**D.    The Endangered Species Act**

Yet another statute at issue in this case is the Endangered Species Act ("ESA"), 16 U.S.C. 1531 et seq. The ESA "reflects 'a conscious decision by Congress to give endangered species priority over the "primary missions" of federal agencies.'" Cal. ex rel. Lockyer v. U.S. Dep't of Agric., 575 F.3d 999, 1018 (9th Cir. 2009) (quoting Tenn. Valley Auth. v. Hill, 437 U.S. 153, 185 (1978)). The ESA protects species that have been "listed" as "threatened" or "endangered." ESA § 4(c), 16 U.S.C. § 1533(c); 50 C.F.R. § 402.01. In this case, plaintiffs' arguments pertain to a single listed species, the California red-legged frog, which is listed as "threatened." 61 Fed. Reg. 25813 (May 23, 1996).

Federal agencies must ensure that their actions "[are] not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of" habitat that has been designated as critical to the species. ESA § 7(a)(2), 16 U.S.C. § 1536(a)(2). The ESA provides a framework for cooperation between agencies to achieve this goal. The Fish and Wildlife Service ("FWS") has primary expertise regarding and authority over the California red-legged frog, and over non-marine species generally. FWS is referred to as a "Service" under the ESA. Other federal agencies, including the Forest Service, must satisfy their section 7 obligations "in consultation with and with the assistance of" FWS. Id. In this process, the Forest Service is referred to as the "action agency."

1    The ESA and implementing regulations provide a procedural
2  framework for consultation regarding proposed actions.  In this
3  case, the Forest Service was first required to prepare a Biological
4  Assessment.  ESA § 7(c)(1), 16 U.S.C. § 1536(c)(1); 50 C.F.R. §
5  402.12.  The Biological Assessment determines, inter alia, whether
6  the proposed action "may affect" listed species.  50 C.F.R. §
7  402.14.  If the action agency determines that the action "may
8  affect" listed species, the agency must consult with the
9  appropriate Service.  ESA § 7(a)(2), 16 U.S.C. § 1536(a)(2); 50
10  C.F.R. § 402.14(a); see also Cal. ex rel. Lockyer, 575 F.3d at 1018
11  ("consultation is required whenever a federal action 'may affect
12  listed species.'").  Consultation may be formal or informal.  50
13  C.F.R. § 402.13(a).  During informal consultation, FWS determines
14  whether the proposed action is "not likely to adversely affect" the
15  listed species.  Id.  If the Service determines that the proposal
16  is not likely to adversely affect any species or critical habitat,
17  then "the consultation process is terminated, and no further action
18  is necessary."  Id.  If FWS cannot reach this conclusion, then
19  formal consultation is necessary, during which the Service prepares
20  a Biological Opinion.  Ground Zero Ctr. for Non-Violent Action v.
21  U.S. Dep't of Navy, 383 F.3d 1082, 1091-92 (9th Cir. 2004).  If FWS
22  determines that the proposed action would violate Section 7's
23  "jeopardy" standard, FWS must set forth one or more reasonable and
24  prudent alternatives that would avoid jeopardy.  ESA § 7(b)(3)(A),
25  16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14.
26    A further permutation is that action agencies may engage in

7

1  "programmatic consultation." Ordinarily, the consultation process

2  looks to a site-specific action. Programmatic consultation instead

3  concerns planning documents and other scenarios in which an agency

4  is preparing to undertake a number of later, similar actions, the

5  specifics of which have not yet been defined. See Gifford Pinchot

6  Task Force v. U.S. Fish and Wildlife Serv., 378 F.3d 1059, 1062

7  (9th Cir. 2004); Pac. Coast Fed'n of Fishermen's Ass'ns v. Nat'l

8  Marine Fisheries Serv., 482 F. Supp. 2d 1248, 1267 (W.D. Wash.

9  2007); Buckeye Forest Council v. U.S. Forest Serv., 378 F. Supp.

10 2d 835, 843-44, 1036 (S.D. Ohio 2005).

11     In 2006, the Forest Service engaged in informal programmatic

12 consultation regarding route designation in the Sierra Nevada. AR

13 1, 31-33. This consultation acknowledged that route designations

14 "may affect" listed species. FWS agreed, however, that if route

15 designations adhered to a list of six "design criteria," then the

16 designated routes would not be likely to adversely affect listed

17 species, such that no further consultation would be necessary. AR

18 1, 3-4. Because plaintiffs do not challenge the validity of the

19 programmatic consultation or these design criteria, the court

20 assumes that this type of consultation complies with the ESA.

21     Section 7's prohibition on federal actions that would

22 jeopardize species or their critical habitat is not the only method

23 by which the ESA seeks to protect and recover listed species.

24 Notably, the Services must develop and implement recovery plans for

25 listed species, which identify measures that will allow the species

26 to be delisted. ESA § 4(f), 16 U.S.C. § 1533(f). FWS adopted a

recovery plan for the California red-legged frog in 2002.   AR
15,843.

**E.   The Travel Management Rule**

In addition to the above statutes, plaintiffs rely on the
Forest Service's Travel Management Rule, a regulation codified at
36 C.F.R. part 215.   Plaintiffs invoke subparts A and B of this
rule.

What is now Subpart A of the Travel Management Rule was first
promulgated in 2001.   Administration of Forest Transportation
System, 66 Fed. Reg. 3206 (Jan 12, 2001), codified at 36 C.F.R. §§
212.1 to 212.21.   Subpart A requires the Forest Service to
determine, for each National Forest, the "minimum road system
needed for safe and efficient travel and for utilization, and
protection of National Forest System lands."   36 C.F.R. §
212.5(b)(1).   The notice of final rulemaking explained that this
system is the minimum that will serve "forest health, emergency
access, and public access needs," and that the system must
"compl[y] with resource objectives, . . . reflect likely funding,
and . . . minimize adverse environmental effects associated with
road construction, reconstruction, and maintenance."   66 Fed. Reg.
at 3208, 3207.   Subpart A further obliges the Forest Service to
concurrently "identify the roads . . . that are no longer needed
to meet forest resource management objectives and that, therefore,
should be decommissioned or considered for other uses, such as for
trails."   36 C.F.R. § 212.5(b)(2).   The requirement to identify
roads for decommissioning is "[e]qually important" as the overall

1  identification of the minimum road system.  66 Fed. Reg. at 3207.

2  Both decisions must be based on "a science-based roads analysis at

3  the appropriate scale."  36 C.F.R. § 212.5(b)(2).

4      Subpart B of the Travel Management Rule was promulgated four

5  years later, in 2005.  Travel Management; Designated Routes and

6  Areas for Motor Vehicle Use, 70 Fed. Reg. 68,264 (Nov. 9, 2005),

7  codified at 36 C.F.R. §§ 212.50 - 212.57.  Underlying the pertinent

8  portions of Subpart B, however, are executive orders dating back

9  to 1972.  In 1972, President Nixon issued Executive Order No.

10 11,644, which recognized the potential for conflict between

11 off-highway vehicle ("OHV")[3] use and other land management goals.

12 To limit these conflicts, Executive Order 11,644 directed federal

13 land management agencies, including the Forest Service, to adopt

14 regulations providing for administrative designation of areas and

15 trails open and closed to motor vehicle use.  Exec. Order No.

16 11,644, §§ 1, 3; 37 Fed. Reg. 2877 (Feb. 9, 1972).  These

17 designations must "be based upon the protection of the resources

18 of the public lands, promotion of the safety of all users of those

19 lands, and minimization of conflicts among the various uses of

20 those lands."  Id. § 3.  The executive order further provides four

21 "minimization criteria:"

22 _____

23     [3] Exec. Order Nos. 11,644 and 11,989 use the terms "Off-Road
   Vehicles" and "ORVs," whereas more recent documents generally use
24 the terms "Off-Highway Vehicles" and "OHVs." For purposes of this
   case, the two terms are interchangeable; both refer to vehicles
25 designed to travel cross-country and on roads and trails not
   suitable for street-legal passenger vehicles.  To conform to the
26 Administrative Record, the court uses "OHV."

(1) Areas and trails shall be located to minimize damage to soil, watershed, vegetation, or other resources of the public lands.

(2) Areas and trails shall be located to minimize harassment of wildlife or significant disruption of wildlife habitats.

(3) Areas and trails shall be located to minimize conflicts between off-road vehicle use and other existing or proposed recreational uses of the same or neighboring public lands, and to ensure the compatibility of such uses with existing conditions in populated areas, taking into account noise and other factors.

(4) Areas and trails shall not be located in officially designated Wilderness Areas or Primitive Areas. Areas and trails shall be located in areas of the National Park system, Natural Areas, or National Wildlife Refuges and Game Ranges only if the respective agency head determines that off-road vehicle use in such locations will not adversely affect their natural, aesthetic, or scenic values.

Id. This executive order was amended in 1977 to further direct land management agencies to immediately close areas or trails that "caus[ed] considerable adverse effects" upon protected resources. Exec. Order No. 11,989, § 2, 42 Fed. Reg. 26,959 (May 24, 1977).

In adopting Subpart B of the Travel Management Rule, the Forest Service explained that "the magnitude and intensity of motor vehicle use have increased to the point that the intent of [Executive Orders] 11644 and [] 11989 cannot be met while still allowing unrestricted cross-country travel." 70 Fed. Reg. at 68,265. Subpart B addresses this changed circumstance by eliminating unrestricted cross-country recreational OHV use and restricting motorized vehicle use to roads and trails designated

11

1  for that purpose.  36 C.F.R. § 212.55(a).  Under Subpart B, the

2  Forest Service's decision of which routes and areas to open to

3  motor vehicle use must consider:

> effects on National Forest System natural and
> cultural resources, public safety, provision
> of recreational opportunities, access needs,
> conflicts among uses of National Forest System
> lands, the need for maintenance and
> administration of roads, trails, and areas
> that would arise if the uses under
> consideration are designated; and the
> availability of resources for that maintenance
> and administration.

36 C.F.R. § 212.55(a).  Subpart B further codifies the Executive

Order's four "minimization criteria," providing that the Forest

Service:

> shall consider effects on the following, with
> the objective of minimizing:
>
> (1) Damage to soil, watershed, vegetation, and
> other forest resources;
>
> (2) Harassment of wildlife and significant
> disruption of wildlife habitats;
>
> (3) Conflicts between motor vehicle use and
> existing or proposed recreational uses of
> National Forest System lands or neighboring
> Federal lands; and
>
> (4) Conflicts among different classes of motor
> vehicle uses of National Forest System lands
> or neighboring Federal lands.

36 C.F.R. § 212.55(b).  In this litigation Federal defendants argue

that the "shall consider . . . with the objective of minimizing"

language "does not require the Forest Service to minimize these

impacts." Fed. Defs.' Br. 21 (Dkt. 57-2).  The court rejects this

interpretation of the regulation.  <u>Accord</u> <u>Idaho Conservation League</u>

v. Guzman, ___ F. Supp. 2d. ___, ___, 2011 WL 447456, *17 (D. Idaho Feb. 4, 2011); see also Part III(A)(2) below.  The language itself does not support the Forest Service's analysis.  More importantly, this aspect of Subpart B codifies Executive Order 11,644, and the executive order plainly states that the land management agencies "shall . . . minimize" the four types of impacts.  Exec. Order. 11,644 § 3.  Accordingly, in this regard, Subpart B is equivalent to the Bureau of Land Management's corresponding regulation interpreting Executive Order 11,644.  Guzman, 2011 WL 447456, *17, *17 n.6. See also Ctr. for Biological Diversity v. Bureau of Land Mgmt., 746 F. Supp. 2d 1055, 1075-76 (N.D. Cal. 2009) ("CBD v. BLM") (BLM's regulation, 43 C.F.R. § 8342.1, compels BLM to minimize impacts).

Finally, under Subpart B the Forest Service must consider the "[c]ompatibility of motor vehicle use with existing conditions in populated areas, taking into account sound, emissions, and other factors."  36 C.F.R. § 212.55(b)(5).

**F.   The Challenged Travel Management Decision**

Plaintiffs' suit is only the most recent chapter in two decades of litigation regarding vehicle use in the ENF.  The Forest Service first promulgated an OHV plan for the ENF in 1990.  That plan was challenged in court, culminating in a 2005 order by the undersigned directing the Forest Service to withdraw the 1990 plan. See Ctr. for Sierra Nevada Conservation v. Berry, No. 2:02-cv-00325-LKK-JFM (E.D. Cal. Aug. 16, 2005) (Order on Remedies (Dkt. 163)) ("Berry order").  The Berry order required the Forest

13

Service to, among other things, withdraw the 1990 Plan and to "issue a Final Environmental Impact Statement and Record of Decision on a new ENF OHV Plan (or site-specific area plans)" by December 31, 2007. Berry Order at 1. This deadline was subsequently extended to April 2, 2008. The Travel Management Decision challenged in this suit was prepared in order to comply both with Subpart B of the Travel Management Rule and the Berry order. See AR 2440 (EIS at 1-9).

At the time of the Berry order, the ENF contained 2,342 miles of official National Forest System roads and trails open to public motorized use. AR 2396 (EIS at xi). These included roads at maintenance levels (ML) 1 through 5. ML-3, ML-4, and ML-5 roads are "managed for standard four wheel passenger vehicles." Id. at 2395. ML-2 roads are "maintained for high clearance vehicles" and "are generally not suitable for standard four wheel passenger vehicles." Id. ML-1 roads in the ENF "were designed to be intermittently used service roads and were intended to be closed to public wheeled motor vehicle use, although a majority of them are no longer physically closed." Id. at 2396. Trails, which do not receive an "ML" classification, are distinct from roads in that trails are narrower and typically maintained only for motorcycle or all-terrain vehicle use.

In addition to these official routes, the ENF contained 526 miles of "unauthorized routes" where "use [was] continuing to occur." Id. Unauthorized routes are generally user-created routes, e.g., routes that develop as a result of repeated

1   cross-country travel by the public.  Although these routes had not

2   received official approval, designation, or maintenance, they were

3   not necessarily "illegal" prior to the Berry order, because

4   off-road and cross-country travel was previously permitted in the

5   ENF.  See Guzman, 2011 WL 447456, *5 n.3 (explaining the creation

6   of unauthorized routes in national forests).  The Berry order

7   prohibited motorized use of unauthorized routes pending release of

8   a new travel management decision.

9       The Forest Service released a draft EIS for the Travel

10  Management Decision on July 20, 2007.  AR 1476.  The draft EIS

11  discussed trails, ML-1 and ML-2 roads, and unauthorized routes.

12  AR 1481.[4]   The draft EIS examined a "no action" alternative,

13  alternative A, and four action alternatives, B through E.  The "no-

14  action" alternative would allow use to continue on all existing

15  routes and would allow cross-country travel.   AR 1487.

16  Alternatives B through E would prohibit cross-country travel and

17  open decreasing numbers of roads and trails to vehicle use, with

18  B authorizing the most miles of routes and E authorizing the least.

19  AR 1491.  Each of these alternatives permitted vehicle use on some

20  previously unauthorized routes, ranging from 17.7 to 45.8 miles of

21  such routes.   Id.   The preferred alternative was D, which

22  authorized motorized travel on 1,061 miles of routes, 34.8 of which

23  were previously unauthorized.   Id.

24      In conjunction with the draft EIS, the Forest Service released

25  ────────────────

26      [4] Plaintiffs have not challenged the exclusion of ML-3 to -5
    roads from the analysis.

a draft Biological Evaluation (under NFMA) addressing each alternative's impacts on sensitive species, AR 12,638, and a Biological Assessment (under the ESA) assessing alternative D's impacts on listed species, including the California red-legged frog.  AR 12,869.  The Forest Service submitted the draft Biological Assessment and draft EIS to FWS for informal consultation.  AR 13.  FWS concluded that alternative D was "not likely to adversely affect" listed species.  AR 2354-55.  In its concurrence, FWS stated that the ESA would require no further action "[u]nless new information reveals effects of the proposed action that may affect federally listed species in a manner or to an extent not considered, or a new species or critical habitat is designated that may be affected by the proposed action."  Id.

The Forest Service released its final EIS and Record of Decision ("ROD") in March of 2008.  AR 2387, 3270.  Rather than adopt the previously preferred alternative, the ROD adopted a modified form of alternative B.  Like the original alternative B, Modified B authorized a greater number of routes than any of the other action alternatives.  AR 2389.  Modified B differed from B as to the particular routes authorized, however, incorporating changes intended to protect environmental resources.  Id.  In total, Modified B authorized 1,212 miles of trails, ML-1, and ML-2 roads, of which roughly 23 miles were previously unauthorized.  AR 2475.  The ROD selected alternative Modified B "because it provides a balanced response to the public comments by satisfying many recreation and social benefit criteria while providing increased

16

1  protection for resources."   AR 3277.   The ROD also adopted a

2  "non-significant" amendment to three provisions of the ENF Forest

3  Plan, exempting twenty enumerated routes from compliance with these

4  provisions.   AR 3273-35.

5     In connection with the final EIS, the Forest Service also

6  issued an updated Biological Evaluation and Biological Assessment.

7  The new Biological Assessment again concluded that the proposal was

8  "not likely to adversely affect" any listed species.   The Forest

9  Service relied on the 2006 programmatic consultation and did not

10 further consult with FWS.

11    Plaintiffs filed an administrative appeal challenging the ROD

12 and FEIS.   On June 27, 2008, this appeal was denied. AR 321, 804.

13 On September 4, 2009, plaintiffs submitted a notice of intent to

14 sue under the ESA to both the Forest Service and FWS.   This suit

15 followed.

16                        **II.  STANDARD**

17    Plaintiffs argue that the Travel Management Decision violated

18 NEPA, NFMA, the Travel Management Rule, and the ESA.   Plaintiffs'

19 NEPA, NFMA, and Travel Management Rule claims are brought under

20 section 706(2) of the Administrative Procedure Act.   Ecology Ctr.,

21 Inc. v. Austin, 430 F.3d 1057, 1062 (9th Cir. 2005) (NFMA and NEPA

22 claims are brought under 5 U.S.C. § 706(2)); Skranak v. Castenada,

23 425 F.3d 1213, 1218-19 (9th Cir. 2005) (claim that Forest Service

24 violated its own regulation is brought under 5 U.S.C. § 706).

25 Under section 706(2), the court will set aside agency action that

26 is "arbitrary, capricious, an abuse of discretion, or otherwise not

                              17

in accordance with the law" or that is undertaken "without observance of procedure required by law." 5 U.S.C. §§ 706(2)(A), (2)(D).  Plaintiffs' ESA claim, which argues that the Forest Service violated an obligation to consult with FWS, is brought under the ESA's citizen suit provision, 16 U.S.C. § 1540(g)(1). W. Watersheds Project v. Kraayenbrink, 632 F.3d 472, 495 (9th Cir. 2011); Wash. Toxics Coal. v. Envtl. Prot. Agency, 413 F.3d 1024, 1034 (9th Cir. 2005).  The ESA claim is nonetheless reviewed under the same APA standards of review.  W. Watersheds Project, 632 F.3d at 495-96.[5]

All parties have moved for summary judgment.  Under APA section 706(2) review, the court does not employ the usual summary judgment standard.  Conservation Cong. v. U.S. Forest Serv., 555 F. Supp. 2d 1093, 1100 (E.D. Cal. 2008).  This is because the court is not generally called upon to resolve facts in reviewing agency action.  Occidental Eng'g Co. v. Immigration and Naturalization Serv., 753 F.2d 766, 769-70 (9th Cir. 1985).  Instead, the court's function is to determine whether or not, as a matter of law, the evidence in the administrative record permitted the agency to make the decision it did.  Id.

An agency decision is arbitrary and capricious where the agency "relied on factors Congress did not intend it to consider,

---

[5] Western Watersheds Project held that the APA standard of review applied, but that review of ESA citizen suits, unlike review of suits brought under 5 U.S.C. § 706(2), is not confined to the administrative record.  W. Watersheds Project, 632 F.3d at 495-96. See also Wash. Toxics Coal., 413 F.3d at 1034.  In this case, no party relies on this broader scope of review.

entirely failed to consider an important aspect of the problem, or offered an explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Lands Council, 537 F.3d at 987 (quotations omitted).  The agency "must articulate a rational connection between the facts found and the conclusions reached." Earth Island Inst., 442 F.3d at 1157 (citing Midwater Trawlers Co-op v. Dep't of Commerce, 282 F.3d 710, 716 (9th Cir. 2002)).

Especially in a case such as this one, where the agency must comply with a multitude of obligations, many of which pull the agency in competing directions, and which collectively lead to a record of tens of thousands of pages, this standard extends beyond mere deference to the agency's considered judgment.  The court will additionally overlook minor gaffes in the record.  This added deference is demonstrated by the instruction to "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983).  Under NEPA in particular, a court "may not 'fly-speck [the EIS] and hold it insufficient on the basis of inconsequential, technical deficiencies.'" Friends of the Southeast's Future v. Morrison, 153 F.3d 1059, 1063 (9th Cir. 1998) (quoting Swanson v. U.S. Forest Serv., 87 F.3d 339, 343 (9th Cir. 1996)).  The inquiry is "'whether claimed deficiencies in a FEIS are merely flyspecks, or are significant enough to defeat the goals of informed decision making and informed public comment.'" Nevada

1  v. Dep't of Energy, 457 F.3d 78, 93 (D.C. Cir. 2006) (quoting Fuel

2  Safe Wash. v. Fed. Energy Regulatory Comm'n, 389 F.3d 1313, 1323

3  (10th Cir. 2004)).

## III. ANALYSIS

The parties seek summary judgment on five claims. Plaintiffs argue (1) that the Forest Service was required to identify a minimum road system under Subpart A of the travel management rule before reaching a travel management decision under Subpart B; that the Forest Service violated NEPA by (2) failing to consider an adequate range of alternatives and (3) failing to include sufficient site-specific information; (4) that the travel management decision designates routes in violation of the governing forest plan, violating NFMA; and (5) that the Forest Service failed to adequately consult with FWS regarding the California red-legged frog, violating the ESA.[6]

Defendants do not challenge plaintiffs' standing to bring these claims, and the court has reviewed plaintiffs' standing declarations and determined standing to be proper.

## A. Plaintiffs' "Subpart-A" Claim

Plaintiffs' primary argument in this suit is that the Travel Management Rule required the Forest Service to complete the Subpart

_____

[6] Plaintiffs' complaint enumerates eight claims. Nonetheless, the parties agree that resolution of the five claims articulated above will fully resolve this suit.  Specifically, plaintiffs abandoned their seventh claim at oral argument; plaintiffs' NFMA argument encompasses what were previously enumerated as the third and fourth claims; and plaintiffs' NEPA argument regarding site-specific data encompasses what were previously the first and sixth claims.

1  A identification of a minimum road system before the Subpart B

2  designation of roads for public use.  This claim turns primarily

3  on a question of regulatory interpretation.  The Ninth Circuit has

4  held that an agency's interpretation of the agency's own regulation

5  is ordinarily controlling, such that courts will defer to the

6  agency interpretation "unless an alternative reading is compelled

7  by the regulation's plain language or by other indications of the

8  agency's intent at the time of the regulation's promulgation."

9  Bassiri v. Xerox Corp., 463 F.3d 927, 930-31 (9th Cir. 2006)

10 (citing Auer v. Robbins, 519 U.S. 452, 461-63 (1997)).  This raises

11 the question of what counts as an agency interpretation.  In this

12 case, many of the purported "interpretations" cited by defendants

13 are not of the types that have previously received Auer deference.

14 Nonetheless, as the court explains below, the Forest Service Manual

15 suggests that the Forest Service may address Subparts A and B in

16 any order, and plaintiffs have not shown that the language of the

17 Travel Management Rule "compels" plaintiffs' interpretation.  It

18 follows that the Forest Service's decision not to first complete

19 the Subpart A analysis was neither arbitrary nor in violation of

20 the procedures required by law.[7]

21      **1.   The Travel Management Rule Is Ambiguous**

22      The Ninth Circuit has articulated two different frameworks for

23

24      [7] Other than to argue that Subpart A must precede Subpart B,
plaintiffs have not challenged the Forest Service's failure to meet
25 its Subpart A obligations.  For example, plaintiffs have not argued
that the Forest Service has "unlawfully withheld or unreasonably
26 delayed" compliance with Subpart A.  5 U.S.C. § 706(1).

1   regulatory interpretation.    Bassiri used a two-step process,

2   beginning with the agency interpretation and then looking to

3   whether an alternative interpretation was "compelled."   Other

4   courts begin with the plain language, looking to agency

5   interpretation only if the regulation is ambiguous, and then

6   looking to whether the interpretation is unreasonable.   See, e.g.,

7   Bayview Hunters Point Cmty. Advocates v. Metro. Transp. Comm'n, 366

8   F.3d 692, 698 (9th Cir. 2004); Hells Canyon Alliance v. U.S. Forest

9   Serv., 227 F.3d 1170, 1180 (9th Cir. 2000).   These two frameworks

10  are presumably equivalent.   Here, the court concludes that the

11  Travel Management Rule is ambiguous, because no language in the

12  rule specifically addresses the timing of the Forest Service's

13  obligations under Subparts A and B.   Plaintiffs' contention that

14  the structure of the rule compels plaintiffs' interpretation is

15  better discussed through the prism of reasonableness.

16      **2.   The Agency's Purported Interpretations of The Travel**

17          **Management Rule**

18      The Forest Service argues that it has interpreted the Travel

19  Management Rule as permitting the Forest Service to begin with

20  Subpart B.   The Forest Service appears to argue that the EIS, the

21  Forest Service Manual, and the Forest Service's own litigation

22  position are all interpretations warranting deference.   Plaintiffs

23  argue that the Forest Service overstates the degree to which it is

24  entitled to deference.   More significantly, plaintiffs cite some

25  of the same language in the record as indicating that the Forest

26  Service had itself adopted *plaintiffs*' interpretation of the

1   regulation.  Below, the court reviews the law underlying deference

2   to agency interpretation of regulations and then examines the

3   potential interpretive documents identified by the parties.  The

4   EIS neither meaningfully interpreted the Travel Management Rule nor

5   conceded that Subpart A must precede Subpart B.  The agency's

6   litigation position is not entitled to deference. The Forest

7   Service Manual is the type of agency statement entitled to

8   deference, and although this manual does not address the sequencing

9   question in the most explicit of terms, the manual provides

10  implicit support for the Forest Service's position.

## a.   Deference to Agencies under Auer

12       The law regarding agency interpretation of regulations may be

13  best understood in juxtaposition with the law regarding agency

14  interpretation of statutes.  As to statutes, courts have recognized

15  two distinct forms of deference to agency interpretations of

16  statutes.  Courts defer to agencies under Chevron U.S.A. v. Natural

17  Res. Def. Council, 467 U.S. 837, 842-45 (1984) where Congress has

18  delegated lawmaking authority to the agency and the agency has

19  interpreted a statute in the exercise of this authority.  United

20  States v. Mead Corp., 533 U.S. 218, 229-30 (2001).  If the statute

21  is ambiguous, the agency properly exercised its delegated authority

22  in reaching the interpretation, and the agency interpretation is

23  reasonable, then courts must adhere to the agency interpretation.

24  Wilderness Soc'y v. U.S. Fish and Wildlife Serv., 353 F.3d 1051,

25  1060 (9th Cir. 2003) (en banc), amended by 360 F.3d 1374 (2004).

26  Numerous cases have addressed which agency actions warrant Chevron

1 deference.   For   example,   in   the   Ninth   Circuit,   an   agency
2 interpretation only receives Chevron deference when it is adopted
3 in a document that has a precedential effect that binds third
4 parties.  Marmolejo-Campos v. Holder, 558 F.3d 903, 909 (9th Cir.
5 2009) (en banc).

6    A  second  form  of  deference  to  agency  interpretation  of
7 statutes exists under Skidmore v. Swift & Co., 323 U.S. 134 (1944).
8 While   Chevron   deference   takes   its   force   from   an   assumed
9 Congressional  delegation  of  authority  to  the  agency,  Skidmore
10 deference reflects the fact that the agency has experience with the
11 statute and is likely to reach a reasoned interpretation regardless
12 of  whether  Congress  intended  the  agency's  interpretation  to  be
13 binding.   Mead,   533   U.S.   at   230.    In   contrast   with   Chevron
14 deference, Skidmore deference is not all-or-nothing. "The weight
15 [accorded to an administrative] judgment in a particular case will
16 depend  upon  the  thoroughness  evident  in  its  consideration,  the
17 validity of its reasoning, its consistency with earlier and later
18 pronouncements,  and  all  those  factors  which  give  it  power  to
19 persuade, if lacking power to control." Skidmore, 323 U.S. at 140.
20 An agency need not adhere to any particular procedures in order to
21 receive Skidmore deference.

22    Returning to agency interpretation of regulations, it appears
23 that with regard to underlying justifications, Auer deference is
24 more akin to Chevron than to Skidmore.  Tautologically, where an
25 agency is interpreting its own regulation, the agency is speaking
26 on a subject for which "Congress [has] delegated authority to the

1 agency generally to make rules carrying the force of law." <u>Mead</u>,

2 533 U.S. at 226-27.   Additionally, <u>Auer</u> and <u>Chevron</u> provide

3 essentially the same degree of deference: under each, where the

4 agency has satisfied the procedural prerequisites for deference,

5 agency interpretation of an ambiguous law will be upheld so long

6 as the interpretation is reasonable.[8]  <u>But see</u> <u>Dep't of Health and</u>

7 <u>Human Servs. v. Chater</u>, 163 F.3d 1129, 1135 (9th Cir. 1998)

8 (explaining, as an additional ground for deferring to an agency's

9 interpretation of its own regulation, that the agency's "expertise

10 makes it well-suited to interpret its own language.").

11     <u>Auer</u> may share <u>Chevron</u>'s justification, but it differs with

12 regard to procedural prerequisites.   As noted, an agency

13 interpretation will only receive <u>Chevron</u> deference if it was

14 adopted through procedures with some formality. <u>Mead</u>, 533 U.S. at

15 229-30; <u>Barnhart v. Walton</u>, 535 U.S. 212, 222 (2002).   Agency

16 interpretation of a regulation may receive <u>Auer</u> deference even when

17 the interpretation was adopted through informal procedures that

18 would not suffice under <u>Chevron</u>.  <u>Bassiri</u>, 463 F.3d at 930.

19     Nonetheless, it cannot be the case that courts must defer to

20 any interpretation of a regulation uttered by any agency official.

21 As the Seventh Circuit has recognized:

22           Just as varying degrees of deference are
          appropriate for regulations or other forms of

23

---

24     [8] The Court recognized an additional limit on <u>Auer</u> deference
in <u>Christensen v. Harris County</u>, 529 U.S. 576 (2000).  <u>Christensen</u>
25 held that an agency cannot "under the guise of interpreting a
regulation . . . create de facto a new regulation." <u>Id.</u> at 588.
26 <u>Christensen</u>'s limit on <u>Auer</u> is not at issue in this case.

> guidance issued by agencies, so too are
> different levels of deference appropriate for
> interpretations of regulations offered by
> agencies.  When the agency speaks formally,
> Auer holds that the agency's interpretation is
> controlling unless it is plainly erroneous or
> inconsistent with the regulation.  An
> off-the-cuff response to an interpretive
> question from the first person who answers the
> telephone would be quite a different matter.

Joseph v. Holder, 579 F.3d 827, 832 (7th Cir. 2009).  Although

"formal" procedures are not required in the Ninth Circuit, Joseph's

observation that some agency employees lack the power to speak for

the agency cannot be denied.

This principle is further illustrated by Auer itself.  Auer

looked to the circumstances surrounding the particular agency

document at issue before concluding that deference was warranted.

Auer concerned a regulation promulgated under the Fair Labor

Standards Act.  The Secretary of Labor had filed an amicus brief

before the Supreme Court offering the Secretary's interpretation

of the regulation.  The Court held that this brief's interpretation

of the regulation was entitled to deference because it was "in no

sense a post hoc rationalization advanced by an agency seeking to

defend past agency action against attack" and there was "no reason

to suspect that the interpretation [did] not reflect the agency's

fair and considered judgment on the matter in question."  Auer, 519

U.S. at 462.  More recently, the Court applied a similar analysis

in deferring to an amicus brief filed by the Federal Reserve Board,

resting on these factors and the fact that "[t]he board [was] not

a party to [the] case."  Chase Bank USA, N.A. v. McCoy, ___ U.S.

26

1   ___, 131 S. Ct. 871, 880 (2011).   In <u>Chase Bank</u>, the Court

2   specified that it deferred to the particular amicus brief "in light

3   of 'the circumstances of this case,'" and that the Court was not

4   holding that all informal interpretations were entitled to <u>Auer</u>

5   deference.   <u>Id.</u> at 884, citing <u>Auer</u>, 519 U.S. at 462.

6       Thus, although the Ninth Circuit has stated that an agency's

7   use of informal procedures does not itself preclude <u>Auer</u> deference,

8   the Supreme Court has clearly indicated that not every document or

9   statement issued by an agency representative is entitled to <u>Auer</u>

10  deference.   Neither court has articulated more specific guidance

11  as to when deference is warranted.   The Ninth Circuit's practice,

12  however, is to extend <u>Auer</u> deference to general statements of

13  policy offered outside the context of litigation against the

14  agency.   The Ninth Circuit has granted <u>Auer</u> deference to: agency

15  opinion letters, <u>Bassiri</u>, 463 F.3d at 930; interpretations

16  published in the federal register, <u>Strom v. U.S.</u>, ___ F.3d ___,

17  2011 WL 1279020, *10 (9th Cir. April 6, 2011), <u>Silvas v. E*Trade</u>

18  <u>Mortg. Corp.</u>, 514 F.3d 1001, 1005 (9th Cir. 2008) and <u>S.E.C. v.</u>

19  <u>Phan</u>, 500 F.3d 895, 903-04 (9th Cir. 2007);[9] <u>amicus</u> briefs filed

20  before the circuit court, <u>Dreiling v. Am. Exp. Co.</u>, 458 F.3d 942,

21  953 n.11 (9th Cir. 2006) and <u>Zurich Am. Ins. Co. v. Whittier Props.</u>

22

23

---

24      [9] Notably, <u>Strom</u> and <u>Phan</u> summarized the <u>Auer</u> rule by stating
    that courts "owe substantial deference to an agency's *published*
25  interpretation of its own regulations."   <u>Phan</u>, 500 F.3d at 904
    (emphasis added); <u>accord</u> <u>Strom</u>, ___ F.3d at ___, 2011 WL 1279020,
26  *10.

1 Inc., 356 F.3d 1132, 1137 n.27 (9th Cir. 2004);[10] and an agency's

2 "internal memorandum," L.A. Closeout, Inc. v. Dept. of Homeland

3 Sec., 513 F.3d 940, 941-42 (9th Cir. 2008).

4         **b.   The Forest Service's Litigation Position**

5     Auer and Chase Bank held that the fact that the agencies were

6 not parties to the litigation indicated that the agencies' amicus

7 briefs "reflect[ed] the agenc[ies'] fair and considered judgment."

8 Auer, 519 U.S. at 462, Chase Bank, 131 S. Ct. at 884.  Mirroring

9 this reasoning, other courts have conversely declined to defer to

10 interpretations offered in the course of litigation against the

11 agency.  Robinson Knife Mfg. Co., Inc. v. Comm'r of Internal

12 Revenue, 600 F.3d 121, 134 n.11 (2nd Cir. 2010) (quoting Auer, 519

13 U.S. at 462). See also Pierre v. Comm'r of Internal Revenue, 2009

14 WL 2591625, *12-13, 133 T.C. No. 2, 2009 U.S. Tax Ct. LEXIS

15 21,*34-*36 (2009) (Cohen, J., concurring).  The circumstances of

16 this case demonstrate that the Forest Service's litigation position

17 is not itself entitled to Auer deference.

18 _____

19     [10] The court observes that the Sixth and Seventh Circuits have "expressed some skepticism about the applicability of Auer

20 deference to amicus briefs at the circuit court level" because "'agency briefs, at least below the Supreme Court level, normally are not reviewed by the members of the agency itself; and it is odd

21 to think of Congress delegating lawmaking power to unreviewed staff decisions.'"  Michigan Bell Telephone Co. v. Covad Communications

22 Co., 597 F.3d 370, 375 n.6 (6th Cir. 2010) (quoting Keys v. Barnhart, 347 F.3d 990, 993-94 (7th Cir. 2003)).  This court has

23 no knowledge of what procedures agencies use before submitting amicus briefs to circuit courts, but the court shares the

24 underlying skepticism about the propriety of extending Auer deference to "unreviewed staff decisions."  As to the specific

25 question of whether amicus briefs warrant deference, this court would of course be bound by the Ninth Circuit decisions cited

26 above.

1               **c.    The EIS and Related Documents**

2        As noted above, each party purports to support its

3   interpretation of the Travel Management Rule by citing statements

4   made in the record.  As the court explains, the record's limited

5   discussion of this rule does not support either party's position.

6        The record discusses the relationship between Subparts A and

7   B in only two passages, both of which are responses to plaintiffs'

8   sequencing argument.  The first is the Forest Service's response

9   to a comment plaintiffs had submitted regarding the draft EIS.  AR

10  2898 (final EIS C-14).  The response stated that "[t]he analysis

11  of effects from implementing each of the alternatives presented in

12  Chapter 3 of the FEIS informs the Forest Supervisor in making a

13  decision regarding the minimum system . . . In making his

14  determination, the Forest Supervisor will consider the direction

15  provided in the ENF LRMP."  Id.

16       The second passage occurs in the response to plaintiffs'

17  administrative appeal.[11]   Plaintiffs' administrative appeal

18  asserted their minimum road system argument.  AR 822.  The appeal

19  deciding officer first stated that the EIS's alternatives analysis

20  ────────────────

21       [11] This portion of the record may be better understood in
    light of the process used to evaluate the appeal.  The "responsible
    official" for the challenged Travel Management Decision itself was
22  the forest supervisor for the Eldorado National Forest.  AR 3272
    (ROD at 3).  The administrative appeal was first reviewed by the
23  forest supervisor for the separate Sequoia National Forest.  AR
    831; 36 C.F.R. § 215.19.  This reviewing officer's recommendations
24  were then adopted in full by the "appeal deciding officer," in this
    case, the regional forester.  AR 805; 36 C.F.R. §§ 215.8, 215.18.
25  Because the deciding officer incorporated the recommendation into
    his decision, the court attributes the language of the decision to
26  the deciding officer.

1  "informs the Forest Supervisor in making a decision regarding the
2  minimum road system," repeating the Forest Service's earlier
3  response to comments. Id.  The officer went on to state, however,
4  that "The Forestwide Roads Analysis completed in 2003 also *helped*
5  *identify* this minimum system. . . . I find that the FEIS and ROD
6  *succeed in designating* a minimum system as required by the Travel
7  Rule . . . ." Id. (emphases added).

8      Plaintiffs argue that these two passages demonstrate that the
9  Forest Service's decision to adopt the Travel Management Decision
10  was based on the belief that the Decision satisfied the Forest
11  Service's obligations under both Subparts A and B.  All parties now
12  agree, however, that the Travel Management Decision did not
13  identify a minimum road system.  Plaintiffs argue that this
14  warrants reversal, because "an agency's action must be upheld, if
15  at all, on the basis articulated by the agency itself." Motor
16  Vehicle Mfrs. Ass'n, 463 U.S. at 50.  The EIS's response to
17  comments defies plaintiffs' characterization, since the response
18  refers to subpart A in the future tense.  The resolution of the
19  administrative appeal presents a more difficult question.  The
20  decision stated that a minimum road system had already been
21  identified.  The denial of the administrative appeal is the final
22  agency action, 36 C.F.R. § 215.1(b), and in light of Federal
23  Defendants' insistence on the importance of administrative
24  exhaustion, there would be a "poetic justice" in holding the Forest
25  Service to statements made in the administrative appeal. Int'l
26  Union of Operating Eng'rs v. County of Plumas, 559 F.3d 1041, 1045

30

1    (9th Cir. 2009). Nonetheless, it is clear that, as Federal

2    Defendants argue, the appeal deciding officer simply wrote in

3    error. Not a single statement in the Record of Decision or EIS

4    indicates that a minimum road system had been or was being

5    identified. Cf. Guzman, ___ F. Supp. 2d. at ____, 2011 WL 447456,

6    at *22. In light of the facts that plaintiffs' argument is

7    supported by a sole statement, that the error of this statement

8    should have been plain to all readers, and that this statement

9    therefore did not meaningfully interfere with public comment,

10   judicial review, or the other purposes of NEPA and the APA, the

11   court declines to hold that this statement represents the "basis

12   articulated by the agency" for purposes of Motor Vehicle Mfrs.

13   Ass'n. The Forest Service has not conceded that Subpart A must

14   precede Subpart B.

15       On the other hand, the court also rejects defendants'

16   contention that these two passages meaningfully interpreted the

17   Travel Management Rule as permitting the Forest Service to begin

18   with Subpart B. Although the FEIS's response to comments implies

19   the interpretation now advocated by the Forest Service, the final

20   agency action, insofar as it interpreted the regulation at all,

21   implies the opposite. The Forest Service cannot point to any

22   articulation of its purported interpretation of the Travel

23   Management Rule in the record. These fleeting statements on the

24   issue do not bear the hallmarks of the agency's "fair and

25

26

1  considered judgment" and are not entitled to <u>Auer</u> deference.[12]

2      Ultimately, the Forest Service appears to argue that by

3  acting, the Forest Service implicitly interpreted all applicable

4  regulations as permitting the agency's choice of action.  This is

5  a <u>post-hoc</u> rationalization, not the type of considered exercise of

6  delegated lawmaking authority that underlies <u>Auer</u>.  At the very

7  least, if the agency wishes for its interpretations to receive <u>Auer</u>

8  deference, the agency must *articulate* those interpretations.

9          **d.   The Forest Service Manual**

10      After the 2005 promulgation of the Travel Management Rule, the

11  Forest Service updated the Forest Service Manual.  The Forest

12  Service Manual, a document published and updated through notice-

13  and-comment proceedings and which guides the entire agency in

14  applying the regulation, is plainly the type of document entitled

15  to <u>Auer</u> deference.

16      The Forest Service Manual requires "responsible officials to

17  use travel analysis to consider the criteria in 36 C.F.R. § 212.55

18  [Subpart B] and contribute towards identification of the minimum

19  road system needed for safe and efficient travel and for

20  administration, utilization, and protection of [national forest]

21  lands (36 C.F.R. § 212.5(b) [Subpart A].").  72 Fed. Reg. 10,632,

22  10,635 (March 9, 2007).   "Travel analysis for purposes of

23

---

24      [12] The court further observes that an EIS is unlike the types
of documents to which the Ninth Circuit has deferred under <u>Auer</u>.
25  Because the EIS in this case did not articulate a coherent
interpretation of the regulation, the court need not decide
26  whether, in another case, an EIS may be entitled to <u>Auer</u> deference.

identification of the minimum road system is separate from travel analysis for purposes of designation of roads, trails, and areas for motor vehicle use.   Travel analysis for both purposes may be conducted concurrently or separately."   FSM 7712. ¶ 2.   The same section of the manual states that "[a]ny proposals resulting from travel analysis for either purpose may be addressed in the same or different environmental analyses."   Id. ¶ 3.

These sections of the manual do not explicitly address the timing of Subparts A and B.   Nonetheless, the manual's statement that the travel analysis underlying Subpart B may occur "separately" from the travel analysis for Subpart A suggests that Subpart B itself may precede Subpart A.   Accordingly, the court concludes that for purposes of Auer, the manual interprets the Travel Management Rule as allowing the agency to begin with Subpart B.   The court must defer to this interpretation if it is reasonable.

**3.   Reasonableness   of   the   Forest   Service   Manual's Interpretation of the Rule**

The Travel Management Rule contains no explicit statement regarding the timing of Subparts A and B.   Plaintiffs argue that the structure of the regulation is such that Subpart A is the "essential prerequisite" to Subpart B, and that prior completion of Subpart A is "logically necessary."   Plaintiffs argue that if B is done first it will be impossible to do A properly, and that A provides information necessary to B.   Plaintiffs additionally discuss the ENF's road maintenance backlog.   None of these

1  arguments compel plaintiffs' interpretation of the rule.

2      First, an essential aspect of the Subpart A analysis is the

3  identification of roads to be decommissioned.  Plaintiffs contend

4  that if the agency first designates roads under Subpart B, the

5  agency will have prejudged whether those roads should be

6  decommissioned under Subpart A.  The court agrees that during the

7  Subpart A analysis the Forest Service will need to evaluate all

8  roads, including any roads previously designated as open under

9  subpart B, for decommissioning.  Plaintiffs have not shown that

10  prior completion of Subpart B gives rise to dangers of

11  "[b]ureaucratic rationalization and bureaucratic momentum" so great

12  that this re-examination will be meaningless.  Northern Cheyenne

13  Tribe v. Hodel, 851 F.2d 1152, 1157 (9th Cir. 1988).

14      Second, plaintiffs argue that Subpart A provides information

15  essential to Subpart B.  Although the chain of reasoning underlying

16  plaintiffs' "logical necessity" argument is unclear, plaintiffs

17  appear to argue that Subpart B obliges the Forest Service to

18  minimize the adverse effects of roads, that the *effects* of roads

19  are correlated with the *amount* of roads, and that Subpart A

20  identifies the minimum amount of roads necessary to satisfy the

21  National Forest's purposes.  Of course, the Forest Service may

22  consider minimizing the amount of roads during the Subpart B

23  analysis as well.  Plaintiffs apparently contend that Subpart A

24  facilitates this analysis by revealing potential multiple-use

25  roads.  Whereas Subpart B looks only to recreation, Subpart A

26  considers the needs of recreation as well as forest administration,

34

fire protection, and other national forest purposes.  36 C.F.R. §
212.5(b)(1); 66 Fed. Reg. at 3208.  Plaintiffs argue that
considering these purposes all at once will enable the Forest
Service to evaluate a comprehensive system and thereby more fully
minimize road impacts.[13]  At most, this argument suggests that
beginning with Subpart A may be prudent.  This is too slender a
reed to support plaintiffs' assertion that the structure of the
Travel Management Rule compels completion of Subpart A before
Subpart B.

In an apparent extension of the preceding argument, plaintiffs
emphasize the ENF's road maintenance backlog.  The record
demonstrates a maintenance backlog in the ENF.  Subpart A presumes
that this backlog will be addressed in part by decommissioning
roads.  Plaintiffs argue that the Subpart B analysis must be
informed by knowledge of which roads will be removed.  Again, this
argument merely provides a reason why the agency might be better
off completing Subpart A first.

Finally, in an argument not obviously connected to Subpart A,
plaintiffs argue that designating roads that the Forest Service
cannot afford is itself arbitrary and capricious.  When roads do
not receive the required level of maintenance their environmental
impact increases.  See, e.g., AR 2522-26 (EIS 3-25 to 3-29).
Preservation of the environment, however, is only one of many goals

_____

[13]  The court must confess that plaintiffs' argument on this
issue is opaque.  The above may not represent the precise chain of
reasoning plaintiffs intended, but if plaintiffs intended something
else, they failed to coherently articulate it.

1   the Forest Service must consider in managing the national forest,

2   and on this issue, plaintiffs have not demonstrated that the Forest

3   Service's balancing of these goals was arbitrary.  Plaintiffs offer

4   an illustrative car analogy.   Plaintiffs contend that road

5   maintenance is akin to getting an oil change every 5,000 miles, and

6   that deferring an oil change until 12,000 miles would be arbitrary

7   and capricious.  Plaintiffs contend that the Forest Service must

8   either change the oil more often or stop driving.  One can easily

9   imagine, however, circumstances in which driving 12,000 miles

10  before changing oil is the best available option.  A driver who

11  cannot afford more frequent maintenance, but who needs to drive in

12  order to work, might defer the oil change despite the knowledge

13  that it is not the best of maintenance.  Similarly, the Forest

14  Service recognized the importance of maintenance and the chronic

15  problems with funding maintenance, but the Forest Service concluded

16  that in light of its budget and the multiple mandates the agency

17  faced, designating roads in excess of the maintenance budget was

18  the best option.[14]

19      In summary, although plaintiffs' arguments have identified

20  various reasons why it might be preferable to conclude Subpart A

21  before Subpart B, plaintiffs have not shown that the language of

22  the regulation compels this ordering.  On arbitrary and capricious

23

24      [14]  The court emphasizes that in making this argument,
    plaintiffs appear to solely rely on the broad purposes of the
25  National Forest Management Act, which inherently require
    compromise.  The court's analysis would potentially differ if the
26  plaintiffs had identified a particular obligation to maintain roads
    or to avoid the consequences of road degradation.

1   review, the court will not reverse the agency merely based on the

2   court's perceptions of prudence.   The court therefore grants

3   summary judgment to the defendants on plaintiffs' Travel Management

4   Rule claim.

5   **B.   Plaintiffs' NEPA Alternatives Analysis Claim**

6        Plaintiffs argue that the Forest Service should have fully

7   examined an alternative that would not have opened any previously

8   unauthorized routes to public motor vehicle travel.

9        As noted above, examination of alternatives "is the heart of

10  the environmental impact statement."   40 C.F.R. § 1502.14.   The

11  agency must "[r]igorously explore and objectively evaluate all

12  reasonable alternatives [to the proposed action], and for

13  alternatives which were eliminated from detailed study, briefly

14  discuss the reasons for their having been eliminated."   40 C.F.R.

15  § 1502.14(a).   The "touchstone" is "whether [the] selection and

16  discussion of alternatives fosters informed decision-making and

17  informed public participation."   Westlands Water Dist. v. U.S.

18  Dep't of Interior, 376 F.3d 853, 872 (9th Cir. 2004) (quoting

19  California v. Block, 690 F.2d 753, 767 (9th Cir. 1982)).   An EIS

20  "cannot be found wanting simply because the agency failed to

21  include every alternative device thought conceivable by the mind

22  of man."   Vt. Yankee Nuclear Power Corp. v. Natural Res. Def.

23  Council, 435 U.S. 519, 551 (1978).   Still, "[t]he existence of a

24  viable but unexamined alternative renders an environmental impact

25  statement inadequate."   Westlands Water Dist., 376 F.3d at 868

26  (quoting Morongo Band of Mission Indians v. Fed. Aviation Admin.,

1   161 F.3d 569, 575 (9th Cir. 1998)).

2        The scope of "viable" or "reasonable" alternatives is

3   determined by the "the purpose and need statement articulated by

4   that agency." 'Ilio'laokalani Coal. v. Rumsfeld, 464 F.3d 1083,

5   1097 (9th Cir. 2006).  This statement inevitably narrows the scope

6   of alternatives, but the agency cannot "define its objectives in

7   unreasonably narrow terms." Muckleshoot Indian Tribe v. U.S.

8   Forest Service, 177 F.3d 800, 813 (9th Cir. 1999) (quoting City of

9   Carmel-by-The-Sea v. U.S. Dept. of Transp., 123 F.3d 1142, 1155

10  (9th Cir. 1997)).  Here, the statement of purpose largely recounts

11  the goals and obligations imposed on the agency by statute, and is

12  therefore reasonable.  AR 2436-37.  These competing goals include

13  conservation and various types of recreation, as explained in part

14  I(C) supra.

15       In balancing competing uses the Forest Service faces a

16  spectrum of choices, with one end representing greater motorized

17  vehicle access and the other representing greater conservation and

18  non-motorized recreation.  The Ninth Circuit has twice invalidated

19  agency decisions where the EIS "did not consider alternatives that

20  sufficiently explored the 'trade-off between wilderness use and

21  development'" in similar land management dilemmas.  Or. Natural

22  Desert Ass'n, 625 F.3d at 1123 (quoting Block, 690 F.2d at 767).

23  In these cases a broad range of options were left unexplored.

24  Oregon Natural Desert Association concerned, in pertinent part,

25  off-highway vehicle use on lands managed by BLM.  BLM "did not

26  consider any alternative that would have closed more than 0.77% of

1   the planning area to [OHVs].'"  625 F.3d at 1124.  The Ninth Circuit

2   rejected the EIS, holding that BLM "must consider closures of

3   significant portions of the land it manages."  Id.  Block concerned

4   allocation of roadless National Forest lands into three management

5   categories.   690 F.2d at 758.   The Forest Service did not

6   "seriously consider[]" allocating more than a third of the acreage

7   as  wilderness;  conversely,  all  alternatives  contemplated

8   significant development.   Id. at 765, 767.  This impermissibly

9   "uncritically assume[d] that a substantial portion of the . . .

10  areas should be developed and consider[ed] only those alternatives

11  with that end result."   Id. at 767.   The Northern District of

12  California recently followed these cases in invalidating an EIS in

13  which every alternative allowed some vehicle use on every mile of

14  the existing 5,098 mile route network.  CBD v. BLM, 746 F. Supp.

15  2d at 1087-88.

16      This case is distinguished from Block and Oregon Natural

17  Desert Association by the range of options explored together with

18  the agency's explanation as to why a "no unauthorized routes"

19  alternative would be unreasonable.  The Forest Service considered

20  five action alternatives, which would designate between 5% and 9%

21  of the existing unauthorized road network as open to vehicle use.

22  AR 2408, 2410.   Thus, the Forest Service considered closing

23  "significant portions" of the unauthorized road network, cf. Or.

24  Natural Desert Ass'n.  The 5% of the unauthorized road network that

25  all alternatives leave open is less than the "substantial portion"

26

1  of land the Forest Service assumed should be developed in <u>Block</u>.[15]

2  Furthermore, the Forest Service explained why these routes

3  were necessary.   The Forest Service held that the project's

4  multiple-use purpose would not be met by a "no previously

5  unauthorized routes" alternative.  AR 2469.  As the EIS explains,

> Some dispersed recreation activities are
> dependent on foot or horseback access and some
> are dependent on motor vehicle access. Those
> activities accessed by motor vehicles consist
> of short spurs that have been created and
> maintained primarily by the passage of
> motorized vehicles. Many such user-created
> routes are not currently part of the National
> Forest Transportation System . . . . Without
> adding them to the [transportation system],
> the [prohibition on cross-country travel]
> would make continued use of such routes
> illegal.

AR at 2397.  Elsewhere, the EIS explains the benefits afforded by

---

[15] Although the overall contrast between this case and <u>Oregon Natural Desert Association</u>, <u>Block</u>, and <u>CBD v. BLM</u> is stark, the specific figures cannot be compared on an "apples to apples" basis. One issue is a denominator problem.  As the Forest Service points out, all alternatives considered closing the majority of the *unauthorized* road network.  The picture changes if the court looks to the *total* road network.  The status quo (*i.e.*, the no action alternative) involved 2,188 miles of roads open to public use.  AR 2410 (EIS at xxiv).  Alternative E, the most restrictive, permits motorized use on 845 miles of routes, or 35% of the prior road network.  <u>Id.</u>  These figures exclude the ML-3+ roads, which were outside the scope of the Travel Management Decision.  Although this raw number approaches the percentages found inappropriate in <u>Block</u>, these percentages also measure different things.  <u>Block</u> concerned acres of hitherto roadless area to be opened to development, whereas this case concerns existing (albeit sometimes unauthorized) routes which may be closed to public use.  Because these are fundamentally different problems, the simple percentages do not tell the whole story.

The court focuses on the percentage of unauthorized routes, rather than the percentage of total routes, because this is how plaintiffs have structured their argument.  Plaintiffs have not argued that the Forest Service should have considered an alternative that would have closed more roads overall.

1  some of the specific previously-unauthorized routes that would be
2  designated under Modified B.   The added routes "will enhance
3  motorized recreation in the Gold Note area" and will "provide[] a
4  number of dispersed camping opportunities in the Capps Crossing
5  area."   AR 2794.   As a whole, this explanation demonstrates that
6  the decision to open routes was not an uncritical assumption.[16]
7  C.f. Block, 690 F.2d at 767; accord Guzman, 2001 WL 447456, *13
8  (although   no   alternative   considered   closing   all   routes   in
9  recommended wilderness areas, the Forest Service had adequately
10 explained that such a closure would fragment transportation network
11 and therefore be unreasonable).

12      Accordingly, the Forest Service properly explained why a "no
13 unauthorized routes" alternative would be unreasonable, and the
14 exclusion of such an alternative from analysis did not violate
15 NEPA.   The   court   therefore   grants   summary   judgment   to   the
16 defendants on plaintiffs' NEPA Alternatives Analysis Claim.

17 **C.    Plaintiffs' NEPA Site-Specific Data Claim**

18      Plaintiffs' third claim is that the EIS failed to include
19 adequate site-specific data.   Plaintiffs argue that the data the
20 EIS used was inappropriate and that the EIS lacked site-specific
21 data regarding a number of particular issues.   The court rejects

---

22        [16] The mere fact that these roads provide specific recreation
23 opportunities is not itself sufficient to demonstrate that closing
   them would be unreasonable.   Presumably, every unauthorized road
24 exists because some user decided that it would provide a worthwhile
   recreational opportunity: every road leads somewhere.   The court
25 is satisfied with the Forest Service's broader explanation that the
   unauthorized routes at issue here play needed roles in the overall
26 road network.

1 both arguments, and accordingly grants summary judgment to the
2 defendants on plaintiff's NEPA Site-Specific Data Claim.

3 **1.    Scope of NEPA's 'Hard Look' Requirement**

4        NEPA "requir[es] that agencies take a 'hard look' at how the
5 choices before them affect the environment." Or. Natural Desert
6 Ass'n, 625 F.3d at 1100.  This 'hard look' requires a "reasonably
7 thorough discussion of the significant aspects of the probable
8 environmental consequences.  This standard is not susceptible to
9 refined calibration. . . . [A] reviewing court [must] make a
10 pragmatic judgment whether the EIS's form, content and preparation
11 foster  both  informed  decision-making  and  informed  public
12 participation."  Block,  690  F.2d  at  761  (internal  quotation
13 omitted).  "The detail that NEPA requires in an EIS depends upon
14 the nature and scope of the proposed action." 'Ilio'ulaokalani
15 Coal., 464 F.3d at 1095 (quoting Block, 690 F.2d 753).  The
16 agency's determination as to whether particular evidence is, or is
17 not, necessary to support the EIS's conclusions will be upheld
18 unless  this  determination  is  itself  arbitrary  and  capricious.
19 McNair, 537 F.3d at 992.  In this case, all parties agree that NEPA
20 required site-specific analysis, i.e., analysis of the impacts of
21 the  particular  roads  under  consideration,  informed  by  data
22 regarding those specific roads.

23 **2.    Types of Site-Specific Data Used by the EIS**

24        The EIS relied on three types of site specific data: GIS data,
25 route evaluation forms, and additional field assessments.  AR 2498-
26 99.

42

1    The "primary" data source was GIS data. AR 2498. Plaintiffs
2  argue that the GIS data was of too gross a scale to support
3  meaningful analysis. This argument is based on a misinterpretation
4  of one passage in the EIS, which discussed certain geological
5  phenomena at a 1:24,000 scale. AR 2517. Plaintiffs mistakenly
6  interpret this statement as indicating that all GIS data used in
7  every aspect of the EIS was at this coarse scale. The record
8  demonstrates that the EIS uses GIS data at a range of scales,
9  including data with spatial resolutions in the tens of feet. See
10 AR 2658-59 (EIS 3-161 to 3-162), 12,960-62 (Terrestrial Management
11 Indicator Species Report 7-9), 13,138 (Biological Evaluation for
12 Botanical Resources 20). More generally, the GIS data was itself
13 derived "from past field surveys and inventories." AR 2498 (EIS
14 3-1). This data was site-specific, and the agency's decision to
15 rely on it was proper.

16    The second data source consisted of "route evaluation[] forms"
17 completed by Forest Service employees. Plaintiffs assert that
18 these forms were not completed for roads presently designated as
19 ML-2, but the page plaintiffs cite explicitly states that these
20 forms were completed for "all ML-1 and ML-2 roads, as well as some
21 unauthorized routes being considered for designation in the action
22 alternatives." AR 2498-99 (emphasis added). These completed forms
23 are provided in the record, further refuting plaintiffs' assertion.
24 AR 13370 - 15834.[17]

25

26    [17] Federal Defendants also seek to distinguish these forms
from those at issue in California v. Bergland, 483 F. Supp. 465,

1    The third data source, which plaintiffs do not acknowledge,
2  consisted of "field assessments and photo documentation" collected
3  by Forest Service employees.  AR 2499.  These assessments were
4  performed for all unauthorized routes proposed for designation as
5  ML-2 roads or NFS trails in the action alternatives, as well as for
6  specific other routes of concern.  Id.

7    Thus, all ML-1 and ML-2 roads received a route evaluation
8  form, all unauthorized routes proposed for designation received a
9  field assessment, and some routes received both.  Plaintiffs'
10 challenges to the adequacy of this type of data are meritless.[18]

11   **3.  Data that Plaintiffs Contend Was Missing**

12   Plaintiffs separately argue that the EIS lacked site-specific
13 data regarding various specific road issues and impacts.  For most
14 of these, plaintiffs argue that the EIS itself concluded that this
15 information were "necessary to support" the EIS's analysis, McNair,
16 537 F.3d at 992, but that the information was lacking.  As the
17 court explains, plaintiffs have generally misinterpreted the
18 portions of the EIS they rely upon.  In those cases where data was
19 absent, this absence did not prevent the EIS from sufficiently
20 "foster[ing] both informed decision-making and informed public

23 483-87 (E.D. Cal. 1980), aff'd in part, rev'd in part by Block, 690
   F.2d 753.  In the instant motions, plaintiffs have not challenged
24 the forms on this ground.  Nonetheless, the court agrees that the
   agency's use of route evaluation forms in this case was proper.
25

26   [18] No party has addressed the extent to which existing NFS
   trails received route evaluations or field assessments.

1 participation." <u>Block</u>, 690 F.2d at 761.[19]   The court therefore

2 rejects this argument.

### a.   Geological Hazards

4      In surveying the geology of the ENF, the EIS discusses three

5 types of geological hazards resulting from "soil failures:"

6 landslides, debris flows, and soil creep. AR 2515.  Landslides are

7 large soil movements, typically involving tens to hundreds of acres

8 moving with a "failure zone" that is greater than ten feet deep.

9 <u>Id.</u>   Moreover, the individual landslides are generally nested

10 together in a larger complex.  <u>Id.</u>  The EIS does not define debris

11 flows except to state that they are generally naturally occurring

12 as the result of rainfall, although "a few roads and trails have

13 the potential for debris flows initiating from fillslope areas,"

14 usually caused by "[f]ailed or plugged culverts." <u>Id.</u>  Similarly,

15 the EIS does not define soil creep.

16      The EIS then addresses the alternatives' potential impacts on

17 geology.  The EIS's discussion is poorly worded, and this opacity

18 gives rise to plaintiffs' primary site-specific data argument.  The

19 EIS states that:

20              There are no direct, indirect, or cumulative
            effects [on soil failure] from any of the
21

22      [19] In presenting this argument, plaintiffs' opening memo can
fairly be described as throwing against the wall everything
23 available in order to see what would stick, including numerous
brief arguments raised only in footnotes.  Here, the court
24 discusses arguments raised in the body of plaintiffs' memo and
those arguments originally presented in footnotes but reiterated
25 in plaintiffs' reply.  As to the other arguments, the court has
considered them and found them lacking for reasons similar to those
26 articulated here.

1      alternatives because geologic hazards relative
       to roads and trails evaluated at this scale
2      (1:24000) are not measurable.  Geologic
       hazards will continue under normal conditions
3      with or without the presence of roads and
       trails.  Large landslide stability will be
4      influenced by the ground water rise with
       little or no influence from road and trail
5      management.  The naturally occurring stream
       bank and riparian zone debris slides and flows
6      will continue to shed sediment.  The
       modification of road and trail prisms, as well
7      as realignment of these corridors, has the
       potential to influence shallow landslides.
8      However, even these are few, and the GIS
       analysis indicates an effect on less than 5%
9      of the area for all alternatives, even under
       the worst-case conditions.

10

11  AR 2517.  Plaintiffs interpret the first sentence of this passage

12  to mean that the Forest Service chose to evaluate impacts at the

13  1:24000 scale and that this evaluation did not reveal any impacts.

14  From this interpretation, plaintiffs launch the obvious retort:

15  that the Forest Service should have used a finer scale evaluation.

16       The Forest Service argues that the 1:24000 scale represents

17  the scale at which geological hazards occur, rather than simply the

18  scale at which the Forest Service analyzed the geological impacts.

19  The remainder of the quoted passage supports the Forest Service's

20  interpretation.  The EIS's explanation as to *why* roads will not

21  meaningfully influence landslides and debris flows is not dependent

22  on the scale of analysis.  Indeed, the fact that the EIS is able

23  to quantify routes' effects on shallow landslides suggests that if

24  there were effects on other geological hazards, the analysis would

25  have been able to detect them.  Thus, the EIS concludes that

26  geological hazards occur at a large scale, that roads are largely

1  incapable of meaningfully influencing these large-scale hazards,

2  and that the roads' effects are therefore "not measurable."

3  Accordingly, although the first sentence of this passage represents

4  another poor choice of wording by the Forest Service, this passage

5  does not concede the inadequacy of the Forest Service's data, and

6  the court does not conclude that this passage is so opaque as to

7  preclude informed public participation or agency decisionmaking.

8                    **b.   Hillslope Instability**

9       Plaintiffs next argue that the EIS failed to include site-

10 specific data as to which routes traverse unstable hill slopes.

11 As explained above, the EIS concludes that routes would have only

12 limited effects on hill stability or other geologic features.

13 Looking in the other direction, the EIS concludes that geological

14 features, especially hill stability, could potentially impact

15 roads, impacting road maintenance and potentially presenting risks

16 to road users. AR 2516. The EIS explains that there is a greater

17 risk of hill slope instability when the slope gradient exceeds 57%

18 and a spring is present. Id. The EIS includes a table listing,

19 for alternatives A through E, the percentage of routes within each

20 alternative that occur in areas where these two risk factors are

21 present. AR 2518. This is precisely the data that plaintiffs

22 contend was absent. This table does not, however, include an

23 analysis of alternative Modified B, and the Federal Defendants have

24 not explained this omission. Nonetheless, in light of the table's

25 conclusion that alternatives B through E present highly similar

26 amounts of routes on unstable slopes, the similarity between

1  Modified B and the other action alternatives, and the fact that the

2  remainder of the EIS provides separate analyses for Modified B, the

3  court concludes that this omission did not violate NEPA.[20]

4              **c.  Soil Erosion and Steep Routes**

5       Although the EIS concludes that routes would not affect soil

6  on the geological scale, the EIS acknowledges that routes can cause

7  smaller-scale soil erosion.  The EIS explains that existing routes

8  (whether official or unauthorized) can cause soil loss by

9  concentrating water which then creates a gully in the adjacent soil

10 where the water flows off the route.[21]  AR 2523.  The EIS analyzes

11 each alternative's potential impact on soil erosion by examining

12 "soils susceptible to gully erosion, total miles of routes open by

13 alternative, . . . condition of native surfaced roads based on

14 field assessments," and the degree to which each alternative would

15 impose seasonal route closures.  Id.

16      In evaluating the extent to which soils were susceptible to

17 erosion, the EIS looks to both the soil and to whether the route

18 was on a hill slope with a gradient of over 30%.  AR 2524.  The EIS

19 ────────────────

20      [20] Plaintiffs additionally substantively challenge the EIS's
    decision to designate any routes through areas that meet both of
21 these hillslope instability criteria, arguing in particular that
    it was unreasonable to designate Hunter's Trail, route 14E09, as
22 open to motorized use.  Pls.' Response 12 (Dkt. 59).  NEPA's
    requirements are procedural rather than substantive.  The EIS
23 acknowledged the number of routes that were on unstable slopes and
    analyzed the effects of these routes.  NEPA does not require more.
24
      [21] The EIS did not examine the effects of route creation on
25 soils or erosion, because although each alternative would designate
    some existing unauthorized routes, no alternative would create new
26 routes.

                              48

1   acknowledges that the gradient of the route itself, as opposed to

2   the hill gradient, also contributes to routes' erosion potentials.

3   AR 2523.   The Forest Service attempted to use the GIS to identify

4   which  routes  included  the  type  of  "sustained,  steep  [road]

5   gradients"  that  indicated  a  "risk  of  erosion,"  but  the  GIS  was

6   unable to identify these routes.   AR 2523.

7        Plaintiffs argue that if the GIS was unable to identify routes

8   with sustained steep gradients then the Forest Service was required

9   to identify these routes through other means.   The court rejects

10  this argument, because plaintiffs have not demonstrated that the

11  other  information  was  insufficient  to  provide  a  "reasonably

12  thorough" discussion of the routes' potential for soil erosion.

13  Block,  690 F.2d at 761.   The EIS explains why the information

14  regarding route gradients was not available.   Neighbors of Cuddy

15  Mt. v. U.S. Forest Serv., 137 F.3d 1372, 1380 (9th Cir. 1998).

16  Although the absence of this information might have precluded the

17  EIS from determining "the precise extent" of the routes' effects

18  on erosion, the EIS "estimate[s] what those effects might be."

19  Conner v. Burford, 848 F.2d 1141, 1450 (9th Cir. 1988).   The Forest

20  Service concluded that the available information was sufficient to

21  inform  this  estimate,  and  plaintiffs  have  not  shown  that  this

22  conclusion was arbitrary or capricious.   McNair, 537 F.3d at 992.

23             **d.   Drainage on Trails**

24       Plaintiffs next argue that the EIS concedes that there was

25  inadequate  information  regarding  the  drainage  characteristics  of

26  OHV trails.   Plaintiffs have misinterpreted the EIS.   The EIS

49

1  explains that OHV trails that were constructed specifically for OHV
2  use typically have good drainage characteristics.  AR 2522.  The
3  EIS goes on to state that "[m]any OHV trails, however, were not
4  originally designed and constructed for OHV use, but were converted
5  from roads. Road prisms are well-compacted and provide a firm
6  running surface, but the compacted surface makes installing OHV
7  rolling dips difficult.  The long sustained gradients of trails
8  converted from roads *demand more attention to drainage*."  Id.
9  (emphasis added).  Plaintiffs argue that the phrase "demand more
10 attention" is an admission that the EIS required additional data
11 and study on this issue.  Federal defendants contend that
12 "attention" refers to maintenance rather than data.  The context
13 demonstrates that this is a reasonable, and perhaps more natural,
14 interpretation.  This phrase therefore does not acknowledge a data
15 deficiency.

16         **e.   Condition of Drainage Structures**

17     The EIS states that "'Maintaining drainage structures is the
18 key to minimizing erosion on system roads. Drainage structures are
19 particularly susceptible to damage during the wet season.'"  AR
20 2522.  Plaintiffs argue that the EIS therefore "should have noted
21 which routes are suffering damage to drainage structures during the
22 wet season."  Pls.' Br. 19 (Dkt. 52-1).  Although the EIS does not
23 contain site-specific analysis as to which particular routes were
24 presently suffering wet season damage to drainage structures, it
25 does not ignore the issue.  The EIS instead uses the extent to
26 which the alternatives would close routes during the wet season as

1   a proxy for the extent to which the alternatives would prevent this

2   damage.   AR 2527-28.   The EIS further incorporates site-specific

3   information regarding the condition of roads, which included the

4   roads' drainage.   AR 2525.   These factors provide a "reasonably

5   complete" analysis of the impact of wet season damage to drainage

6   structures on erosion.

7                    **f.   Causes of Poor Road Conditions**

8        As noted above, one type of information the EIS uses to assess

9   routes' impacts on soil erosion is field assessments and surveys.

10  One way in which the EIS uses the field assessments is to look to

11  whether roads are in poor condition. AR 2525.  "Road condition was

12  recorded as the percent of each route that was rutted, washed out,

13  eroded, or slumped; had poor drainage; or was too steep." Id.  The

14  EIS uses road condition as an indicator of the extent to which the

15  alternatives "avoid problem areas." AR 2526.  The EIS reasons that

16  if a road is in poor condition, this may be because the road is in

17  a problem area, requiring more maintenance and presenting a greater

18  potential for erosion.   Id.   The EIS acknowledges that this is an

19  imperfect heuristic, however, because it could be that a route is

20  in poor condition simply because it has not received ordinary

21  maintenance.   Id.

22       Plaintiffs argue that the Forest Service should have improved

23  the quality of this heuristic by recording the causes of poor

24  conditions on individual roads, rather than merely assuming a

25  general correlation between poor conditions and problem areas.  The

26  EIS was "reasonably complete" without this information.

1                    g.    Type and Conditions of Stream Crossings

2          The draft aquatic species Biological Evaluation noted that

3     "[t]he type and condition of stream crossings has not been

4     spatially identified.  Therefore, site-specific analysis of these

5     characteristics is generally lacking.  As a result, site-specific

6     and localized adverse effects may be understated."  AR 12,656.

7     Federal defendants argue that in light of the extensive other

8     information regarding aquatic habitat, this information was not

9     necessary to inform the agency or the public of the action's

10    consequences.  Notably, the Aquatic Management Indicator Species

11    Report specifies the total number of motorized route stream

12    crossings under each alternative, AR 12,913.  The Aquatic Species

13    Biological Evaluation further breaks this figure down by the sizes

14    of the streams crossed.  AR 12,778.  This document also identified

15    particular routes which cross streams.  AR 12,848-53 (tables A-8

16    and A-9).

17         Plaintiffs argue that, as the draft Biological Evaluation

18    acknowledged, identifying the specific location of crossing might

19    have increased the precision of the aquatic habitat analysis.  The

20    mere fact that a more thorough analysis was possible does not

21    demonstrate that the analysis actually performed was inadequate.

22    Plaintiffs have provided no other argument as to why it was

23    necessary to know the location of stream crossings.  Accordingly,

24    the court does not hold that this information was required.

25    **D.   Plaintiffs' National Forest Management Act Claim**

26         Individual projects within the ENF, including the Travel

1  Management Decision, must be consistent with the ENF Forest Plan

2  and the Sierra Nevada Forest Plan.  Plaintiffs' NFMA claim argues

3  that provisions of both the ENF and Sierra Nevada Forest Plans

4  prohibit vehicle use in meadows, and that the Travel Management

5  Decision designates routes in violation of these prohibitions.

6      Because this argument raises complicated issues, the court

7  summarizes its conclusions here.  The Forest Service addressed the

8  two Forest Plans separately, adopting different strategies to

9  reconcile each with the Travel Management Decision.[22]  As to the

10 ENF Forest Plan, the Travel Management Decision incorporates

11 amendments to the plan, specifically exempting an enumerated list

12 of routes from three ENF Forest Plan provisions regarding meadows.

13 NFMA appears to permit this approach.[23]  In this case, however, the

14 Forest Service's implementation of this strategy was incomplete.

15 The record indicates that the Travel Management Decision designates

16 42 routes through meadows, but the incorporated amendments only

17 refer to 20 routes.  In discussing the Sierra Nevada Forest Plan,

18

19      [22] As explained in part I(c) above, what the court refers to
   as the ENF and Sierra Nevada Forest Plans are in fact part of the
20 same Forest Plan.

21      [23] In any event, plaintiffs have waived any challenge to the
   adoption of these amendments (separate from their challenges to the
22 EIS and ROD as a whole).  If an amendment to a Forest Plan will
   "significantly affect[] the quality of the human environment," then
23 an EIS is required for the amendment itself.  In this case, the
   Forest Service determined that the amendments to the ENF Forest
24 Plan were non-significant.  At oral argument, plaintiffs conceded
   that they have waived their challenge to the determination of non-
25 significance, or to the procedures used to adopt these amendments.
   See, e.g., Koerner v. Grigas, 328 F.3d 1039, 1048-49 (9th Cir.
26 2003) (failure to raise an issue in an opening brief waives the
   issue).

1   the Forest Service did not rely on the amendments to the ENF Forest

2   Plan, instead concluding that the Travel Management Decision was

3   consistent with the Sierra Nevada Forest Plan's provisions as they

4   stood.  For the reasons stated below, the Forest Service failed to

5   provide a rational explanation for this conclusion.

6        The Forest Service presumably could have adopted an amendment

7   that encompassed all 42 routes and exempted these routes from the

8   provisions of both ENF and Sierra Nevada Forest Plans.  It appears

9   that such an amendment would have reconciled the conflicts between

10  the Travel Management Decision and the forest plans.[24]  This is not

11  what the Forest Service did.  The court cannot uphold agency action

12  on the ground that the agency might have been able to support its

13  action had the agency acted differently.  Accordingly, the Travel

14  Management Decision conflicts with the governing Forest Plans, and

15  thereby violates NFMA.

16       **1.   The Quantity of Routes through Meadows**

17       The  Travel  Management  Decision  designated  routes  through

18  meadows.  While the record is consistent on this point, it provides

19  conflicting statements regarding the quantity of such routes.  The

20  Aquatic Species Biological Evaluation indicates that alternative

21  Modified B includes 42 routes through meadows.  AR 12,845 (BE A-22,

22  Table A-7).  The discussion of the ENF Forest Plan identifies 20

23  routes through meadows totaling 4.8 miles.  AR 3274 (ROD at 5).

24

25       [24] The court does not decide whether such a broader amendment
     would have been non-significant or compliant with NFMA; the court
26   merely observes that such an amendment would eliminate the conflict
     between the forest plans and the travel management decision.

In responding to comments, the EIS states that "In Modified B, the preferred alternative, 21 routes with a total of 4.8 miles through meadows are proposed to allow public wheeled motor vehicle use." AR 2980 (EIS C-96).   The Forest Service's briefing has not explained the discrepancy between these three figures.   Instead, where plaintiffs have cited these divergent numbers, Federal Defendants have criticized *plaintiffs* for the inconsistency.  Fed. Defs.' Reply Br. 35 n.20 (Dkt. 66).  It may be that the 21 routes identified in the response to comments are meant to be the same 20 routes identified in the discussion of the ENF Forest Plan. Another explanation would be that the comment identified the remaining 22 routes, although it appears unlikely that the two separate groups of routes would each amount to exactly 4.8 miles. Absent explanation to the contrary, the court assumes that all 42 routes identified in Table 7 pass "through" meadows in the pertinent sense, and that the other figures merely refer to subsets of these routes.[25]

## 2.   The ENF Forest Plan's Meadow Provisions

The EIS discussed the ENF and Sierra Nevada Forest Plans

_____

[25] The record provides similarly varied estimates of the total mileage of route segments within meadows.  At several places, the EIS and Aquatic Species Biological Evaluation state that alternative Modified B designates a total of 4.1 miles of routes within meadows.  AR 2572 (EIS 3-75), AR 2488 (EIS 2-41), AR 12,781 (BE at 31).  These estimates do not identify the particular routes counted.  Other portions of the EIS state that 20 or 21 segments through meadows amount to 4.8 miles.  AR 2980.  Presumably the 42 segments amount to a greater mileage.  See also AR 2581 (FEIS at 3-84) ("approximately five miles" of routes designated by Modified B are "within meadows.").

separately.   Because  the  court  looks  to  whether  the  reasoning

offered  by  the  agency  supports  the  conclusion  reached,  the  court

similarly  separates  the  two  plans  here.

The  ENF  Forest  Plan  includes  three  directives  relating  to

meadow  protection.   The  Forest  Service  must  "consider  closing  and

obliterating  existing  roads"  throughout  the  ENF  in  order  to  protect

meadows,   AR  4995  (ENF  LRMP  4-90),  "[p]rohibit  motor  vehicle  use

on  meadows,"  AR  5183  (ENF  LRMP  4-278),  and  "[c]lose  roads  to  and

across  meadows,"   AR  5187  (ENF  LRMP  4-282).[26]

The  EIS  acknowledges  the  conflict  between  these  three

prohibitions  and  the  Travel  Management  Decision's  designation  of

routes  through  meadows.  AR  2457  (EIS),  3274  (ROD).   The  Forest

Service  purported  to  address  this  conflict  by  amending  the  ENF

Forest  Plan.   Id.   For  example,  the  second  prohibition  was  amended

to  read  "[p]rohibit  motor  vehicle  use  on  meadows,  except  for  the

route  segments  identified  in  [an  attached]  table."   Id.   This

table  enumerates  20  route  segments  through  meadows,  totaling  4.8

miles.   Id.   The  EIS  explains  that  the  amendment  is  warranted

---

[26]  Although  these  prohibitions  contain  several  apparent
caveats,  these  caveats  are  not  discussed  by  the  parties'  briefing
or  the  cited  portions  of  the  Travel  Management  Decision  EIS  and
documents.   The  first  prohibition  only  requires  that  the  Forest
Service  "consider"  closing  roads.   Nonetheless,  the  Forest  Service
concluded  that  routes  through  meadows  would  need  to  be  exempted
from  this  obligation  to  "consider"  their  closure.   AR  3274.
    The  second  and  third  of  these  prohibitions  apply  only  within
"Management  Area  28."   The  court  infers  that  only  a  fraction  of  the
meadows  are  included  in  this  area.   There  are  roughly  10,416  acres
of  meadows  in  the  ENF.   AR  2531  (EIS  3-34),  12,769  (BE  at  19).
Management  Area  28,  however,  contains  only  2,937  acres.   AR  5182
(ENF  LRMP  4-277).

1  because "these specific routes provide a unique recreation
2  opportunity (such as a high elevation trail experience), enhance
3  the recreation experience by connecting routes or areas, provide
4  access to an area of interest, or allow access to dispersed
5  camping."  AR 2455 (EIS 2-9).

6      By incorporating this amendment into the Travel Management
7  Decision, the Forest Service validly determined that the 20
8  enumerated routes would not violate the ENF Forest Plan.  The
9  problem for the Forest Service is that the Travel Management
10 Decision designates an additional 22 route segments through
11 meadows.  The record does not appear to discuss the relationship
12 between these additional 22 routes and the prohibitions found in
13 the ENF Forest Plan.  At oral argument the court directly asked
14 counsel for the Forest Service about this disparity, and counsel
15 was unable to provide an explanation.  Therefore, notwithstanding
16 the amendment to the ENF Forest Plan, the plan apparently prohibits
17 22 of the routes designated by the Travel Management Decision.
18 Alternatively, the record fails to provide a rational connection
19 between the fact that the decision designates 42 routes through
20 meadows and the conclusion that those routes do not violate the ENF
21 Forest Plan.

22     **3.   The Sierra Nevada Forest Plan's Meadow Provisions**

23     The Sierra Nevada Forest Plan adds a parallel and more complex
24 framework for protecting meadows and other aquatic resources.  The
25 Sierra Nevada Forest Plan imposes various "Riparian Conservation
26 Objectives."  See AR 10,970 (SNFPA ROD – 31 (Appendix A: Management

Direction)).  In preparing for the Travel Management Decision, the Forest Service concluded that these objectives required that "routes . . . not bisect or go through meadows." AR 12,828-29 (BE at A-4 to A-5).  The Forest Service has failed to reconcile its own conclusion with the fact that Modified B designates 42 routes through meadows.  Accordingly, the Forest Service's conclusion that the Travel Management Decision complied with the Sierra Nevada Forest Plan was arbitrary and capricious.

The BE interprets the Sierra Nevada Forest Plan's riparian conservation objectives as prohibiting routes through meadows.  The riparian conservation objectives themselves, together with the concurrently issued standards and guidelines, are complex.[27]  The

---

[27] For example, Riparian Conservation Objective #2 sets the objective of:

> Maintain[ing] or restor[ing]: (1) the geomorphic and biological characteristics of special aquatic features, including lakes, meadows, bogs, fens, wetlands, vernal pools, [and] springs; (2) streams, including in stream flows; and (2) hydrologic connectivity both within and between watersheds to provide for the habitat needs of aquatic-dependent species.

AR 10,970.  The "standards and guidelines" for this objective include:

> 100. Maintain and restore the hydrologic connectivity of streams, meadows, wetlands, and other special aquatic features by identifying roads and trails that intercept, divert, or disrupt natural surface and subsurface water flow paths.  Implement corrective actions where necessary to restore connectivity.
> . . . .
> 102. Prior to activities that could adversely affect streams, determine if relevant stream characteristics are within the range of natural variability. If characteristics are

BE adopts simplified criteria to be used in evaluating compliance with these objectives.  The compliance criterion for objectives #2 and 5 is simply "routes do not bisect or go through meadows."  AR 12,829.

The court rejects the Forest Service's present attempts to retreat from this criterion.  The Forest Service first argues that it is the EIS, rather than the BE, that presents the agency's final word, and that the EIS does not use this criterion.  This argument fails because the EIS does not independently analyze the objectives, instead referring to the BE.  The EIS notes that alternative Modified B designates routes through meadows, albeit fewer of such routes than any other alternative save Alternative E, and then asserts in a footnote that "[t]hese routes were not considered inconsistent with the Riparian Conservation Objectives under the criteria established for the analysis."  AR 2673, 2675 (EIS 3-176, 3-178 n.10).  The EIS then refers the reader to the BE and provides no further discussion on this issue.  AR 2675.  The Forest Service alternatively argues that it is the objectives themselves, rather than the compliance criteria, that are binding.  This is true, and the Forest Service presumably could have adopted

---

outside the range of natural variability, implement mitigation measures and short-term restoration actions needed to prevent further declines or cause an upward trend in conditions.  Evaluate required long-term restoration actions and implement them according to their status among other restoration needs.

AR 11,000.

1  different compliance criteria.[28]   This argument is nonetheless

2  unavailing, because "an agency's action must be upheld, if at all,

3  on the basis articulated by the agency itself," and the only

4  analysis the Forest Service offered for riparian conservation

5  objectives 2 and 5 rested on the "routes do not bisect or go

6  through meadows" criterion.   <u>Motor Vehicle Mfrs. Ass'n</u>, 463 U.S.

7  at 43.

8      Having concluded that, in this case, the Forest Service is

9  bound by this criterion, the court turns to the agency's

10  application of it.[29]   The BE concludes that alternative Modified B

11  is "[l]ikely to meet" riparian conservation objectives 2 and 5.

12  AR 12830 (BE at A-6).   The BE offers two explanations for this

13  conclusion.   First, the BE excludes from analysis existing ML-2

14  roads that retain their ML-2 designation under alternative Modified

15  _____

16  [28] Indeed, the draft BE adopted three different criteria for
    objective #2: "[riparian conservation areas] in 7[th] field
17  watersheds do not exceed route densities of more than 5 mi/sq
    mile," "Watersheds do not have more than 30 crossings per mile of
18  [riparian conservation areas]," and "Routes in [riparian
    conservation areas] are not in poor condition."   AR 12693 (Draft
19  BE A-55).   The Forest Service similarly could have adopted a more
    tempered criterion, perhaps putting a cap on the number of routes
    crossing meadows rather than flatly prohibiting such crossings.
20      Plaintiffs argue that the failure to explain the change in
    criteria between the draft and final BE itself rendered the
21  decision arbitrary and capricious.   Because the court grants
    plaintiffs' NFMA claim on other grounds, the court does not address
22  this argument.

23      [29] In this litigation, the Forest Service has rested solely on
    the argument that this criterion was inapplicable; the Forest
24  Service has not attempted to argue that the alternative Modified
    B actually complied with this criterion.   Nonetheless, before
25  granting summary judgment to the plaintiffs on this issue, it
    appears appropriate for the court to look to whether the record
26  adequately explained its findings regarding this criterion.

1  B.   AR 12,826.   Of the forty-two routes Modified B designates

2  through meadows, twenty-seven meet this description. AR 12,845 (BE

3  A-22, Table A-7).   Second, the BE observes that under alternative

4  Modified B, no roads through meadows that were previously

5  designated as ML-1 are designated for public use.   AR 12,830-31.

6  Because this fails to discuss the 15 trails and non-excluded ML-2

7  roads through meadows, the Forest Service's conclusion that the

8  decision complied with the riparian conservation objectives was

9  arbitrary and capricious.

10      Two further issues warrant discussion.  First, the discussion

11  of the conservation objectives, and of the Sierra Nevada Forest

12  Plan in general, did not rely on the amendment to the ENF Forest

13  Plan.   The portions of the record discussing the riparian

14  conservation objectives are separate from those portions

15  discussing the ENF Forest Plan.   The BE juxtaposes alternative

16  Modified B (the chosen alternative) against alternatives B, C, and

17  D by stating that the latter three would violate the riparian

18  conservation objectives and thereby require an amendment to the

19  forest plan, indicating that the Forest Service concluded that

20  Modified B satisfied the riparian conservation objectives without

21  recourse to an amendment.   AR 12789 (BE at 39).   The amendments

22  specifically pertain to the three provisions of the ENF Forest

23  Plan, rather than exempting the 20 enumerated routes from the

24  forest plan requirements in general.   In this litigation, the

25  Forest Service has not argued that the amendment to the ENF Forest

26  Plan exempts any routes from compliance with the riparian

1  conservation objectives.[30]

2      Second, the decision to exclude twenty-seven ML-2 routes from

3  analysis was itself arbitrary and capricious.  The BE excludes ML-2

4  roads that would remain designated as ML-2 roads.  AR 12,826.  The

5  BE concludes that this is proper "because [these] roads will not

6  be subjected to new management activities or a new type of use."

7  AR 12,826 (BE at A-2).   The BE further explains that this

8  determination was "based on [Sierra Nevada Forest Plan] Standard

9  and Guideline 92[,] which states 'Evaluate new proposed management

10 activities within . . . [riparian conservation areas] during

11 environmental analysis to determine consistency with the riparian

12 conservation objectives at the project level . . ." Id.[31]  This

13 exclusion conflicts with the Forest Service's court-imposed

14 obligation to reconsider vehicle travel.  The Travel Management

15 Decision does not represent a change from a permissible status quo.

16 Rather, this court previously held that the Forest Service had

17 operated without a valid plan for management of vehicle travel

18 since 1990.  Berry, Order filed February 15, 2005 (pages 52-54).

19 The court remanded to the Forest Service with instructions to

20

21      [30] Even if the 20 routes enumerated by the amendments to the
   ENF Forest Plan were also excluded from the riparian conservation
22 objective analysis, there would remain routes through meadows in
   apparent violation of the compliance criteria, such as routes 17E16
23 and 17E18.

24      [31]  The BE further explains that "[g]uidance for this
   determination was provided by the Regional Office of the Forest
25 Service (USFS, Region 5) in February 2008."  AR 12926.  No party
   has identified this guidance document in the record, and the court
26 has been unable to locate it.

1   consider vehicle travel anew.  <u>Berry</u>, Order filed August 16, 2005.

2   The Forest Service properly interpreted these orders in stating

3   that the "purpose and need" for the Travel Management Decision was

4   to "*reconsider* whether motorized use should be allowed to continue

5   on [national forest] roads maintained for high clearance vehicles

6   (NFS ML-2) and [national forest] trails managed for [off-highway

7   vehicle] use."  AR 2436 (EIS at 1-5) (emphasis added).[32]

8       For all of these reasons, the court concludes that the Forest

9   Service's conclusion that the Travel Management Decision complied

10  with the ENF and Sierra Nevada Forest Plans was arbitrary and

11  capricious, in violation of NFMA.

12      The question of remedy is another matter, however.  It appears

13  that out of a forest encompassing 789,994 acres, that is, more than

14  1,234 square miles, the offending roads apparently span about 10

15  miles of meadows.  On the other hand, the total span of meadows in

16  the forest is about 10,416 acres, or more than 16 square miles.

17  _____

18      [32] Plaintiffs also argue that the exclusion is arbitrary
    because it is inconsistent with other positions taken by the Forest
19  Service.  The draft BE did not exclude these roads, and even the
    final EIS included these roads in all other aspects of its
20  analysis.  Where an agency reverses its own position the agency
    must offer some explanation for the change.  <u>Sierra Club v. U.S.</u>
21  <u>Army Corps of Eng'rs</u>, 772 F.2d 1043, 1053 (2nd Cir. 1985) (failure
    to justify change between draft and final EISs rendered final EIS
22  deficient); <u>Nw. Envtl. Def. Ctr. v. Bonneville Power Admin.</u>, 477
    F.3d 667-68 (9th Cir. 2007) ("an agency changing its course must
23  supply a reasoned analysis indicating that prior policies and
    standards are being deliberately changed, not casually ignored.")
24  (quotation omitted).  Because the court holds that the exclusion
    was improper in light of the prior orders in <u>Berry</u>, the court does
25  not address whether the inconsistency between the Forest Service's
    own statements would be independently sufficient to invalidate this
26  exclusion.

1  The requested remedy would set aside years of decision-making by

2  the Forest Service, and an administrative record spanning thousands

3  of pages, because the Forest Service failed to properly consider

4  these 10 miles of roads.   Accordingly, the court directs the

5  parties to brief what remedy is appropriate in this situation.   The

6  parties should give particular attention to whether the Ninth

7  Circuit's caution that the courts not "flyspeck" the Environmental

8  Impact Statement, see Nevada v. DOE, 457 F.3d at 93, has

9  application in the context of determining a remedy based upon such

10  an apparently insignificant impact.

11  **E.   Plaintiffs' Endangered Species Act Claim**

12      Plaintiffs argue that the Forest Service violated the

13  Endangered Species Act by failing to adequately consult with FWS

14  regarding the designation of previously unauthorized routes.[33]   The

15  Forest Service contends that alternative Modified B, which was

16  adopted by the ROD, complied with the design criteria established

17  during the 2006 programmatic consultation, such that no further

18  consultation was necessary.   Plaintiffs argue that the Forest

19  Service's decision not to separately consult was arbitrary and

20

21  [33] It appears that the Biological Assessment solely looked to
the designation of unauthorized routes. AR 12889.  Similarly, the

22  design criteria specify that they are to be "used for designation
of unauthorized or unclassified routes and areas for recreational

23  wheeled motorized vehicle use.  System roads, trails, and areas are
not subject to these criteria or consultation."   AR 1 (Project

24  Design Criteria, Oct. 2006).  The Travel Management Decision, in
addition  to  designating  previously  unauthorized  routes,

25  reconsidered whether existing system routes should be open to
public use.  It is not clear to the court why this reconsideration

26  was not also subjected to ESA analysis.  Plaintiffs have not raised
this issue, so the court does not further address it.

capricious for four reasons: (1) in the record, the Forest Service itself stated that alternative Modified B violated the design criteria, (2) because the Forest Service did not evaluate habitat using "protocol surveys," the Forest Service's determinations of habitat unsuitability are inadequate, (3) the Forest Service misapplied the criteria by excluding areas with ephemeral streams from its analysis, and (4) the Forest Service was aware of additional information, primarily contained in the recovery plan for the frogs, that called into question whether compliance with the design criteria alone was sufficient to protect the frogs.

**1.   Whether the Forest Service Admitted that the Decision Violates the Design Criteria, and the "Protocol Survey" Argument**

Plaintiffs' first two ESA arguments are best addressed jointly.  The Forest Service did not specifically consult with the FWS Service regarding alternative Modified B, relying instead on the 2006 programmatic consultation.  Plaintiffs' first ESA theory argues that the Forest Service's Biological Assessment ("BA") concedes that alternative Modified B violated the programmatic consultation's design criteria, and that the Forest Service was therefore required to seek a separate consultation.  Plaintiffs' second ESA theory is that in evaluating whether habitat was suitable for frogs, the Forest Service was required to use surveys conducted according to a FWS protocol, but that the Forest Service instead relied on "field reconnaissance" and other non-protocol

data.  The court rejects both arguments on the merits.[34]

As noted above, the Forest Service must consult with FWS regarding any project that "may affect" listed species.  Prior to the Travel Management Decision, the Forest Service engaged in programmatic consultation with FWS.  FWS agreed that future designation of unauthorized routes would not be likely to adversely affect listed species if the routes conformed to various design criteria.  AR 1, 3-4.  Plaintiffs' ESA claims primarily rest on the second and fifth of these criteria.  Design criterion #2 provides: "In suitable California red-legged frog habitat, routes avoid Riparian Reserve and Riparian Conservation Areas except where necessary to cross streams."  AR 12,891.[35]  Criterion #5 is functionally equivalent, but pertains to "areas" rather than "routes."  Id.  Thus, a route or area violates these design criteria when it is both within suitable habitat and within a Riparian Reserve or Conservation Area.

---

[34] Defendants also argue that plaintiffs failed to present these two arguments during their administrative appeal, such that these arguments are barred for failure to exhaust pursuant to 7 U.S.C. § 6912(e).  Because the court rejects these arguments on the merits, the court does not decide whether section 6912(e) applies to ESA claims or whether, if it does, plaintiffs exhausted these arguments.  McBride Cotton & Cattle Corp. v. Veneman, 290 F.3d 973, 976 (9th Cir. 2002) (7 U.S.C. § 6912(e) is non-jurisdictional); Wash. Toxics Coal., 413 F.3d at 1033-34 (plaintiffs not required to exhaust administrative remedies provided by the Federal Insecticide, Fungicide, and Rodenticide Act prior to bringing ESA claim regarding EPA's treatment of pesticides).

[35] This criterion also requires that "Crossing approaches get the riders in and out of the stream channel and riparian area in the shortest distance possible while meeting the gradient and approach length standards," AR 12,891, but plaintiffs do not invoke this additional requirement.

1    The Forest Service's application of the design criteria is
2  illustrated by the differences between the draft and final BAs.
3  Both assessments use a two step process for determining whether
4  routes within riparian conservation areas were also within suitable
5  frog habitat.  In the first step, the Forest Service uses the GIS
6  database to identify areas that were potentially suitable.  The
7  draft BA, which evaluated alternative D, identifies 2.5 miles of
8  routes in potentially suitable habitat. AR 12,881.  In the second
9  step, the Forest Service uses "field reconnaissance" to evaluate
10 whether these areas were in fact suitable habitat.  The draft BA
11 concludes, on the basis of this reconnaissance, that only 1.4 miles
12 of routes designated by alternative D were in actually suitable
13 habitat.  Id.

14    Because these 1.4 miles were in suitable frog habitat, they
15 did "not meet the programmatic Project Design Criteria."  AR
16 12,884.  The Forest Service concluded that these routes were
17 nonetheless not likely to adversely affect the frogs, AR 12885,
18 because "field surveys" revealed that no frogs were actually
19 present in areas adjacent to those 1.4 miles.  AR 12,881.  Because
20 the "not likely to adversely affect" conclusion rested on reasoning
21 other than that approved by the 2006 programmatic consultation, the
22 Forest Service was required to consult with FWS.

23    The Forest Service did so, and FWS concurred that alternative
24 D was "not likely to adversely affect" the frogs.  FWS explained
25 that:
26 ////

> Habitat assessments have determined that approximately 1.4 miles of unauthorized routes proposed for designation occur in areas that contain suitable frog habitat. None of these routes cross aquatic features and surveys of the aquatic features have not resulted in the detection of the frog. Since no routes are located near known frog populations we concur with your determination that the proposed route designation is not likely to adversely affect the California red-legged frog.

AR 28. In this analysis, FWS concurred with the Forest Service's determination as to which areas were and were not suitable. For those areas that were suitable, FWS relied on past "survey" data to determine that no frogs were actually present. Thus, both the draft BA and the 2007 Concurrence demonstrate that whether habitat is suitable and whether frogs are actually present are distinct questions. The second question only needs to be asked once the habitat is determined to be suitable, and FWS only used surveys in addressing this second question.[36]

After the 2007 concurrence, the Forest Service prepared a final BA regarding alternative Modified B. Modified B designates six unauthorized routes, totaling 2.8 miles, that were not included in alternative D, although Modified B also excludes many of the unauthorized routes that would have been included under D. AR 12889 (Modified B includes 23.2 miles of unauthorized routes, 11.6 fewer miles than D). The final BA again uses the two step process

---

[36] Obviously, the presence of frogs in an area would indicate that the area was suitable for frogs. Neither the agencies nor the court holds that surveys are irrelevant to the question of suitability; the court merely defers to the agencies' conclusion that suitability can be determined without recourse to surveys.

to determine whether routes or areas within riparian conservation areas were also within suitable habitat. The GIS database identified four route segments, amounting to 0.41 miles, that were "in suitable habitat . . . as defined using the GIS model." AR 12,899.[37] The Forest Service then looked to additional data sources to decide whether or not the habitat surrounding these four route segments was actually suitable. For two of the four routes, the Forest Service conducted its own "field reconnaissance," whereas for the other two, the Forest Service relied on "surveys . . . conducted along these streams during hydroelectric re-licensing processes." Id. Based on this additional data, the Forest Service concluded that none of the routes were in habitat with conditions suitable for frogs. Id. The Forest Service applied a similar analysis with regard to three "staging areas." AR 12,900.[38]

---

[37] The BA's analysis identifies these four routes, totaling 0.41 miles, and plaintiffs' arguments concern that discussion. A subsequent table in the BA, titled "Summary of findings . . .", states that 1.3 miles of routes occur "in suitable California red-legged frog habitat that occur in RCAs, but are not necessary to cross streams." AR 12902. Plaintiffs mention this table in passing, but plaintiffs' arguments discuss only the 0.41 miles of routes discussed above. Accordingly, although the meaning of this table, and its consistency with the conclusions reached elsewhere in the BA, are unclear to the court, the court does not further address the issue.

[38] In discussing the staging areas, plaintiffs solely discuss the Hunter's Staging Area, which is on the Rubicon River. Pls.' Br. 26, 28 (Dkt. 52-2). The BA determined that this area did not provide suitable habitat. AR 12900. For the other two staging areas within riparian conservation areas, the BA appears to conclude that habitat is suitable but that no frogs are present. Although it is unclear how this conclusion squares with the determination that these areas satisfy the design criteria, this

1    From there, the final BA's explanation of its reasoning

2  becomes unclear, giving rise to plaintiffs' first ESA argument.

3  The BA explicitly states that "[t]he best available information

4  indicates that 0.41 miles of unauthorized routes in the Preferred

5  Alternative and the location of two staging areas *do not meet the*

6  *programmatic Project Design Criteria.*" AR 12,902 (emphasis added).

7  This passage goes on to state that none of these unauthorized

8  routes were in habitat that was suitable for the listed frogs, so

9  the decision was not likely to adversely affect the frogs.  <u>Id.</u>

10  As explained above, the ESA does not permit the Forest Service to

11  make a "not likely to adversely affect" determination absent FWS's

12  concurrence.  If the routes violated the design criteria, the

13  Forest Service could not rest on the prior concurrence in the

14  programmatic consultation, and the Forest Service instead needed

15  to initiate a separate consultation.  The court concludes, however,

16  that the quoted language was merely another example of mistaken

17  wording by the Forest Service.  The Forest Service's conclusion

18  that none of the unauthorized routes or areas were in suitable

19  habitat entails the conclusion that none of the routes or areas

20  violated the pertinent aspects of design criteria 2 and 5.  The

21  apparently intended meaning of this statement is that although the

22  Travel Management Decision designates routes in riparian

23  conservation areas that the GIS identified as potentially suitable

24  habitat, the habitat is in fact unsuitable, rendering the decision

25  _____

26  is another issue that plaintiffs have not raised, and which the
   court therefore does not address.

compliant with the design criteria.  This interpretation is further supported by the fact that the first page of the BA states that "Modified Alternative B implements route designations as described in the Route Designation Project Design criteria for . . . the California red-legged frog . . . . The project is therefore not likely to adversely affect these species and no further consultation is required with the Fish and Wildlife Service based upon the USFWS memo dated Dec. 27, 2006)."  AR 12889.  Finally, plaintiffs have not identified any potential violation of the design criteria other than the designation of routes in suitable habitat.  Accordingly, the court rejects plaintiffs' contention that the Forest Service itself conceded that the decision violated the design criteria.

Plaintiffs' second argument challenges the way in which the Forest Service determined habitat suitability.  Plaintiffs argue that "field reconnaissance" and the other data was insufficient to demonstrate unsuitability, and that the Forest Service should have instead "surveyed" the areas according to a FWS protocol, which would determine whether frogs were actually present in the areas. Plaintiffs attempt to support this argument by citing the language used by FWS in its 2007 concurrence regarding alternative D. Pls.' Br. 26 (Dkt. 52-1) (citing AR 28).  The 2007 concurrence, however, does not suggest that surveys (whether conducted to protocol or otherwise) are necessary for determining whether habitat is suitable.  Instead, the concurrence indicates that if routes are in suitable habitat, then surveys may reveal that the routes are

nonetheless unlikely to adversely affect listed frogs.  Plaintiffs offered no other purported authority demonstrating that reconnaissance was inadequate to determine habitat suitability. Accordingly, plaintiffs have not shown that the Forest Service's suitability determinations were arbitrary or capricious.[39]

### 2.   The "Ephemeral Streams" Argument

Riparian conservation areas are defined to include ephemeral streams. Plaintiffs' next argument is that the Forest Service's application of the design criteria improperly excluded ephemeral streams from its analysis.  Defendants argue that this argument is barred by ESA § 11(g)(2) because it falls outside the scope of plaintiffs' notice of intent to sue[40] and that this argument fails on the merits.   The court concludes that plaintiffs provided adequate notice and that by excluding ephemeral streams the Forest Service failed to demonstrate compliance with the design criteria.

### a.   Notice of the Ephemeral Stream Argument

The ESA requires a would-be private plaintiff to notify both the party alleged to be in violation of the ESA and the Secretary

---

[39] Plaintiffs make several tangential arguments regarding survey methodology.  Because the agencies appear to agree that surveys are only required in suitable habitat, and because plaintiffs have not refuted the determination that no habitat was suitable, no surveys were required, and the question of survey methodology is irrelevant.

[40] Defendants have not argued that plaintiffs failed to provide notice with regard to any of plaintiffs' other theories of ESA liability.   Moreover, although defendants contend that the administrative exhaustion requirement of 7 U.S.C. § 6912(e) applies to ESA claims against the Forest Service, defendants do not argue that plaintiffs' failed to administratively exhaust their ephemeral stream argument.

1  of the pertinent Service of the plaintiff's intent to sue at least

2  60 days prior to filing suit.  ESA § 11(g)(2)(A)(i), 16 U.S.C. §

3  1540(g)(2)(A)(i).  This requirement is jurisdictional.  Sw. Ctr.

4  For Biological Diversity v. Bureau of Reclamation, 143 F.3d 515,

5  520 (9th Cir. 1998).  "A failure to strictly comply with the notice

6  requirement acts as an absolute bar to bringing suit under the

7  ESA."  Id. at 522 (citing Hallstrom v. Tillamook County, 493 U.S.

8  20, 26-28 (1989) and Lone Rock Timber Co. v. U.S. Dept. of

9  Interior, 842 F. Supp. 433, 440 (D. Or. 1994)).

10      Here, defendants concede that plaintiffs properly submitted

11 a timely notice to the proper parties. Defendants' argument is that

12 plaintiffs' claim regarding suitability of ephemeral streams falls

13 outside the scope of this notice.  The notice must "provide

14 sufficient information of a violation so that the Secretary or

15 [alleged violator] could identify and attempt to abate the

16 violation."  Sw. Ctr. for Biological Diversity, 143 F.3d at 522.

17      Two Ninth Circuit cases have addressed whether ESA notice

18 letters were sufficiently specific, and the letter at issue in this

19 suit surpasses the thresholds set by these cases. In Southwest

20 Center, plaintiffs' complaint argued in pertinent part that the

21 Bureau of Reclamation was violating the ESA "by allowing its

22 operations to jeopardize the [Southwestern Willow] Flycatcher, and

23 . . . by 'taking' Flycatchers in the Lake Mead delta without a

24 valid incidental take statement."  143 F.3d at 519.  Although

25 plaintiffs had timely submitted three notice letters, none of these

26 letters indicated that plaintiffs "had a grievance about the

1  Flycatcher habitat at the Lake Mead delta." Id. at 521.  Without
2  this information, the letters failed to "provide sufficient
3  information of a violation so that the Secretary [of the Interior]
4  or the [Bureau of] Reclamation could identify and attempt to abate
5  the violation." Id. at 522.  Instead, these letters merely
6  demonstrated that plaintiffs desired consultation regarding the
7  Bureau's operations in a different geographical area and that
8  plaintiffs believed that a memorandum of agreement regarding
9  management of that area should be invalidated. Id. at 521.  The
10 Northern District of California recently relied on Southwest Center
11 to hold that where the notice of intent to sue identified the
12 location of the asserted violation, the provisions of the ESA at
13 issue, and the agency action at issue, the notice was sufficiently
14 specific. Ctr. for Biological Diversity v. Chertoff, No. C-08-
15 2999, 2009 WL 839042, *4 (N.D. Cal. Mar. 30, 2009).

16     In Marbled Murrelet v. Babbitt, 83 F.3d 1068 (9th Cir. 1996),
17 the court held that plaintiffs had provided adequate notice
18 regarding their ESA § 7(a)(2) claim notwithstanding the fact that
19 the notice letter primarily focused on ESA § 9.  83 F.3d at 1073.
20 Because the letter included a sentence reciting the pertinent
21 section 7 obligations and asserting a violation thereof, "the
22 letter as a whole provided notice sufficient to afford the
23 opportunity to rectify the asserted ESA violations." Id.

24     In this case, plaintiffs' notice letter argued that the Forest
25 Service violated the ESA by designating routes within the ENF
26 without adequately consulting with FWS, thereby violating ESA §

1  7(a)(2).   Fed. Defs.' Supp. Br. Ex. A, 10-11 (Dkt. 74-1).   The

2  notice letter highlighted the importance of "suitable breeding and

3  non-breeding habitats," id. at 4, and argued that the decision

4  designates routes through streams and other aquatic resources,

5  which will harm the California red-legged frog, id. at 9-10.  Thus,

6  plaintiffs provided all of the information that was found lacking

7  in Southwest Center.  Under Marbled Murrelet, it is irrelevant that

8  the notice letter also asserted violations of ESA §§ 2(c), 7(a)(1),

9  9, or that the letter's primary argument regarding consultation was

10 not the ephemeral streams argument at issue here.

11      Defendants argue that further specificity was required,

12 relying on ONRC Action v. Columbia Plywood, Inc., 286 F.3d 1137

13 (9th Cir. 2002).   ONRC Action is inapplicable here because it

14 rested on a Clean Water Act ("CWA") regulation with no analogue

15 under the ESA and on particular facts not present here.  Beginning

16 with the first issue, the language of the ESA and CWA notice

17 requirements is similar.   16 U.S.C. § 1540(g)(2); 33 U.S.C. §

18 1365(b)(1)(A).  "[C]ourts generally interpret similar language in

19 different statutes in a like manner when the two statutes address

20 a similar subject matter." U.S. v. Novak, 476 F.3d 1041, 1051 (9th

21 Cir. 2007) (citing Metro. Life Ins. Co. v. Taylor, 481 U.S. 58, 65

22 (1987); Northcross v. Bd. of Educ., 412 U.S. 427, 428 (1973)).

23 However, where regulations have been promulgated under one such

24 statute but not the other, cases interpreting those regulations do

25 not apply to the latter statute.  Glenbrook Homeowners Ass'n v.

26 Tahoe Reg'l Planning Agency, 425 F.3d 611, 615-16 (9th Cir. 2005).

1  An Environmental Protection Agency regulation interprets the CWA
2  notice provision, and this regulation includes an extensive list
3  of information that must be included in the notice.  40 C.F.R. §
4  135.3(a).  No analogous regulation exists under the ESA.  ONRC
5  Action rested in part on this regulation.  386 F.3d at 1143
6  (quoting 40 C.F.R. § 135.3(a)).  Thus, ONRC Action provides limited
7  guidance, if any, to interpretation of the ESA's notice provision.

8      ONRC Action also relied on an unusual factual situation not
9  present here.  The complaint in that case offered three theories
10  as to why a permit was invalid.  The notice letter had "in quite
11  explicit language . . . put forward a particular theory on which
12  the permit was invalid," without discussing the other two theories.
13  Id. at 1143.  The court held that notice was inadequate as to these
14  other theories.  "[W]hen the 60-day notice so specifically
15  identified only one attack," the defendant "was not required to
16  speculate as to all possible attacks."  Id.  As other courts have
17  observed, ONRC Action "was silent as to whether a more generalized
18  notice (i.e., one merely stating that the permit was invalid) would
19  have been sufficient."  N. Calif. River Watch v. Lake County
20  Sanitation Dist., No. C 03-4552, 2004 WL 3154580, *3 (N.D. Cal.
21  Sept. 2, 2004) (interpreting the CWA's notice provision).  In this
22  case, plaintiffs' notice did not specifically argue that the Forest
23  Service's failure to evaluate the suitability of ephemeral streams
24  precluded reliance on the programmatic consultation.  Nonetheless,
25  the notice broadly argued that possible effects on frogs precluded
26  reliance on the programmatic consultation.  Fed. Defs.' Supp. Br.

1  Ex. A, 10 (Dkt. 74-1). Although the notice advanced some arguments
2  as to which effects had not been considered or as to why the
3  programmatic consultation could not be used, these arguments, when
4  read in the context of the notice as a whole, were not so
5  "particular" and "specific" as to implicitly disclaim reliance on
6  other theories supporting plaintiffs' broader argument.

7      Accordingly, plaintiffs provided adequate notice of their
8  ephemeral stream argument.

9          **b.   Merits of the Ephemeral Stream Argument**

10     Plaintiffs argue that because riparian conservation areas
11  include ephemeral streams, the Forest Service was required to
12  analyze whether routes near ephemeral streams intruded on suitable
13  habitat.  The court concludes that the Forest Service improperly
14  excluded ephemeral streams from its analysis, and thereby failed
15  to determine whether the routes actually complied with the design
16  criteria.

17     Ephemeral streams are those that "are not connected to the
18  subsurface water system and flow only in response to intense
19  rainstorms that exceed the infiltrative capacity of the soil or
20  during snowmelt. . . . Since ephemeral streams do not have a
21  sustainable source of flow, they are not able to support riparian
22  plant species." Dkt. 74-2 (SNFPA FEIS page 203).[41]

23     Riparian conservation areas include areas surrounding

24
25     [41] The administrative record provided to the court included
   the index to the SNFPA EIS, but not the EIS itself.  The court
26  concludes that consideration of this document is appropriate, and
   no party has objected to its inclusion.

ephemeral streams.  As explained in the final EIS:

> The Riparian Conservation Area (RCA) is 300 feet on each side of perennial streams, 150 feet on each side of *seasonal streams*, and 300 feet surrounding special aquatic features (lakes, ponds, meadows, springs, bogs, bogs, and other wet areas).  The RCAs are designated in the Sierra Nevada Forest Plan Amendment (SNFPA 2004).

AR 2530 (FEIS 3-33 n.2) (emphasis added).  The Record of Decision for the SNFPA, cited by the EIS, states that the term "seasonally flowing streams" "includes intermittent and ephemeral streams." AR 10979.

The final EIS explicitly excluded ephemeral streams from its discussion of riparian conservation areas.  AR 2534; see also AR 2424 n.3, 2676 n.11, 2680 n.14.  The parties agree that BA similarly excluded ephemeral streams from the analysis.  Thus, under the multi-step suitability analysis discussed above, the first step (using the GIS) never identified ephemeral streams as potentially suitable habitat.

The parties dispute whether ephemeral streams can provide suitable habitat, but the preliminary question is whether the Forest Service considered this issue.  If the Forest Service properly determined that ephemeral streams could not provide suitable habitat, then no further discussion of ephemeral streams was required in the analysis of the design criteria, and this theory of ESA liability fails.

All parties' arguments primarily rely on the same passages in the record, which define the elements of suitable frog habitat:

> Aquatic breeding habitats are standing bodies of fresh water . . . including: natural and manmade (e.g. stock) ponds, slow moving streams or pools within streams, and other ephemeral or permanent water bodies that typically become inundated during winter rains and hold water for minimum of 20 weeks in all but the driest of years. . . .
>
> Non-breeding aquatic habitats consist of the fresh water habitats described above, that may or may not hold water long enough for the subspecies to hatch and complete its aquatic life cycle, but that do provide for shelter, foraging, predator avoidance, and aquatic dispersal for juvenile and adult California redlegged frogs. Other wetland habitats that would be considered to meet these elements include but are not limited to: plunge pools within intermittent creeks; seeps; quiet water refugia during high water flows; and springs of sufficient flow to withstand the summer dry period. . . . Non-breeding habitats [in the ENF] are comprised of the 241.9 km (150.3 mi) of low-gradient perennial stream and 20.6 km (12.8 mi) of low-gradient seasonal stream adjacent to the low-gradient perennial reaches as well as other aquatic features such as seeps.

AR 12,895-96 (BA) (citations omitted).[42]   Except for the last sentence, the BA quotes this language from FWS's rule designating critical habitat for the California red-legged frog.[43]

---

[42] The record further defines "upland habitats" as areas bordering aquatic and riparian habitat.  AR 12,896.   The BA indicates that riparian conservation areas encompass upland habitat by including areas within 300 feet of perennial streams.  AR 12,896 n.8.   Because upland habitat is defined by proximity to aquatic habitat, it appears that the only pertinent question here is whether ephemeral streams may constitute aquatic breeding or non-breeding habitat.

[43] Specifically, the EIS cited the FWS's 2006 rule designating critical habitat for the California Red-Legged Frog, 71 Fed. Reg. 19244, 19262-63 (April 13, 2006); AR 1735 (citing this rule).  This rule was later revised, although the revision did not alter this language.   The parties note that subsequent to the travel

1    Plaintiffs argue that ephemeral streams may constitute both
2    aquatic breeding and non-breeding habitat. As to breeding habitat,
3    plaintiffs rely on the statement that this habitat can include
4    "ephemeral . . . water bodies." The term "ephemeral water bodies"
5    appears not to be a simple synonym for "ephemeral stream." Rather,
6    "water bodies" include streams, ponds, and perhaps other features.
7    See Fed. Defs.' Supp. Brief at 8 n.5. "Ephemeral," as used in the
8    SNFPA, only means "not connected to the subsurface water system."
9    Id. Ex. B. This explains why an ephemeral pond, for example, might
10   catch and retain rainwater for a period of 20 weeks or more, but
11   an ephemeral stream will dry up after the rain stops. Thus,
12   despite the reference to ephemeral water bodies in the definition
13   of aquatic breeding habitat, the BA implicitly but adequately
14   demonstrates that ephemeral streams cannot provide such habitat.

15       The BA does not, however, demonstrate that ephemeral streams
16   cannot provide suitable non-breeding habitat. As plaintiffs
17   observe, non-breeding habitat includes "ephemeral . . . water
18   bodies" and is not limited to bodies that hold water for at least
19   20 weeks. The Forest Service's brief argues that ephemeral streams
20   cannot constitute non-breeding habitat because "ephemeral streams
21   do not provide wetland areas or riparian vegetation." Fed. Defs.'
22   Supp. Br. 7. Although the record indicates that ephemeral streams
23   do not support riparian vegetation, id. Ex. B, defendants have not

24

25   management decision, the FWS repeated this language in its *Revised*
26   *Declaration of Critical Habitat for the California Red-Legged Frog*,
     75 Fed. Reg. 12,816, 12835 (March 17, 2010).

1  cited any explanation as to why riparian vegetation is necessary.

2  The BA merely states that non-breeding habitat must "provide for

3  shelter, foraging, predator avoidance, and aquatic dispersal."  AR

4  12,896.   The BA indicates that these needs can be met without

5  riparian vegetation.  In discussing upland habitat, the BA states

6  that "various vegetational series," including grasslands and

7  woodlands, can provide shelter, forage, and predator avoidance.

8  Id.  Common sense suggests that "aquatic dispersal" may occur when

9  water is present in low gradient ephemeral streams, regardless of

10  whether riparian vegetation is present, and defendants have not

11  argued otherwise.  Moreover, the BA specifically concluded that

12  low-gradient seasonal streams provided non-breeding habitat;

13  insofar as seasonal streams include ephemeral streams, this

14  suggests that low gradient ephemeral streams can provide non-

15  breeding habitat.

16     The only statement in the record approaching an explicit

17  discussion of whether ephemeral streams may provide suitable

18  habitat occurs in the EIS's explanation as to why ephemeral streams

19  were excluded from the overall analysis.  The EIS states that

20  ephemeral streams "generally do not contain aquatic habitat that

21  is considered necessary for the survival and reproduction" of any

22  threatened, endangered, and sensitive species.  AR 2534.  It is

23  unclear whether the Forest Service uses "necessary" as a synonym

24  for "suitable."  If it does, then this blanket assertion of

25  unsuitability is inadequate because the Forest Service has failed

26  to explain its basis.  On the other hand, if "necessary" and

"suitable" have distinct meanings, the Forest Service has overstepped its role under the ESA.  The Forest Service can only rely on the 2006 programmatic concurrence by strictly adhering to its design criteria.  A conclusion that routes were in habitat that was suitable but unnecessary would not adhere to these criteria, and would therefore require a separate concurrence from FWS.[44]

Finally, the court rejects defendants' contention that FWS's 2007 concurrence approved of the exclusion of ephemeral streams. Neither the draft BA nor the draft EIS stated that ephemeral streams were excluded from the analysis.  Instead, the draft EIS explicitly stated that riparian conservation areas included "150 feet [on] each side of ephemeral and seasonal streams."  AR 1582 (DEIS 76 n.2).  If the draft BA excluded ephemeral streams from analysis, it appears that nothing in the record communicated that fact to FWS.  Accordingly, the Forest Service cannot rely on an implicit approval from FWS to overcome the issues discussed above.

In summary, the programmatic consultation required the Forest Service to evaluate whether routes in riparian conservation areas were also in suitable habitat.  Ephemeral streams and their

---

[44] Defendants further argue that evaluating effects on ephemeral streams would be unreasonably difficult, in light of the difficulty in finding these streams using the GIS.  This was one reason given by the EIS for the blanket exclusion of ephemeral streams from analysis.  AR 2534.  Defendants provide no authority indicating that this difficulty excused the Forest Service from the consultation requirement.  If the Forest Service believes that ephemeral streams may provide suitable habitat, but that this habitat is too unimportant to warrant a difficult analysis, the Forest Service should reinitiate consultation–either programmatic or site-specific-and seek concurrence as to whether analysis of ephemeral streams is necessary.

surroundings are riparian conservation areas, but the Forest Service did not determine whether routes were near ephemeral streams or, if so, whether these areas provided suitable habitat. Accordingly, the Forest Service's conclusion that alternative Modified B satisfied the design criteria was arbitrary and capricious.

Once again, the question of remedy is another matter. The violation here deals with the Forest Service's failure to properly address whether roads were near "ephemeral streams," which by definition, can exist for 20 weeks or less. The parties are directed to brief what remedy is appropriate for this failure, in light of what would appear to be the great difficulty of even identifying such ephemeral streams, in a forest of 789,994 acres.

### 3. Core Recovery Areas

Finally, plaintiffs argue that "the Forest Service cannot ignore impacts to frog Core Recovery Areas [designated in the Recovery Plan] . . . by blindly deferring to the FWS's four-year-old programmatic concurrence; the agency itself remains obligated to ensure its actions comply with the ESA." Pls.' Response Br. 23 (Dkt. 60). The Forest Service was entitled to rely on FWS's concurrence "if a challenging party can point to no 'new' information–i.e., information that [FWS] did not take into account–which challenges the [concurrence's] conclusions." Pyramid Lake Paiute Tribe of Indians v. U.S. Dept. of Navy, 898 F.2d 1410, 1415 (9th Cir. 1990). Here, the recovery plan was promulgated by FWS four years before FWS issued the programmatic concurrence.

83

1  Accordingly, the recovery plan, and the designations of Core
2  Recovery Areas therein, are not "new" information that precludes
3  the Forest Service from relying on the programmatic concurrence.

4                          **IV. CONCLUSION**

5      For the reasons stated above, the parties' motions for summary
6  judgment (Dkt. Nos. 52, 57, and 58) are GRANTED IN PART AND DENIED
7  IN PART.

8      1.   The court GRANTS summary judgment to defendants as to
9           plaintiffs' claims regarding Subpart A of the Travel
10          Management Rule, the NEPA alternatives analysis, and the
11          adequacy of site specific data.  Plaintiffs' motion is
12          accordingly DENIED as to these claims.

13     2.   The court GRANTS summary judgment to plaintiffs as to
14          the NFMA and ESA claims, as explained in the body of
15          this order.  Defendants' motions are accordingly DENIED
16          as to these claims.

17     3.   The Eldorado National Forest Public Wheeled Motorized
18          Travel Management Record of Decision dated March 31,
19          2008 and the underlying Final Environmental Impact
20          Statement dated March, 2008 were adopted in violation of
21          the National Forest Management Act and the Endangered
22          Species Act.

23     4.   The court will conduct further proceedings regarding
24          remedy.  Within fourteen (14) days of the effective date
25          of this order, the parties SHALL file briefs proposing
26          a process and briefing schedule for use in addressing

remedies.

IT IS SO ORDERED.

DATED:  May 26, 2011.


LAWRENCE K. KARLTON
SENIOR JUDGE
UNITED STATES DISTRICT COURT